**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BANXCORP d/b/a/ BANXQUOTE, and NORBERT MEHL individually d/b/a BANXQUOTE,

Plaintiffs,

v.

COSTCO WHOLESALE CORPORATION, CAPITAL ONE FINANCIAL CORPORATION, CAPITAL ONE BANK (USA), N.A. and CAPITAL ONE, N.A., inclusive,

Defendants.

Civil Action No. 09-CV-1783 (KMK)

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs BanxCorp, d/b/a BanxQuote and Norbert Mehl individually d/b/a BanxQuote (collectively referred to as "BanxQuote" or "Plaintiffs"), by and through their attorneys, CANTER LAW FIRM P.C., for their Complaint against Defendants Costco Wholesale Corporation ("Costco"), and Capital One Financial Corporation, Capital One Bank (USA), N.A. and Capital One, N.A. (together "Capital One") (collectively referred to as "Defendants"), by and though its attorneys, CANTER LAW FIRM P.C., hereby allege, upon information and belief, as follows:

**PARTIES**

1. Plaintiff BanxCorp d/b/a BanxQuote is a New York corporation with its principal place of business at 199 Main Street, Suite 303, in the City of White Plains, County of Westchester and State of New York.

2. Plaintiff Norbert Mehl d/b/a BanxQuote is a resident of the City of New Rochelle, County of Westchester and State of New York and is the Chief Executive Officer of BanxQuote.

3. Defendant Costco Wholesale Corporation is a Washington corporation, with its principal executive offices located at 999 Lake Drive in the City of Issaquah, County of King, and State of Washington.

4. Defendant Capital One Financial Corporation is a Delaware Corporation with its principal executive offices located at 1680 Capital One Drive in the City of McLean, County of Fairfax, and State of Virginia.

5. Defendant Capital One Bank (USA), N.A. is a wholly owned subsidiary of Defendant Capital One Financial Corporation and is a national bank association organized under federal law with its principal executive offices at 4851 Cox Road in the City Glen Allen, County of Henrico, and State of Virginia.

6. Defendant Capital One, N.A. is wholly own subsidiary of Defendant Capital One Financial Corporation and is a federal savings bank with its principal executive offices at 1680 Capital One Drive, in the Town of McLean, County of Fairfax and State of Virginia.

**JURISDICTION AND VENUE**

7. Plaintiffs' first cause of action arises under the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq*., and their third cause of action arises under the Digital Millennium Copyright Act, 17 U.S.C. § 1202(b). Accordingly, this Court has subject-matter jurisdiction over this action pursuant to 18 U.S.C. § 1030(g), 28 U.S.C. § 1331 and 28 U.S.C. § 1338.

8. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, inasmuch as there is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. This Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367 because these claims are so related to Plaintiffs' claims under

federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in this District, and because a substantial part of the events giving rise to the claims occurred in this District, and a substantial part of the property that is the subject of this action is situated in this District.

11.     Defendants all are doing business in and/or have directed their activities at New York, and derive substantial revenue from the state of New York such that traditional notions of fair play and substantial justice would not be offended specifically this judicial district.

12.     Defendant Costco has been continually licensed to do business in the State of New York since 1990 and operates numerous Costco warehouse clubs in New York[1], serving close to a million people in New York through its warehouse clubs and in-store promotional vehicles (including the CostcoTV network), its costco.com e-commerce website, its weekly email campaigns and its monthly *Costco Connection* shopping and vendor catalog distributed by mail[2] and online at costcoconnection.com.

13.     Defendant Capital One has numerous offices as well as approximately 289 bank branches in New York, and is subject to the rules and regulations of the New York State Baking Department.

---

[1] *See* www.costco.com/Warehouse/Location.aspx?country=United%20States

[2] According to an initial audit report of *The Costco Connection* released by the Audit Bureau of Circulation (ABC) in September 2008, its circulation in New York consisted of 302,748 copies. Based on 2.5 readers per copy, as reported in March 2008 by Mediamark Research & Intelligence LLC ("MRI"), Costco reaches more than 756,870 monthly readers in New York.

14.     Defendants compete with Plaintiffs to sell financial products in New York, and generate daily interstate commerce and transactions, including a substantial amount of deposits and withdrawals, with funds continuously flowing in and out of New York State.

15.     The Court has personal jurisdiction over Defendants because Defendants have conducted and continue to conduct business in New York with a fair measure of permanence and continuity, and have otherwise committed acts giving rise to personal jurisdiction in New York, within the meaning of N.Y.C.P.L.R. §§ 301 and 302.

16.     Venue is proper under Civil L.R. 21(a) of the Southern District of New York, as the claim arose in Westchester County, Plaintiffs reside in Westchester County and Defendants conduct business at locations in Westchester County.

## NATURE OF ACTION

17.     Plaintiffs seek compensatory and punitive damages from Defendants for (1) Copyright Infringement; (2) "Hot News" Misappropriation under New York Common Law; (3) Violation of the Digital Millennium Copyright Act - Removal and/or Alteration of Copyright Management Information - 17 U.S.C. § 1202(b); (4) Common Law Fraud; (5) Breach of Contract; (6) Unfair Competition; and (7) Unjust Enrichment/Restitution.

## STATEMENT OF FACTS

18.     This case is about corporate corruption on a grand scale, committed by the largest membership warehouse club chain in the world – known as Costco[3], and ranked #29 on the

---

[3] Costco is publicly traded under the Nasdaq symbol COST, and has a market capitalization of $18.5 billion (as of 2/13/09), with annual revenues of $73 billion, and 142,000 employees. It has 550 warehouses, with 403 locations in 40 U.S. States & Puerto Rico (as of 11/22/08). It has 53.5 million cardholders, representing 29.2 million member households. *See* Costco's Company Profile at http://phx.corporate-ir.net/phoenix.zhtml?c=83830&p=irol-homeprofile as viewed on February 17, 2009.

Fortune 500 list[4] – in conjunction with the 10th largest depository institution in the United States – known as Capital One.[5]

19. Upon information and belief, in order to circumvent various government banking and bank holding company regulations, chartering, licensing requirements, and oversight, that would have subjected Costco to certain regulatory supervision, capital requirements, restrictions and guidelines, Costco decided to form a "Nonbank bank"[6] with direct banking service ("Direct Banking Service") by entering into an exclusive agreement with Capital One, who agreed to provide a co-branded hosting service to provide Costco's members' High Yield Savings Accounts & CDs.

20. Upon information and belief, on or about January 2004, Defendants' agreement enabled Costco to start offering co-branded money market savings accounts ("High Yield Savings Accounts") and certificate of deposit accounts ("CDs") to Costco's 53.5 million members nationwide; particularly targeting its Executive Members, with Capital One acting as the co-branded service provider and sponsor.

21. Upon information and belief, Defendants engaged in systematic, illegal use and access to and reproduction and distribution of Plaintiffs' BanxQuote registered trademark and service mark, and Plaintiffs' proprietary and copyrighted *original* database compilations and

---

[4] *See* money.cnn.com/magazines/fortune/fortune500/2008/snapshots/2649.html

[5] Capital One's common stock is listed on the New York Stock Exchange under the symbol COF. According to the FDIC, as of September 30, 2008, Capital One had combined total domestic deposits of $95.5 billion and total assets of $145.6 billion.

[6] According to the Barron's *Dictionary of Banking Terms* (2005), a Nonbank Bank is "[a]n institution that provides most of the services of a bank but is not a member of the Federal Reserve System and does not have a charter from a state banking agency. A nonbank bank may offer credit cards, consumer and commercial loans, savings accounts, and accounts with services similar to bank checking accounts. By avoiding government regulation, such businesses may be able to be more innovative and profitable than traditional government-regulated banks."

market research performance indexes known as the BanxQuote National Average Money Market and CD rates ("BanxQuote Indexes"), and illegally profiting therefrom.

22.     Through this arrangement, designed by Defendants for the primary purpose of facilitating the sale of co-branded High Yield Savings Accounts & CDs to Costco's own members, Defendants managed to steal 100% of the 2004-2008 database series of BanxQuote Indexes developed by BanxQuote for over two decades and at great effort and expense.

23.     Consequently, upon information and belief, Costco gained repeated and unauthorized clandestine access to BanxQuote's proprietary and copyrighted website at *www.banxquote.com*, by use of a pretextual and fraudulently obtained third party license, which masked Capital One's data retrievals from *BanxQuote.com* for over 1,800 days straight.

24.     Upon information and belief, the stolen BanxQuote Indexes enabled Defendants to *offer co-branded* High Yield Savings Accounts & CDs to Costco's 53.5 million members with unsurpassed ease and credibility during a 5-year period starting in January 2004.

25.     BanxQuote invested considerable efforts and resources, involving time and money in ongoing market research and development since its inception in 1984, to create the copyrighted BanxQuote Indexes, original database compilations which required complex custom software development and programming, computer program updates, original selection and arrangement of data, real time database input and output systems, complex algorithms and multiple computer hardware systems, and training.

26.     Equally important, were BanxQuote's significant efforts and resources to build a considerable market value for the BanxQuote brand, and utmost credibility of the BanxQuote Indexes in the national banking and financial institutional markets.

27. Upon information and belief, the stolen BanxQuote Indexes became an essential element in Costco's strategy to build a multibillion dollar High Yield Savings Accounts & CDs Direct Banking Service enterprise.

28. Upon information and belief, Defendants have therefore been engaged in a systematic program of unfair, unlawful, and corrupt business practices and practice of free-riding that continued for five (5) consecutive years.

29. Upon information and belief, through their illegitimate and illegal business practices, Defendants have taken the BanxQuote Indexes and systematically deployed them to successfully penetrate the market for High Yield Savings Accounts & CDs on Costco's behalf.

30. Upon information and belief, Defendants profited from the theft and use of Plaintiffs' BanxQuote Indexes.

31. Upon information and belief, Defendants refused to change their corrupt business model, because they considered the BanxQuote Indexes a vital element in their plan to keep growing their multibillion dollar enterprise and continued demand for Costco's High Yield Savings Accounts & CDs.

32. Upon information and belief, Defendants kept undermining and diluting demand for BanxQuote's own website traffic and user base, while at the same time building Defendants' own customer base, revenues and brands at BanxQuote's expense.

**A. The BanxQuote Indexes**

33. In 1984, after the U.S. banking industry and interest rates were deregulated, BanxQuote began systematically compiling, creating and publishing original works of authorship consisting of extensively researched, highly time-sensitive bank rate databases and indexes for a selected series of banking, mortgage and loan products throughout the United States.

34.     The BanxQuote Indexes were selected, coordinated and arranged in a complex and particular manner as independently determined and conceived from time to time by BanxQuote in its sole discretion and based upon Plaintiff Mehl's vast experience in the financial sector.

35.     BanxQuote grew into a company which, *inter alia*, developed and licensed certain intellectual property, including copyrighted financial market research indexes known as the BanxQuote Indexes, and provided related services under its BanxQuote registered trademark and service mark.

36.     BanxQuote became widely considered as the foremost provider of indexes and analytics that are frequently used as original benchmarks to measure the rates and performance of the U.S. banking and mortgage markets.

37.     The BanxQuote Indexes are maintained according to strict, original, consistent and systematic standards and procedures independently developed and updated by Plaintiffs for over twenty years.

38.     BanxQuote clients have included hundreds of financial institutions nationwide and its indexes are frequently licensed and used as a trusted source and performance benchmark by public policymakers, government agencies, GSEs such as Freddie Mac, and major banks.

39.     Since 1994, BanxQuote current and historical proprietary, original and copyrighted data, indices, charts and analytical tools are available to financial market professionals on over 250,000 Bloomberg Terminals worldwide under the screen name BANX.

40.     Separately, Plaintiffs operate *BanxQuote.com*, a retail online banking marketplace featuring dynamically updated real time market rates on banking, mortgage and loan products, connecting consumers (the buyers) with multiple financial institutions (the sellers, or service

providers) throughout the United States. Since their inception, the BanxQuote Indexes have also formed an integral part of the flagship website *BanxQuote.com.*

41.     Plaintiffs anticipated the potential growth and significance of its BanxQuote Indexes and the Internet as a direct banking platform, and in most instances, has consistently been several steps ahead of the competition, technologically, as well as in terms of inventiveness, creativeness, reputation and trustworthiness.

42.     For example, the BanxQuote Money Market Index is recognized by the Dow Jones Barron's Dictionary of Banking Terms as an "Index of rates paid by investors on negotiable certificates of deposit and high yield savings accounts, compiled weekly by BanxCorp."

43.     The BanxQuote Jumbo-Conforming Mortgage Index is typically used by government agencies and economists to analyze the historical spread between national average conforming and jumbo mortgage rates. It is used as an independent performance benchmark of the U.S. mortgage markets, while at the same time it is used by Freddie Mac as a proxy for the interest rate savings passed through to conforming mortgage borrowers, as shown in a chart on its website.

44.     The BanxQuote indices have been consistently used by some of the leading and most prestigious financial services companies in the United States.

45.     More recently for example, the 2008 Economic Report of the President issued by the White House, and a 2008 banking presentation by the U.S. Department of the Treasury contained BanxQuote charts and benchmark indexes illustrating the onset and magnitude of the financial market crisis.

46.     In 1985, a decade before the Internet became widely accepted, Plaintiffs started publishing online national and state by state average bank rates for comparison shopping through a proprietary computerized bulletin board system under the BanxQuote trademark.

47.     The Wall Street Journal published the BanxQuote Indexes for 18 consecutive years, subject to significant license fees.

48.     The BanxQuote Indexes were the first such indices to be published electronically worldwide by providing intra-day data-feeds via hundreds of thousands of institutional trading monitors through distribution arrangements with Reuters, Dow Jones Telerate, Bloomberg and Knight-Ridder MoneyCenter.

49.     Plaintiffs' *BanxQuote.com* website was launched at a BanxQuote National Banking & Media Conference held at the Salomon Brothers New York headquarters in 1995. The conference and multi-media event featured a series of forward-thinking roundtable discussions moderated by senior executives and editors of Bloomberg, Business Week, Dow Jones, Fortune Magazine, Reuters and others media, with the participation of banking regulatory officials and top financial industry executives from across the country.

50.     BanxQuote was among the first to produce co-branded websites incorporating the BanxQuote Indexes in partnership with third-party websites.

51.     BanxQuote was among the first to provide dynamic real-time quotes online, allowing banks to remotely update their rates 24x7 anytime, anywhere, by accessing the *BanxQuote.com* secure server with a confidential user name and password.

52. Since its inception, the BanxQuote Indexes have been frequently quoted and syndicated by leading print and online media[7], such as the following:

- Bloomberg (ongoing)
- Business Week - Current Figures of the Week (ongoing)
- The Wall Street Journal - BanxQuote Money Markets Table (1985-2002)
- WSJ.com BanxQuote Banking Center (1995-2002)
- The New York Times BanxQuote Banking Center (1996-2002)
- The Washington Post BanxQuote Banking Center (1996-1999)
- Business Week BanxQuote Banking Center (1997-1999)

53. To protect its valuable interest in the BanxQuote Indexes and other proprietary information, at the bottom over its webpage Plaintiffs displayed the following copyright management information: "© [year of publication] BanxCorp. All Rights Reserved."

54. To further protect its valuable intellectual property Plaintiffs registered the BanxQuote Index copyright with the United States Copyright Office pursuant to registration

[7] The BanxQuote Indexes have also received frequent press coverage by numerous other news organizations throughout the U.S., such as the following: Associated Press, CBS, U.S. News & World Report, USA Today, Forbes, Fortune, American Banker, Chicago Sun-Times, The Washington Post, Tribune Business News, Advance Publications, The Philadelphia Inquirer, Seattle Post-Intelligencer, Houston Chronicle, Dallas Morning News, The Boston Globe, St. Louis Post-Dispatch, South Florida Sun-Sentinel, Kansas City Star, St. Petersburg Times, Denver Rocky Mountain News, The Milwaukee Journal Sentinel, The Journal Record, The Record (Bergen County, NJ), Kiplinger's Personal Finance Magazine, Oakland Tribune, The Salt Lake Tribune, El Diario/La Prensa, The Boston Herald, Los Angeles Business Journal, Buffalo News (Buffalo, NY), Portland Press, Herald (Maine), Colorado Springs Gazette Telegraph and National Underwriter.

number TX 6-903-396, effective March 6, 2009, that covers for example BanxQuote Index updates from 10/1/2008 to 12/31/2008, infringed by Defendants.[8]

55.      These copyrights generally cover, but are not limited to, the original works of authorship consisting of the systematically researched and highly time-sensitive bank rate databases and indexes for a series of banking, mortgage and loan products throughout the United States, collected, selected, coordinated and arranged in a particular manner as independently determined and conceived from time to time by BanxQuote in its sole discretion.

**B.      Costco's Business Model and Membership Levels**

56.      Upon information and belief, Costco focuses on selling products and services at low prices, often at very high volume.

57.      Costco does not carry multiple brands or varieties where the product or service is essentially the same except when it has a house brand to sell.

58.      This results in high volume of sales from a single vendor, allowing further reduction in price, and reducing marketing costs.

59.      Costco is open only to members and offers three types of membership: Business, Gold Star (individual) and the Executive membership.[9]

60.      **Business** members qualify by owning or operating a business, and pay a $50 annual fee (in the U.S.) to shop for resale, business and personal use. This fee includes a spouse card.

---

[8] *See* Certificate of Registration annexed hereto as Exhibit "B"

[9]    *See* Costco's Investor Relations - Company Profile at http://phx.corporate-ir.net/phoenix.zhtml?c=83830&p=irol-homeprofile as viewed on February 17, 2009. *See also*, Costco's 10-K Annual Report for 2008 filed with the S.E.C. ("10-K")

61. Individual **Gold Star** members pay a $50 annual fee (in the U.S.), and membership is available to those individuals that do not own a business. This fee includes a free spouse membership.

62. **Executive Members** pay a $100 annual fee. In addition to offering all of the usual benefits, it allows members to purchase a variety of discounted business and consumer services *offered by Costco*, such as, auto and homeowner insurance, real estate, home equity and mortgage services, auto loans and refinancing, online investing, *(High Yield Savings Accounts & CDs) money market accounts*, etc., at substantially reduced rates.

63. The services are generally provided by third-parties and vary by state.

64. Executive members qualify for a 2% annual reward (which can be redeemed at Costco warehouses), up to a maximum of $500 per year, on all qualified purchases made at Costco. At the end of 2008, 2007 and 2006, Executive members represented 26%, 23% and 20%, respectively of Costco's primary membership base, - representing 6.7 million, 5.5 million, and 4.5 million respectively - and the percentage of Costco's net sales attributable to these members continues to increase.

65. According to its 10-K, Costco's membership base is made up as follows:

| Costco's Membership Breakdown | (in thousands) | | |
|---|---|---|---|
| | **2008** | **2007** | **2006** |
| Gold Star members | 20,200 | 18,600 | 17,300 |
| Business members | 5,600 | 5,400 | 5,200 |
| Total primary cardholders | 25,800 | 24,000 | 22,500 |
| Add-on cardholders | 27,700 | 26,400 | 25,200 |
| Total cardholders | 53,500 | 50,400 | 47,700 |
| Executive members *(extrapolated numbers)* | 6,700 | 5,500 | 4,500 |

**C. Costco's Multi-Channel Marketing & Sales Vehicles**

66.     Upon information and belief, Plaintiffs' BanxQuote Indexes were illegally embedded and ubiquitously integrated as an intrinsic part of Defendants' Co-Branded Direct Banking Service  through Costco's multi-channel "array of editorial, marketing and sales vehicles, both print and electronic, [which] are *the only way to reach Costco's 35 million cardholders* in the U.S. and Canada," such as the following:

   a.  *The Costco Connection* which "includes articles promoting Costco and its products," distributed at Costco warehouses and mailed monthly to 8 million Executive, Business and Gold Star members, and to Costco shareholders, with a total monthly readership of 20 million, and also available online at costcoconnection.com; [10]

   b.  The e-commerce website portal Costco.com which received more than 10 million unique visitors per month, and transacted more than 2.8 million orders online in 2007; [11]

   c.  Upon information and belief, weekly email campaigns, directed to Costco.com vendors, consists of more than 10 million opt-in Costco members;[12]

   d.  Upon information and belief, Periodic in-store promotions permit Costco warehouses, which generally operate on a seven-day, 69-hour week, include

---

[10] *See* www.costcoconnection.com/connection/2008mediakit/ as viewed on February 15, 2009. Readership figures are based on Costco's publicly declared "2.5 readers per copy (MRI 2007/08) x 8 million guaranteed circulation (October 2008)."

[11] *See* www.costco.com/Service/FeaturePage.aspx?ProductNo=11273284 as viewed on February 15, 2009 (by clicking on a link entitled High-Yield Savings Accounts & CDs). *See also The Costco Connection* 2008 Media Kit.

[12] *See The Costco Connection* 2008 Media Kit.

"in-store TVs" that "continually broadcast … to more than 50 million Costco shoppers as they enter Costco warehouses every month;" and

e. Upon information and belief, Costco conducts periodic mailings of *Costco Wallet of Savings* coupon books.[13]

**D. The Costco Connection's Member Profile**

67. According to public declarations by Costco[14], the profile of *The Costco Connection*'s audience, "Costco's best members," can be summarized as follows:

a. Costco's members are 6 times more likely to have a money market account, than the national average;

b. 56.5% of *The Costco Connection* readers have purchased products or services during the past 12 months as a result of seeing them in *The Costco Connection*;

c. 70.7% visited or used Costco's Web site;

d. 93% feel the editors of *The Costco Connection* respect their intelligence;

e. 93% have confidence in what they read in *The Costco Connection;*

f. During the coming year *The Costco Connection* readers will spend more than $33 billion just at Costco;

g. They have an Aggregate Buying Power (ABP) exceeding $840 billion;

---

[13] *See, e.g., The Costco Connection*, February 2006, at 45:

> Don't forget Costco's Wallet Full of Savings for a wide variety of service values, . . . Look for unique savings opportunities on . . . home equity, online investing, ***money market accounts***, . . . All of these values are summarized in one place. Visit costco.com, click on "Services," then click on "Wallet Special Offers" for complete details. [Emphasis added]

[14] *See The Costco Connection* 2007/2008 MRI survey results, as publicly disclosed by Defendant in its 2008 Media Kit.

h. "Truly, they are the cream of the crop."

**E. Costco's Foray Into the Direct Banking Business**

68. Upon information and belief, Costco's foray into the banking business, has been described as follows: [15]

> Unlike Wal-Mart, Costco hasn't sought its own banking charter. Instead it has partnered with some of the biggest names in the financial services industry, such as Capital One, Lending Tree, Symetra, American Express and Ameriprise.
>
> And the services have become an important driver for converting Costco members into executive members, a $55 price difference in membership fees that gains access to even deeper discounts on the same financial services offered to members.
>
> One reason to partner with others rather than trying to do banking on its own is that Costco is relieved of many of the legal and regulatory hassles.

69. Upon information and belief, Defendants feared that Costco's price-sensitive members would draw unfavorable comparisons between money market savings and CD rates offered by Costco relative to other more established competitors' interest rates, and that Cotsco's image for everyday low prices could erode their efforts to launch a successful Direct Banking Service with High Yield Savings Accounts and CDs.

70. This was one of the reasons why Defendants engaged in a clandestine plan to surreptitiously misappropriate and utilize Plaintiffs' prestigious BanxQuote Indexes as their Direct Banking Service core performance benchmark tool, by placing the BanxQuote Indexes at the heart of Costco's Direct Banking Service marketing and sales offerings during a 5-year period starting in January 2004.

**F. Defendants' Co-Branded Direct Banking Services**

---

[15] *See* http://www.seattlepi.com/business/252568_costco19.html as viewed on August 3, 2009.

71. Upon information and belief, from January 12, 2004, until December 31, 2008, the BanxQuote Indexes were illegally embedded and ubiquitously integrated as an intrinsic part of Defendants' Co-Branded Direct Banking Service through Costco's multi-channel array of editorial, marketing and sales vehicles.

72. Upon information and belief, Defendants were responsible for the illegal publication and distribution of the BanxQuote Indexes online on their co-branded website accessible via the Costco.com gateway link and on costcoconnection.com, for a period of approximately 1,800 consecutive days around the clock.

73. Upon information and belief, Defendants also generated approximately 146 million or more illegal media impressions of the BanxQuote Indexes, by mail and in print, through the publication of the BanxQuote Indexes in *The Costco Connection* as part of their co-branded High Yield Savings & CDs offerings in at least 10 or more instances between January 2004 and December 2008.[16]

74. Figure 1 below, illustrates one such example.

[16] Media impression figures are a conservative estimate based on *The Costco Connection*'s monthly publishing frequency, its Five Year Average Qualified Circulation Trend as represented by BPA Worldwide in reliance upon Costco's August 12, 2008, publisher's affidavit, and the March 2008 MRI readership study.

**Figure 1 – Snapshot of Defendants' Co-Branded Promotion in *The Costco Connection* and costcoconnection.com**

# *Exclusively for Costco members!*

**Plus, you can enjoy these special benefits:**

- *Easy access to your money with free checks and an ATM card*◊
- *Online transfers to and from your existing accounts*◊
- *No fees; get started with as little as $1,000*

To find out more, visit costco.com and click on Services, or call 1-866-630-7955. *Please mention Offer Code SAVE146CF*

Costco Executive Members receive a $50 interest credit on their first account opened with an initial deposit of $5,000.†

MEMBER FDIC
Capital One Bank

* As of 5/2/2007, if the daily balance of this money market account was $100 or more, the Annual Percentage Yield (APY) was 5.00%; if not, the APY was 0.00%. Minimum initial deposit amount is $1,000. Terms and conditions of this offer may change at any time. Rates are variable and may change at any time after account opening. This product is offered by Capital One Bank, member FDIC.

◊ Withdrawal limits apply.

** National Average of APYs for money market accounts as published by BanxQuote.com as of 5/22/07.

† To receive the $50 interest credit, you must be a Costco Executive Member at the time you open your account; this must be your first Capital One Direct Banking account of any kind through Costco; and you must fund your account with at least $5,000 within 30 days. The $50 interest credit will be credited to your account as interest income 4-6 weeks after you fund your account.

© 2007 Capital One Services, Inc. Capital One is a federally registered service mark. All rights reserved.

75. In all instances where Defendants used the BanxQuote Indexes, prospective investors had to visit Costco.com, and click on Services.

76. Upon visiting costco.com and clicking on Services, members found the only possible published access or gateway link to Costco's High Yield Savings Accounts & CDs, as highlighted in Costco's own website screenshot. *See* Figure 2 below.

**Figure 2 – Costco.com Services Portal Website Screenshot High Yield Savings Accounts & CDs Gateway Link**



77.     Then, once they clicked on the re-directed High Yield Savings Accounts & CDs

link, or by entering "direct savings" in the Costco.com search box, Costco members landed in

Defendants' co-branded website featuring the BanxQuote Indexes with Defendants' brands and

logos above, which stayed embedded on all website pages offering Defendants' co-branded High

Yield Savings Accounts & CDs. *See* Figure 3.

**Figure 3 – Defendants' Co-Branded Website Header**

Your Savings – Rising Rates Are Good News For Money Market Accounts, CDs," including the following chart entitled **"How The Rates Stack Up:"**

**Figure 4 – May 2006, *The Costco Connection* – Page 75 Editorial – *INSIDE COSTCO***

## How the rates stack up

HERE'S A LOOK at how Costco and Capital One's CDs and money market accounts compare to national averages. (Rates assume a $5,000 deposit.)

| | Costco members | National average† |
|---|---|---|
| Five-year CD | 5.32%* | 3.99% |
| Money market account | 4.51%** | 1.30% |

* Certificates of Deposit: As of 4/12/06, the annual percentage yield (APY) in effect for a 60-month CD with a deposit of less than $100,000, is 5.32%. Other rates and terms are also available. Rates subject to change without notice. A minimum deposit of $5,000 is required to open a CD. Fees could reduce earnings. A substantial penalty may be imposed for early withdrawal.

** Money Market Account: As of 4/12/06, if the daily balance of this money market account was $100 or more, the APY was 4.51%; if not, the APY was 0.00%. Minimum initial deposit amount is $5,000. Terms and conditions of this offer are subject to change without notice. Rates are variable and are subject to change. Fees could reduce earnings. Withdrawal limits apply.

These products are offered by Capital One, F.S.B. and Capital One Bank, members FDIC.

† Source: Banxquote.com national averages as of 4/12/06.

82. The pseudo-editorial offer above is one more example of Defendants unmistakable co-branding partnership, since the large print refers to "Costco and Capital One's CDs and money market accounts" compared to the BanxQuote national averages. In other words, the BanxQuote Indexes were being illegally used by Defendants in co-branded products and co-branded marketing channels.

83. Defendants' theft and redistribution of the BanxQuote Indexes took place day after day for five years. This was a planned, prolonged, secret scheme to arrange an unfair wholesale transfer of stolen market research information for competitive purposes.

## G. Volume of High Yield Savings Accounts & CDs Offered by Costco

84. The following conservative assumptions can be made concerning the makeup and volume of High Yield Savings Accounts & CDs offered by Costco during a 5-year period

starting in January 2004, (i) based Costco's multimedia marketing campaigns consisting of 10 million monthly visitors to Costco.com, 10 million weekly emails which drive more than 20% of Costco's annual online business, 8 million *Costco Connection* readers, 50 million monthly in-store CostcoTV viewers, and (ii) by performing a data overlay between Costco's own publicly disclosed member profiles as published by MRI, and the Federal Reserve 2007 Survey of Consumer Finances ("FRB-SCF"):

a. Costco's members have a median household income of $107,800 – "members who have high-end discretionary income" according to Costco – placing them within the 80-89.9 percentile of income ("High-end") of the FRB-SCF (Table 1).

b. The FRB-SCF (Table 6.B) shows that 100% of High-end U.S. households own transaction accounts, of which approximately 50% consist of Money Market and Savings accounts (Table 6.1) with a median value in excess of $6,000, and 19.9% of High-end U.S. households own CDs with a median value of $20,000.[18]

c. According to the Direct Marketing Association ("DMA") 2007 Response Rate Trends Report, based on over 1,600 DMA member campaigns from 2004 to 2007, catalogues generate response rates of 2.24%, and direct mail 2.15%. "Multi-channel marketing -- offering customers more than one way to buy

[18] MRI's research report shows that *The Costco Connection*'s readers are 6 times more likely than the national average to have a money market savings account, and 23.7% own CDs.

something -- has become common place. The meshed lines of different channels have resulted in a successful, synergistic marketing approach."[19]

d. As a matter of fact, Defendants ran their co-branded High Yield Savings & CDs multi-channel direct marketing campaigns, predicated upon the BanxQuote Indexes, more than a dozen times within *The Costco Connection*, on innumerable email campaigns, direct mail coupon books, online and through the CostcoTV in-store network.

e. It is therefore reasonable to assume that at one time or another during a 5-year period starting in January 2004, out of Costco's 53.5 million cardholders, at least 1 million members – less than 2% – had to have purchased High Yield Savings Accounts & CDs offered by Costco with a minimum deposit of at least $5,000.

85. Upon information and belief, Plaintiffs estimate that, by the end of 2008, Costco's Direct Banking Service assets comprised over $5 billion in High Yield Savings Accounts & CDs, all of which were raised through the unlawful use of the stolen BanxQuote Indexes.

**H. <u>The Fraudulently Induced BanxQuote License</u>**

86. Upon information and belief, in order to prevent Plaintiffs from discovering this secret cover-up before obtaining a license for the BanxQuote Indexes, Capital One fraudulently induced Plaintiffs to enter into a limited purpose licensing arrangement.

---

[19] Unless the ongoing direct marketing response rates would not have been at or above the 2% DMA national average – per individual campaign – there would have been no economic incentive for Defendants to have continued with this program, including the BanxQuote Index at the heart of it, for 5 consecutive years.

87. Due to the fact that at the time, Capital One already had a long-term ongoing business relationship with Plaintiffs through the separate e-commerce website *BanxQuote.com*, it would have been unlikely for Plaintiffs to detect the fraudulent cover-up.[20]

88. Thus, under a false pretense and without ever disclosing that it was truly acting for the benefit and on behalf of Costco, despite such actual or potential *conflict of interest*, Capital One started negotiating a license for the BanxQuote Indexes in December 2003.

89. On January 28, 2004, Capital One[21] executed a "limited, and non-transferable license" agreement ("BanxQuote License Agreement"),[22] commencing on January 12, 2004, with automatic annual renewals, ostensibly for Capital One's own use of the BanxQuote Indexes, but under the following terms and conditions:

> Company [Capital One] agrees and understands that it is <u>not permitted to sublicense, transfer, or assign</u> its rights hereunder and that it <u>shall not permit the redistribution</u> of the BanxQuote Data <u>by any other third party</u> without the express prior authorization of BanxQuote pursuant to a separate agreement or by mutually agreeable amendment executed and attached hereto."[23] [emphasis added].
>
> Company [Capital One] agrees: . . . b) to not knowingly encourage or participate in the unauthorized use of the BanxQuote Data, nor knowingly develop or market any software with the intention that such software shall be used to unlawfully manipulate the BanxQuote Data or otherwise in violation of the terms of this Agreement.[24]

90. The BanxQuote License Agreement further provides, among other things, the following:

---

[20] From 1997 until the end of 2008, Capital One was posting and offering its own private label High Yield Savings Accounts & CDs on the *BanxQuote.com* transactional e-commerce website, in consideration for additional fees.

[21] According to disclaimers on capitalone.com, Capital One Financial Corporation and its subsidiaries Capital One Bank (USA), N.A., and Capital One, N.A., all of which are Defendants in this action, provide the services and materials featured in their website.

[22] *See* BanxQuote License Agreement annexed hereto as Exhibit "A."

[23] *See* BanxQuote License Agreement Paragraph 1 annexed hereto as Exhibit "A."

[24] *See* BanxQuote License Agreement Paragraph 9 annexed hereto as Exhibit "A."

> Company [Capital One] recognizes that the BanxQuote Data are valuable assets of BanxQuote developed by the expenditure of considerable work, time, and money, and Company [Capital One] acknowledges that it has no proprietary interest therein.[25]
>
> Any dispute arising out of this Agreement shall be brought only in the courts of the State of New York and the parties hereto thereby consent to jurisdiction of those courts over them. This Agreement shall be governed by the laws of the State of New York without regard to the choice of law principles thereof. Should any action be brought to enforce this Agreement, the losing party shall pay all costs, expenses and reasonable attorneys fees incurred by the prevailing party to enforce this Agreement. This Agreement supersedes all prior agreements, promises, covenants, arrangements, communications, representations or warranties, where oral or written, by any officer, employee, or representative of any party hereto. No amendment shall be effective unless in writing and signed by authorized representatives of both parties.[26]

91. BanxQuote entrusted its most valuable assets, namely its BanxQuote Indexes, to Capital One, in their role of a trusted national banking institution, thereby giving rise to a fiduciary relationship of trust and confidence requiring an even stricter standard of behavior.

92. BanxQuote was expecting the highest standard of care and undivided loyalty from Capital One, and would have never expected that Capital One would breach its duties at BanxQuote's expense, by failing to perfect and protect BanxQuote's rights, "including, but not limited to, copyright."[27]

93. Notwithstanding, upon information and belief, as soon as the "limited, and non-transferable" BanxQuote License Agreement was signed, and despite the fact that it was intended only for Capital One's use, Capital One secretly started transferring and redistributing the BanxQuote Indexes to and by Costco, its partner – a prohibited third party.

---

[25] *See* BanxQuote License Agreement Paragraph 6 annexed hereto as Exhibit "A."
[26] *See* BanxQuote License Agreement Paragraph 10 annexed hereto as Exhibit "A."
[27] *See* BanxQuote License Agreement Paragraph 6 annexed hereto as Exhibit "A."

94. In hindsight, it is now painfully obvious that Capital One acted in bad faith and without offering Plaintiffs the benefit of full disclosure. Indeed, the BanxQuote License Agreement's implied covenant of good faith and fair dealing was breached by Capital One at signing.

95. Had Plaintiffs known at the time that Capital One's true intentions were to actually sublicense, transfer, or assign its rights to Costco, or to use or disseminate the BanxQuote Indexes in *co-branded Costco and Capital One* direct mail, print advertisements, newspaper advertisements, websites, and marketing presentations, Plaintiffs would have never agreed to grant the BanxQuote License Agreement.

96. The Costco Direct Banking Service was spawned over the course of five years on the back of Plaintiffs' BanxQuote Indexes without BanxQuote's knowledge and consent, facilitating Defendants' launch and development of a multibillion dollar value Direct Banking Service enterprise with member accounts nationwide, at BanxQuote's expense.

97. In fact, it was not until June 2008 that Plaintiffs – while conducting extensive research on the web about the usage of the BanxQuote Indexes and brand, in an entirely unrelated context – merely by coincidence discovered Costco's fraudulent cover-up and vital role in this mischievous scheme.

**I. <u>Defendants' Escalated Cover-Up During the Second Half of 2008</u>**

98. Nevertheless, when confronted by Plaintiffs upon discovering the fraud in June 2008, and despite overwhelming evidence to the contrary, Defendants continued with their infringements and deception. In fact, their attempts to cover up their illegal actions spanning from December 2003 until December of 2008 were redoubled.