UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BANXCORP d/b/a BANXQUOTE, and NORBERT
MEHL individually d/b/a BANXQUOTE,

                              Plaintiffs,

        -v-

COSTCO WHOLESALE CORPORATION,
CAPITAL ONE FINANCIAL CORPORATION,
CAPITAL ONE BANK (USA), N.A., and
CAPITAL ONE, N.A., inclusive,

                              Defendants.

Case No. 09-CV-1783 (KMK)


OPINION AND ORDER

Appearances:

Nelson E. Canter, Esq.,
Canter Law Firm P.C.,
White Plains, NY
*Counsel for Plaintiffs*

Nancy Jill Mertzel, Esq.,
Gibbons P.C. (NY),
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, U.S.D.J.:

Plaintiffs bring this case alleging copyright infringement, hot news misappropriation, fraud, breach of contract, unfair competition, and unjust enrichment in connection with Defendants' use of Plaintiffs' BanxQuote National Average Money Market and CD rates. Defendants move to dismiss the case in its entirety. For the reasons given herein, Defendants' Motion to Dismiss is granted in part and denied in part.

<u>I. Background</u>

<u>A. Factual Background</u>

For the purposes of this Motion to Dismiss, the Court accepts the allegations in the Second Amended Complaint ("SAC") as true.  Plaintiffs Norbert Mehl ("Mehl") and BanxCorp do business as BanxQuote.  (SAC ¶¶ 1-2.)  BanxQuote publishes "database compilations and market research performance ind[ices] known as BanxQuote National Average Money Market and CD rates" ("BanxQuote Indices").  (*Id.* ¶ 21.)  Plaintiffs describe the BanxQuote Indices as systematic compilations of selected banking, mortgage, and loan data that "are frequently used as original benchmarks to measure the rates and performance of the U.S. banking and mortgage markets."  (*Id.* ¶¶ 33-34, 36.)

Plaintiffs allege that Defendant Costco Wholesale Corporation ("Costco") entered into an agreement with Defendant Capital One Financial Corporation through its subsidiaries (collectively, "Capital One") to provide a co-branded direct banking service that offered high yield savings accounts ("HYSAs") and certificate of deposit accounts ("CDs") to Costco's members.  (*Id.* ¶¶ 19-20.)  On January 28, 2004, Capital One and BanxCorp entered into a limited, non-transferable license agreement (the "License Agreement") commencing on January 12, 2004 with automatic annual renewals.  (*Id.* ¶ 89.)  The License Agreement permitted Capital One to access and use, for limited purposes, the BanxQuote Indices and the data contained therein.  (*Id.* ¶¶ 89-91.)  Plaintiffs allege that at the time Capital One entered into this agreement, it was acting on behalf of Costco (without disclosure), and that Capital One breached the License Agreement by redistributing the BanxQuote Indices to Costco in order to benefit the co-branded banking services.  (*Id.* ¶¶ 88, 93.)  Plaintiffs allege that they would not have entered into the License Agreement had they known of Capital One's intentions.  (*Id.* ¶ 95.)  Finally, Plaintiffs

allege that data from the BanxQuote Indices have been distributed by Capital One and Costco in "direct mail, print advertisements, newspaper advertisements, websites, and marketing presentations" from December 2003 to December 2008.  (*Id.* ¶¶ 95-96, 98.)

B. Procedural Background

Plaintiffs, proceeding pro se, filed their Complaint on February 25, 2009, and filed an Amended Complaint on March 25, 2009.  After retaining counsel, Plaintiffs filed the SAC on September 2, 2009.

Plaintiffs allege seven causes of action.  The two federal causes of action are Count One, which alleges copyright infringement based upon Defendants' improper use of the BanxQuote Indices (*id.* ¶¶ 106-16), and Count Three which alleges violation of the Digital Millennium Copyright Act ("DMCA"), based on allegations that when Defendants copied the BanxQuote Indices they altered or removed the copyright management information BanxCorp had associated with the data, (*id.* ¶¶ 126-33).  The remaining causes of action arise under New York law.  Count Two alleges hot news misappropriation of the time-sensitive data contained in the BanxQuote Indices.  (*Id.* ¶¶ 117-25.)  Count Four alleges fraud based on allegations that Defendants materially misrepresented their intentions with respect to their use of the BanxQuote Indices pursuant to the License Agreement.  (*Id.* ¶¶ 134-43.)  Count Five alleges breach of contract against Capital One only, based on the alleged distribution to, and use of the BanxQuote Indices by, Costco in violation of the License Agreement.  (*Id.* ¶¶ 144-51.)  Count Six alleges unfair competition based on allegations that Defendants' use of the BanxQuote Indices gave Defendants an unfair competitive advantage both in terms of decreased web traffic at Plaintiffs' websites, and in terms of direct competition in providing HYSAs and CDs.  (*Id.* ¶¶ 121, 152-57.) Finally, Count Seven alleges unjust enrichment based on allegations that Defendants received value due to their wrongful use of the BanxQuote Indices.  (*Id.* ¶¶ 158-61.)  Defendants' Motion

3

to Dismiss was fully submitted as of December 10, 2009.  The Court held oral argument on May

11, 2010.

## II. Discussion

### A. Standard of Review

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's

factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor."  *Gonzalez*

*v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *see also Ruotolo v. City of New York*,

514 F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a complaint

pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all

reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)).  "In

adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated

on the face of the complaint, in documents appended to the complaint or incorporated in the

complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v.*

*Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).[1]

The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6)

motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide

the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted) (second alteration in *Twombly*).

---

[1] Plaintiffs submitted a document entitled "Plaintiffs' Affidavit of Norbert Mehl in Opposition to Defendants' Motion to Dismiss" with their Memorandum of Law.  (Dkt. No. 29.) As the Court indicated in its memorandum endorsement of Defendants' letter of December 10, 2009 (Dkt. No. 30), because the affidavit is not mentioned in the SAC, the Court will not consider the affidavit in resolving Defendants' Motion to Dismiss.  (Dkt. No. 30.)

Instead, the Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. If Plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (internal citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

### B. Federal Law Causes of Action

Defendants argue that Counts One (copyright infringement) and Three (DMCA violation) fail to state a claim. (Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") 3; SAC ¶¶ 106-16, 126-33.)

#### 1. Count One: Copyright Infringement

There is no disagreement as to the elements Plaintiffs must establish to state a claim for copyright infringement. (Defs.' Mem. 3; Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Mem.") 4.) "'To prevail on a claim of copyright infringement, the plaintiff must demonstrate both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant.'" *Cameron Indus., Inc. v. Caravan, Ltd.*, 676 F. Supp. 2d 280, 283-84 (S.D.N.Y. 2009) (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109-10 (2d Cir. 2001)); *see also*

*Porto v. Guirgis*, 659 F. Supp. 2d 597, 608 (S.D.N.Y. 2009) (requiring "'ownership of a valid copyright, and [] copying of constituent elements of the work that are original'" (quoting *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996))); *Lewinson v. Henry Holt & Co.*, 659 F. Supp. 2d 547, 559 (S.D.N.Y. 2009) (same) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); *R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 51 (S.D.N.Y. 2009) (requiring ownership of a valid copyright and "'unauthorized copying of the copyrighted work'" (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003))).  The second element is further broken down into two components: "[t]o establish infringement, the copyright owner must demonstrate that '(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protect[a]ble elements of the plaintiff's.'"  *Eyal R.D. Corp. v. Jewelex N.Y., Ltd.*, 576 F. Supp. 2d 626, 641 (S.D.N.Y. 2008) (quoting *Yurman Design*, 262 F.3d at 110); *see also Cameron Indus.*, 676 F. Supp. 2d at 284 (same); *Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 273 (S.D.N.Y. 2005) (same) (quoting *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)); *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 553 (S.D.N.Y. 2003) (same).

In this case, Defendants concede that Plaintiffs have pled actual copying, and do not contest that, if the works at issue are protectable, Plaintiffs own a copyright.  (Defs.' Mem. 3-8.) Instead, Defendants argue that Plaintiffs "have not validly alleged infringement of protectable elements of Plaintiffs' work."  (*Id.* at 3.)

There are three levels of generality at which Plaintiffs could be alleging copyright infringement.  The lowest level of generality is the raw data from which the BanxQuote Indices are created (the "raw data").  The second level of generality is the product of the raw data, i.e.

the actual average listed in the BanxQuote Indices (the "final value").  The third level of generality is the arrangement and presentation of the final values (the "arrangement").[2]  Both the final value and the arrangement are, in different ways, compilations, which the Second Circuit has suggested must meet three requirements for copyright protection:  "(1) the collection and assembly of preexisting data; (2) the selection, coordination, or arrangement of that data; and (3) a resulting work that is original, by virtue of the selection, coordination, or arrangement of the data contained in the work."  *Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc.*, 945 F.2d 509, 512 (2d Cir. 1991).

To advance their Motion, Defendants make two arguments.  First, Defendants contend that the raw data and final values are facts, which are not protectable, and not predictions or estimates, which Defendants concede would be protectable.  (Defs.' Mem. 4-6.)  Second, Defendants claim that "[t]o the extent that Plaintiffs claim [that] Defendants infringed copyright in a compilation, the claim should be dismissed because it is conclusory and implausible," and go on to argue that Plaintiffs have not alleged copyright in the arrangement.  (*Id.* at 6-8.) Plaintiffs respond by conceding that they do not allege a copyright in the raw data (Pls.' Mem. 3), but argue that they have a copyright in the final values (*id.* at 4-9), because the final values are not facts.  Plaintiffs make no claim that they have a copyright in the arrangement.

No copyright can exist in facts "because facts do not owe their origin to an act of authorship[,] . . . [and are] not created[,] . . . [but] merely discovered . . . ."  *Feist*, 499 U.S. at 347.  However, as originality, which is a constitutional requirement, "remains the *sine qua non*

---

[2] To illustrate by way of example, imagine that there are three banks in the world, A, B, and C, which offer interest rates of 4%, 5%, and 6%, respectively, on a given type of account. These facts are the raw data.  The average of these rates, 5%, is the final value.  The table or graph containing this, and other, final values, is the arrangement.

of copyright," "[f]actual compilations . . . may possess the requisite originality . . . [where] [t]he[] choices as to selection and arrangement . . . are made independently by the compiler and entail a minimum degree of creativity."  *Id.* at 348; *see also CDN Inc. v. Kapes*, 197 F.3d 1256, 1259 (9th Cir. 1999) ("Discoverable facts, like ideas, are not copyrightable.  But compilations of facts are copyrightable where the underlying facts are not.").

The Second Circuit has provided some guidance on how to determine the border between unprotected data and protectable compilations of data in the form of final values.  In dicta in *New York Mercantile Exchange, Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109 (2d Cir. 2007) ("*New York Mercantile*"), the Second Circuit was presented with the question of whether settlement prices for futures contracts were facts.  *Id.* at 114.  The court described the contracts as follows:

> A futures contract requires the delivery of a commodity at a specified price at a specified future time, though most contracts are liquidated before physical delivery occurs. . . . The settlement prices are used to value the open positions. . . . Unlike on a securities exchange, the settlement price may not be the final trade, for two reasons.  First, because of the nature of trading, it is not always clear which trade was the closing trade. . . . Second, . . . [f]or the "outer" months, those further from the trading date, there is often little or no trading on a particular day. . . . For high-volume months, settlement prices are based on a formula: "a weighted average of all trades done within the closing range." . . . For low-volume months, the extent of the . . . creative judgment is disputed.

*Id.* at 110-11 (footnote omitted).  The Second Circuit ultimately decided the case on alternative grounds, *id.* at 115 ("we do not decide whether settlement prices are unoriginal, and instead affirm based on the merger doctrine"), but stated that "there [wa]s a strong argument" that the settlement prices were unprotectable facts, *id.* at 114, though that argument was weaker for the low-volume months, *id.* at 116 (stating that if "there is no real market to speak of" in the low-volume months, the settlement prices "appear[] closer to creation, to making predictions of

expected values" (internal quotation and ellipsis omitted)).  As the *New York Mercantile* court noted:

> For high-volume months, settlement prices are determinations of how the market values a particular futures contract . . .[,] not how the market *should* value them or *will* value them.  Under this view, the market is an empirical reality, an economic fact about the world . . . .  So characterized, there is one proper settlement price; other seemingly-accurate prices are mistakes which actually overvalue or undervalue the futures contract.

*Id.* at 115 (emphasis in original).  Therefore, consistent with the dicta in *New York Mercantile*, when confronted with raw data that have been converted into a final value through the use of an original formula, the Court should put significant weight on the degree of consensus and objectivity that attaches to the formula.[3]  For example, if a scientist knew an object's mass and the force acting upon the object, this raw data could be converted into the object's acceleration due to that force by using the "formula" known as Newton's Second Law of Motion.  This use of a formula would merely discover an "empirical reality."  On the other hand, "formulae" that purport to identify the best baseball player based on some weighted composition of batting average, on-base percentage, defensive efficiency, and a myriad of other selective factors, are not discovering "empirical realities."  The difference lies in the originality of the method used to

---

[3] In *New York Mercantile*, the Second Circuit also engaged in a comparison of the settlement prices at issue, and the "compilation of estimated projections for used car prices" that the Second Circuit held merited copyright protection in *CCC Information Services, Inc. v. Maclean Hunter Market Reports*, 44 F.3d 61 (2d Cir. 1994).  *See N.Y. Merc.*, 497 F.3d at 115 n.5.  The crucial distinction between the two cases was that "[t]he values [in *CCC Information Services*] were based on assumptions about 'average' cars; as these cars did not exist, there could be no actual market to discover."  *Id.*  By contrast, "settlement prices can be seen as 'pre-existing facts' about the outside world which are discovered from actual market activity."  *Id.*  This analysis reinforces the point that when raw data are converted into final values, the final values should not be considered "facts" when the process of conversion contains at least minimal originality as evidenced by estimates or subjective decisions.  *See CCC Info. Servs.*, 44 F.3d at 67 (noting, post-*Feist*, that applying "professional judgment and expertise" to "a multitude of data sources" is sufficient to warrant protection under the Copyright Act).

compile or analyze the data.  *See Key Publ'ns*, 945 F.2d at 513 ("Selection implies the exercise of judgment in choosing which facts from a given body of data to include in a compilation."); *Eckes v. Card Prices Update*, 736 F.2d 859, 863 (2d Cir. 1984) (holding that the selection of 5,000 "premium cards" out of "18,000 or so different baseball cards" was sufficiently original to be protected under the Copyright Act).[4]

Since *New York Mercantile*, at least one district court has attempted to navigate the current state of the law, though noting that the point at which raw data have become copyright-able expressions through the use of sufficiently original formulae "has not been fully clarified by the Second Circuit."  *RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 676 F. Supp. 2d 9, 21 (D. Conn. 2009).  In that case, the court considered "load ratings" of ball bearings, which are measures of the "radial force a particular bearing having known geometric and physical attributes, such as size and quantity of balls, can withstand."  *Id.* at 16 (internal quotation marks omitted).  The exact values of the load ratings were "mainly a function of the geometry of the bearing and material, [but also considered] certain other 'life factors' enumerated in published industry guidelines . . . [such as] tolerances, material cleanliness, lubrication, hardness, and operating temperature."  *Id.*  The plaintiff's strongest argument that the load ratings were not mere facts was that "creativity [wa]s used in developing the load ratings . . . [, because] certain bearing manufacturers use the various 'life factors' . . . to adjust their load rating calculations from a standard calculation based only upon the geometrical features of the bearings."  *Id.* at 22.

---

[4] Of course, the formula chosen can be generally accepted and objective enough to constitute a "fact" without being completely accurate.  That is presumably true for settlement prices, and is even true for Newton's Second Law of Motion, which is inaccurate because it fails to consider relativistic effects.  *See Albert Einstein & the Theory of Relativity*, http://csep10.phys.utk.edu/astr161/lect/history/einstein.html (last visited May 24, 2010) (lecture from "Astronomy 161" course at the University of Tennessee, Knoxville).

However, the court found that argument unpersuasive in the light of *New York Mercantile*, because

> [w]hile there may be some level of judgment involved in selecting which particular "life factors" to utilize in adjusting the standard load rating calculation, based upon the record before the Court such judgment is very minimal given that the relevant life factors are published in industry guidelines. The level of judgment necessary to calculate the load rating information is undoubtedly no more than that needed to determine the settlement prices at issue in [*New York Mercantile*] . . . .

*Id.* However, as in *New York Mercantile*, the court did not rest its decision solely on this ground, and stated that it would reach the same decision even if "the load bearing ratings are expressions rather than facts," because of the court's application of the merger doctrine. *Id.* at 23. The court's reasoning, therefore, like the reasoning in *New York Mercantile*, is merely dicta.

Nonetheless, the Court considers the reasoning in *New York Mercantile* and *RBC Nice Bearings* as persuasive authority. The key factors uniting these decisions, and distinguishing the results from that in *CCC Information Services*, are: (1) the raw data used to create the final value were unprotectable facts; (2) the method of converting raw data into the final value was an industry standard, or otherwise widely accepted as an objective methodology; and (3) the final value attempted to measure an empirical reality. When these three things are true, the final value produced from raw data ordinarily is not protected by copyright. In other words, to demonstrate that the final values produced from raw data are protectable by copyright, a plaintiff must demonstrate either that (1) the raw data used to create the final value were protectable; *or* (2) the method of converting the raw data into a final value was an original (but not necessarily novel) process that is neither widely accepted as objective, nor an industry standard; *or* (3) the final

value did not attempt to measure an empirical reality.[5]  This test captures the Supreme Court's focus on "minimal" originality, as an expression can be copyrighted if minimal originality exists in the raw data, the method of producing the final value, or the object the final value attempts to measure.  *See CDN, Inc.*, 197 F.3d at 1259 ("Although the requirement of originality is a constitutional one inherent in the grant to Congress of the power to promote science and the useful arts, the required level of originality is 'minimal.'" (quoting *Feist*, 499 U.S. at 358)).  Furthermore, the test captures the Second Circuit's observation that "the exercise of judgment in choosing [] facts" is sufficient to warrant protection under the Copyright Act.  *Key Publ'ns*, 945 F.2d at 513.  The plaintiffs in *New York Mercantile* and *RBC Nice Bearings* failed this test for the reasons outlined above.[6]

The Court will, therefore, apply this analysis to the SAC.  The SAC repeatedly refers to the BanxQuote Indices as "original" and "creative" (SAC ¶¶ 21, 25, 33, 36-37, 55, 107-08, 110), but without underlying facts supporting these conclusions, such statements are not by themselves sufficient.  *See Twombly*, 550 U.S. at 555 (noting that a plaintiff must do more than provide "labels and conclusions").  The SAC also repeatedly refers to the time and expense involved in creating the BanxQuote Indices (SAC ¶¶ 22, 25, 33, 37, 118), but facts can be just as expensive and time consuming to discover as protectable expressions can be to produce.  *See Eldred v.*

---

[5] The distinction between original and novel was drawn by the Supreme Court in *Feist*. *See*, 499 U.S. at 345 ("Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.").

[6] The plaintiff in *CCC Information Services* passed the test because projected values of hypothetical average cars did not measure an objective reality.  *See CCC Info. Servs.*, 44 F.3d at 67 (describing the final value as an "abstract concept"); *see also N.Y. Merc.*, 497 F.3d at 115 n.5 (emphasizing that the final value in *CCC Information Services* measured something that "did not exist").

*Ashcroft*, 537 U.S. 186, 236 (2003) (noting that the "sweat-of-the-brow view of copyright . . . was emphatically rejected by [the Supreme Court] in 1834"); *Feist*, 499 U.S. at 359-60 ("[O]riginality, not 'sweat of the brow,' is the touchstone of copyright protection . . . ."); *Sparaco v. Lawler, Matusky, Skelly, Eng'rs LLP*, 303 F.3d 460, 466 (2d Cir. 2002) (noting that "the earlier notion that an author's labor in discovering facts justified giving the author protection against the copying of those facts" has been "repudiate[d]").  Similarly, the SAC repeatedly refers to how authoritative the BanxQuote Indices are (SAC ¶¶ 36, 38, 43) but, if anything, these statements undercut Plaintiffs' case because they suggest that the methodology of the BanxQuote Indices has achieved industry-wide acceptance.[7]

More concrete, are the various descriptions of the BanxQuote Indices which are scattered throughout the SAC.  These include allegations that the BanxQuote Indices are: (1) "original database compilations which required complex custom software development and programming, computer program updates, original selection and arrangement of data, real time database input and output systems, complex algorithms and multiple computer hardware systems, and training" (*id.* ¶ 25); (2) the result of "systematically compiling, creating and publishing original works of authorship consisting of extensively researched, highly time-sensitive bank rate databases and ind[ices] for a selected series of banking, mortgage and loan products throughout the United

---

[7] Though at first counter-intuitive, it is actually to be expected that the more acceptance a financial measure obtains (i.e. the more successful it is), the more "fact-like" it becomes.  Just as scientific theories start as mere speculation and eventually gain a patina of objectivity, economic indicators that we now rely on, such as CPI, were once just glimmers in the eyes of economists. *Compare* Inflation, http://www.britannica.com/EBchecked/topic/287700/inflation (last visited May 24, 2010) (outlining four basic theories of inflation, the oldest of which dates back to David Hume in the eighteenth century) *with* Bureau of Labor Statistics Handbook of Methods, Ch. 17 The Consumer Price Index, at 7-11 (updated June, 2006), *available at* http://www.bls.gov/opub/hom/pdf/homch17.pdf (outlining the history of the Federal Government's official measurement of inflation starting in 1919).

States" (*id.* ¶ 33); (3) "selected, coordinated and arranged in a complex and particular manner" (*id.* ¶ 34); (4) "original works of authorship consisting of the systematically researched and highly time-sensitive bank rate databases and ind[ices] for a series of banking, mortgage and loan products throughout the United States, collected, selected, coordinated, and arranged in a particular manner" (*id.* ¶¶ 55, 110); (5) produced by "compiling thousands of constantly changing interest rates and banking information from discretionary and periodically changing leading banks in all fifty states of the United States at a substantial cost, both monetary and in the form of corporate resources and sophisticated technological infrastructure" (*id.* ¶ 118); and (6) "based on thousands of variable interest rates subject to change at any time by the banks, Fed Funds, the U.S. Treasury market, domestic and global money markets, London Interbank LIBOR rates, Eurodollar markets, bond markets, futures markets and foreign exchange markets," (*id.* ¶ 119 (footnote omitted)).

As an initial matter, it is clear from these descriptions, that Plaintiffs cannot seek copyright protection based upon the underlying raw data, which consists of unprotectable facts about interest rates charged by certain banks and a variety of economic indicators.  These are akin to the actual trade values at issue in *New York Mercantile*, and the physical characteristics of the ball bearings in *RBC Nice Bearings*.  Therefore, Plaintiffs have failed to establish the requisite originality in the raw data.  Similarly, the object of the BanxQuote Indices is to measure, among other things, the "rates paid by investors on negotiable certificates of deposit and high yield savings accounts" (SAC ¶ 42), which is an objective fact about the banking market.  This is akin to the attempt to measure the value of settlement prices as they are (not as they *should* be or *will* be) in *New York Mercantile* or the radial strength of ball bearings in *RBC*

*Nice Bearings*.  Therefore, Plaintiffs have failed to establish originality in the object of the final values.

The remaining question, therefore, is whether Plaintiffs have pled sufficient facts to allege "minimal" originality in the method of converting the raw data to the final values. Plaintiffs allege that the method involves "complex algorithms."  (SAC ¶ 25.)  Alone, this is insufficient.  *See Sparaco*, 303 F.3d at 466 (noting that difficulty in production does not render the product copyrightable).  Plaintiffs, understandably, do not wish to reveal the algorithms they use, but they must allege facts about the creation or execution of the algorithms that establish that they are sufficiently original.  To this end, Plaintiffs further allege that the methodology was developed "independently."  (SAC ¶¶ 34, 37, 55, 110.)  This is relevant, as it suggests that the methodology is neither widely used nor an industry standard, but is not sufficient because purely objective methodologies could be developed independently.  *See N.Y. Merc.*, 497 F.3d at 114 n.4 (noting the difference between "independent creation," and "creativity").  Plaintiffs come closer to the mark when they allege that the raw data consist, in part, of "banking information from discretionary and periodically changing leading banks."  (SAC ¶ 118.)  However, this allegation would not be sufficient to rule for Plaintiffs as a matter of law because, as in both *New York Mercantile* and *RBC Nice Bearings*, it is possible to exercise discretion at such a minimal level that no originality enters the process.[8]  *See Feist*, 499 U.S. at 359 ("There remains a narrow category of works in which the creative spark is utterly lacking *or so trivial as to be virtually*

_____

[8] For example, if the discretion being exercised is merely the choice between using one industry standard list of "leading banks" and another, that would probably be an insufficient exercise of discretion.  However, if the leading banks are chosen through a purely subjective assessment of various banks' importance to the global market, that could introduce a sufficient degree of originality into the process as to render the final values protectable.

*nonexistent*.  Such works are incapable of sustaining a valid copyright." (internal citation

omitted) (emphasis added)).  However, Plaintiffs' claim of originality is also bolstered by the list

of other factors the BanxQuote Indices consider, namely "thousands of variable interest rates . . .,

Fed Funds, the U.S. Treasury market, domestic and global money markets, London Interbank

LIBOR rates, Eurodollar markets, bond markets, futures markets and foreign exchange markets .

. . ."  (SAC ¶ 119 (footnote omitted).)  It is possible that this list is simply an abbreviated way of

saying that the BanxQuote Indices consider every important financial indicator, but there is no

immediately apparent reason why these economic measures were considered and others were

omitted (why, for example, the London Interbank Offered Rate (LIBOR) and not the equivalent

Japanese (TIBOR) or German (FIBOR) rates?).  *See N.Y. Times Co. v. Tasini*, 533 U.S. 483, 515

n.12 (2001) ("[S]election alone [can demonstrate] sufficient originality to merit copyright

protection." (internal quotation marks omitted)); *Feist*, 499 U.S. at 348 (noting that compilations

"may possess the requisite originality" for copyright protection because, inter alia, "[t]he

compilation author typically chooses which facts to include"); *Key Publ'ns*, 945 F.2d at 512-13

(allowing copyright protection for a work "that is original[] by virtue of the selection,

coordination, or arrangement of the data included in the work").  It is also reasonable to infer,

given the varied nature of these economic indicators, that a meaningful amount of discretion and

subjectivity is required in deciding how to weigh the various indicators and how to combine

them into a single final value.  It is, therefore, plausible to infer that the BanxQuote Indices do

not contain simple mathematical averages, but are instead created through judgment being

applied to disparate indicators.  Indeed, Plaintiffs allege that they exercise discretion over exactly

which values to use from within certain categories of indicators (such as "leading banks").

These allegations are sufficient to get Plaintiffs to first base.  *See CDN Inc.*, 197 F.3d at 1260

16

(finding that the process of publishing wholesale prices of coins was sufficiently original to be copyrightable); *Key Publ'ns*, 945 F.2d at 513 (concluding that a selection of businesses to include in a directory showed sufficient "exercise of judgment" to be creative and protectable under the Copyright Act); *Lipton v. Nature Co.*, 781 F. Supp. 1032, 1034 (S.D.N.Y. 1992) (concluding, post-*Feist*, that a compilation of terms of venery from Middle English was protectable under the Copyright Act because, inter alia, there was originality in the selection both of the terms and the translations); *Budish v. Gordon*, 784 F. Supp. 1320, 1332-33 (N.D. Ohio 1992) (concluding, post-*Feist*, that a Medicaid planning book, which included tables summarizing selected state laws, was sufficiently original to merit copyright protection).[9]

Finally, the Court must consider whether copyright protection is barred by the merger doctrine. "[I]deas cannot be copyrighted. Instead, only the manner of an idea's expression is copyrightable." *N.Y. Merc.*, 497 F.3d at 116 (internal quotation, citation, and brackets omitted). "To ensure free access to ideas, courts have applied the merger doctrine such that . . . 'expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself.'" *Id.* at 116-17 (quoting *Kregos v. Associated Press*, 937 F.2d 700, 705 (2d Cir. 1991)); *see also Bus. Mgmt. Int'l, Inc. v. Labyrinth Bus. Solutions, LLC*, No. 05-CV-6738, 2009 WL 790048, at *13 (S.D.N.Y. Mar. 24, 2009) (stating that the merger doctrine applies "'where there is only one[,] or so few ways of expressing an idea[, that] protection of the expression would effectively accord protection to the idea itself'" (quoting *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 146 n.6 (2d Cir. 1997)) (internal ellipsis omitted)). "In [the Second] Circuit, [courts] look at the

---

[9] Obviously, this conclusion says nothing about whether Plaintiffs would survive summary judgment, if Defendants were to seek such at an appropriate time.

range of possible expressions and consider whether all possible expressions are so 'substantially similar' that granting the copyright would bar others from expressing the underlying idea." *N.Y. Merc.*, 497 F.3d at 117 (footnote omitted). *New York Mercantile* is particularly instructive because it too considered a compound economic indicator expressed in numerical form. In that case, the Second Circuit held that "[t]o survive summary judgment, . . . [the party seeking copyright protection] must demonstrate that the range of possible settlement prices [wa]s broad enough that any possible expression will not 'necessarily be substantially similar.'" *Id.* (quoting *Hart v. Dan Chase Taxidermy Supply Co.*, 86 F.3d 320, 322 (2d Cir. 1996)) (internal quotation marks omitted); *see also RBC Nice Bearings*, 676 F. Supp. 2d at 23 (requiring "a range of possible variations" in the final value). As already noted, in *New York Mercantile* the Second Circuit held that the settlement prices were not protectable under the merger doctrine. *See N.Y. Merc.*, 497 F.3d at 117. Plaintiffs will, no doubt, have to confront this issue during discovery and at summary judgment, but the Court cannot say that as a matter of law it is implausible that the BanxQuote Indices are sufficiently subjective that a wide range of potential final values would be possible. *Cf. id* at 117-18 (urging courts to "exercise considerable care in analyzing merger," which argues in favor of allowing parties to present evidence on this issue, and finding the merger doctrine satisfied because "any settlement price for a particular futures contract would be determined based on the same underlying market facts, [and] any dissension would be exceptionally narrow" (internal quotation marks omitted)); *Webloyalty.Com, Inc. v. Consumer Innovations, LLC*, No. 04-CV-90, 2005 WL 121796, at *5 (D. Del. Jan. 13, 2005) (denying summary judgment because defendant had failed to "establish that there is a limited, if not

singular, manner to express the [idea at issue]").[10]  Defendants' Motion to Dismiss Count One,

therefore, is denied.

### 2. Count Three: DMCA

Plaintiffs allege violation of 17 U.S.C. § 1202(b)(1) and (3).  (SAC ¶¶ 129-30.)  These

are sections of the DMCA, which provide:

> No person shall, without the authority of the copyright owner or the law –
>
> > (1) intentionally remove or alter any copyright management information,
> >
> > (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
> >
> > (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
>
> knowing, or, . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b).  Copyright management information ("CMI") includes, inter alia, the title

or identifying information of the work, author or copyright owner, the terms and conditions of

use of the work, and identifying numbers or symbols referring to such information.  *See id.* §

1202(c)(1)-(3), (6)-(7).  Courts have applied this statute in a straightforward manner such that

---

[10] The Court is mindful of the fact that calculating the settlement price in *New York Mercantile* required considering the only information available – the last batch of trades – and coming up with some kind of weighted average.  As the court in that case emphasized, however, there was simply no other way of creating a value for the settlement price and, hence, there was a limited range of possible expressions.  *N.Y. Merc.* 497 F.3d at 118.  In this case, Plaintiffs allege that the BanxQuote Indices are not a simple weighted average of all the available data, but that they include data points that are indicative but not directly relevant – such as LIBOR rates – and exclude data that is directly relevant but, perhaps, over-representative – such as rates of the non-selected banks.  These allegations suggest a larger room for dissension than was present in *New York Mercantile*, which was decided at summary judgment.  *Id.* at 112-13.

Plaintiffs here need only allege (1) the existence of CMI on the BanxQuote Indices; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally.  *See Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454, 461 (S.D.N.Y. 2009) (noting that the DMCA is violated by "removing and/or altering copyright-management information," and denying a motion to dismiss when plaintiff alleged that its articles identified it as the owner and author and that the defendants intentionally altered or removed that information); *accord Fox v. Hildebrand*, No. 09-CV-2085, 2009 WL 1977996, at *2-3 (C.D. Cal. July 1, 2009) (denying a motion to dismiss when the evidence demonstrated that defendants removed plaintiff's hand-written copyright notice from certain drawings); *Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC*, 629 F. Supp. 2d 526, 537 (E.D. Va. 2008) (noting that removal of copyright notice from plaintiff's plans was sufficient to satisfy one element of a DMCA claim), *aff'd on other grounds*, No. 08-2103, 2010 WL 1804135 (4th Cir. May 6, 2010).  Here, Plaintiffs allege that "Defendants, without authority of Plaintiffs or the law, have intentionally altered the copyright management information by displaying . . . altered reference line[s] in connection with Plaintiffs' BanxQuote Ind[ices]," and that "Defendants' removal of copyright management information from Plaintiffs' BanxQuote Ind[ices] . . . and subsequent distribution of the BanxQuote Ind[ices] . . . was executed with full knowledge of Plaintiffs' rights under copyright law, and in disregard of Plaintiffs' rights."  (SAC ¶¶ 129, 131.)

Defendants argue that these allegations fail because they are conclusory and implausible. (Defs.' Mem. 9.)  What Defendants do not acknowledge, however, are the other allegations contained in the SAC, which include an example of an ad Defendants allegedly ran which includes the following CMI: "National Average of [Annual Percentage Yields] for money market accounts as published by BanxQuote.com as of 5/22/07."  (SAC ¶ 74 Fig. 1.)  This

differs from the CMI that Plaintiffs allege was associated with the BanxQuote Indices: "© [year of publication] BanxCorp.  All Rights Reserved."  (*Id.* ¶ 127.)  Providing an actual example of the allegedly infringing ad is obviously more than a conclusory allegation.  Defendants counter that the License Agreement includes "BanxQuote.com National Averages" as an acceptable means of identifying the BanxQuote Indices.  (Defs.' Mem. 10.)  However, Plaintiffs allege that the altered CMI was distributed to a third party, Costco, in violation of the License Agreement and subsequently published by all Defendants in the altered form.  (SAC ¶ 93.)  Defendants cannot assert the protection of the License Agreement for conduct that allegedly breached the License Agreement.  Finally, Defendants argue that Plaintiffs have failed to allege sufficient facts to establish a reasonable inference that Defendants knew they were infringing Plaintiffs' DMCA rights.  (Defs.' Mem. 11.)  However, Plaintiffs allege intentional breach of the License Agreement, and continued breach after Defendants were confronted with evidence of their allegedly infringing conduct.  (SAC ¶¶ 93-98.)  In addition, as noted above, Plaintiffs allege that Defendants used (slightly) different CMI than that laid out in the License Agreement.  Taken together, these allegations are sufficient to give rise to a plausible inference that Defendants were aware of the appropriate uses of Plaintiffs' CMI and chose to alter the information regardless. *Cf. Meijer, Inc. v. Ferring B.V.* (*In re DDAVP Direct Purchaser Antitrust Litig.*), 585 F.3d 677, 692-93 (2d Cir. 2009) (reversing the district court's grant of a motion to dismiss because "scienter issues . . . are appropriate for resolution by the trier of fact" when omissions had occurred "over a period of years," despite applying the heightened pleading standard of Fed. R. Civ. P. 9(b) (internal quotation marks omitted)).[11]

_____

[11] Defendants attempt to rebut this conclusion by relying on *Schiffer Publishing, Ltd v. Chronicle Books, LLC*, No. 03-CV-4962, 2004 WL 2583817 (E.D. Pa. Nov. 12, 2004), and *Kelly*

At summary judgment, Defendants will have an opportunity to present evidence that the placement of the CMI either indicated that it did not refer to the BanxQuote Indices, or was sufficiently removed to demonstrate that Defendants lacked the intent required to show a violation of the DMCA.  However, the Court declines to hold that, as a matter of law, CMI must be placed on the actual information on a website in order to state a claim under the DMCA. Defendants' Motion to Dismiss Count Three is, therefore, denied.[12]

### C. Pre-emption of State Law Causes of Action

Defendants argue that Counts Two (hot news misappropriation), Five (breach of contract), Six (unfair competition), and Seven (unjust enrichment), are preempted.  (Defs.' Mem. 11.)  As no party disputes,

> [t]he Copyright Act exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C.  §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle[s] of exclusive rights already protected by copyright law under 17 U.S.C. § 106.  The

_____

*v. Arriba Soft Corp.*, 77 F. Supp. 2d 1116 (C.D. Cal. 1999), *rev'd in part on other grounds*, 336 F.3d 811 (9th Cir. 2003).  In *Schiffer*, the court held that CMI would not be considered "removed" from images contained in a book that only contained CMI on the inside cover.  2004 WL 2583817, at *14.  *Schiffer* is, therefore, distinguishable because the CMI on the inside cover of a book suggested copyright in the book itself, and not in particular images inside the book. Here, the CMI was on each of the websites allegedly used by Defendants.  (SAC ¶ 127.)

*Kelly* is similarly unhelpful.  In *Kelly*, the court held that CMI was not removed from a picture on a website when the only CMI available appeared on the website but not on the images themselves.  77 F. Supp. 2d at 1122.  *Kelly*, however, dealt with images, and not with the information contained on a webpage to which Plaintiffs had attached their CMI.

[12] Defendants also argue that Plaintiffs fail to adequately allege that Defendants "distribute[d]" the altered CMI as prohibited by 17 U.S.C. § 1202(b)(3).  However, Plaintiffs allege distribution of the BanxQuote Indices in "direct mail, print advertisements, newspaper advertisements, websites, and marketing presentations" (SAC ¶ 95), and while Plaintiffs do not explicitly state which of these methods of publication contained the altered CMI, this allegation combined with the allegation that the altered CMI was contained on Defendants' "website and [in] various other media" (*id.* ¶ 130), is sufficient to "nudge[] [Plaintiffs'] claim[] across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

first prong of this test is called the "subject matter requirement," and the second
prong is called the "general scope requirement."

*Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004) (citing 17 U.S.C. §

301(a) and *Nat'l Basketball Ass'n v. Motorola, Inc.* ("*NBA*"), 105 F.3d 841, 848 (2d Cir. 1997));

*see also Porto*, 659 F. Supp. 2d at 616 (outlining the two part test); *Myrieckes v. Woods*, No. 08-

CV-4297, 2009 WL 884561, at *4 (S.D.N.Y. Mar. 31, 2009) (same).  Plaintiffs, because they

seek the protection of the Copyright Act, acknowledge that the subject matter requirement is

met, but argue that each of their state-law causes of action fails the general scope requirement

and, hence, is not preempted.[13]  (Pls.' Mem. 12.)

"In order for a state cause of action to survive preemption, it must have an 'extra

element' beyond reproduction, preparation of derivative works, distribution, performance or

display, which 'changes the nature of the action so that it is qualitatively different from a

copyright infringement claim.'"  *Gusler v. Fischer*, 580 F. Supp. 2d 309, 316 (S.D.N.Y. 2008)

(quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)); *see also*

*Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 817 (S.D.N.Y. 2008) ("A state law

claim is not preempted if the extra element required by the state law claim changes the nature of

the action so that it is *qualitatively* different from a copyright or patent infringement claim."

(internal quotation marks and brackets omitted) (emphasis in original)); *Atrium Group De*

*Ediciones Y Publicaciones, S.L. v. Harry N. Abrams, Inc.*, 565 F. Supp. 2d 505, 509-10

(S.D.N.Y. 2008) ("[T]he only 'extra element' that avoids preemption for a state-created cause of

_____

[13] The Court notes that even if the Banxquote Indices were not protectable under the
Copyright Act, the subject matter requirement is broad enough to encompass them.  *See NBA*,
105 F.3d at 848 ("The subject matter requirement is met when the work of authorship
being copied or misappropriated falls within the ambit of copyright protection." (internal quotation
marks and brackets omitted)).

action is something that is 'required instead of or in addition to the acts of reproduction,

performance, distribution or display.'" (quoting *Computer Assocs.*, 982 F.2d at 716)).   "An

action 'will not be saved from preemption by elements such as awareness or intent, which alter

the action's scope but not its nature.'"   *Gusler*, 580 F. Supp. 2d at 316 (quoting *Computer

Assocs.*, 982 F.2d at 717); *see also Am. Movie Classics Co. v. Turner Entm't Co.*, 922 F. Supp.

926, 931 (S.D.N.Y. 1996) (same).

### 1. Count Two: Hot News Misappropriation

The Parties are in agreement on the legal standard governing Plaintiffs' hot news claim.[14]

Plaintiffs rely on *Associated Press*, which states that "[a] cause of action for misappropriation of

hot news remains viable under New York law, and the Second Circuit has unambiguously held

that it is not preempted by federal law."  *Id.* at 461 (citing *NBA*, 105 F.3d at 845, and *Fin. Info.,

Inc. v. Moody's Investors Serv., Inc.*, 808 F.2d 204, 209 (2d Cir. 1986)).   Defendants rely on

*NBA*, in which the Second Circuit stated that "only a narrow 'hot-news' misappropriation claim

survives preemption . . . ."  *NBA*, 105 F.3d at 852.  The *NBA* court went on to say that "the extra

elements . . . that allow a 'hotnews' claim to survive preemption are: (i) the time-sensitive value

of factual information, (ii) the free-riding by a defendant, and (iii) the threat to the very existence

of the product or service provided by the plaintiff."  *Id.* at 853.  This is consistent with

*Associated Press*, which held that

> under New York Law, a valid, non-preempted claim for misappropriation arises
> when: "(i) a plaintiff generates or gathers information at a cost; (ii) the
> information is time-sensitive; (iii) a defendant's use of the information constitutes
> free riding on the plaintiff's efforts; (iv) the defendant is in direct competition

---

[14] The Court follows the Parties' lead in analyzing this claim under preemption rather
than failure to state a claim, but notes that the two arguments are, in this case, so similar as to be
almost indistinguishable.

> with a product or service offered by the plaintiffs; and (v) the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened."

*Assoc. Press*, 608 F. Supp. 2d at 461 (quoting *NBA*, 105 F.3d at 845).  Indeed, the Parties essentially acknowledge as such.  (Defs.' Mem. 14; Pls.' Mem. 13.)  Defendants focus on the second, third, and fourth elements in their efforts to dismiss this cause of action.  (Defs.' Mem. 15-17.)

To satisfy the second element, Plaintiffs must allege not only that the news was time-sensitive when it was gathered, but that it was time-sensitive when it was misappropriated.  *See NBA*, 105 F.3d at 853 (noting that a hot-news claim "is about the protection of property rights in time-sensitive information"); *Fin. Info.*, 808 F.2d at 209 (requiring "immediacy of distribution . . . to sustain a 'hot' news claim," and finding that this requirement was not met when "the information [defendant] published would have been at least ten days old").  Plaintiffs sufficiently allege that the BanxQuote Indices contained time-sensitive information, by claiming that they required "real time database input" (SAC ¶ 25), that creating the BanxQuote Indices required the use of "highly time-sensitive bank rate databases and ind[ices]" (*id.* ¶¶ 33, 55, 110), that BanxQuote "provide[s] dynamic real-time quotes online, allowing banks to remotely update their rates 24x7" (*id.* ¶ 51), that BanxQuote "compil[es] thousands of constantly changing interest rates and banking information" (*id.* ¶ 118), and that the BanxQuote Indices "are highly time sensitive and subject to change by Plaintiffs at any time, since they are intricately intertwined with, and based on thousands of variable interest rates subject to change at any time," (*id.* ¶ 119).

It is less clear that Plaintiffs allege that the information was appropriated while it was still hot.  To support this claim, Plaintiffs allege that "Defendants managed to steal 100% of the 2004-2008 database series of BanxQuote Ind[ices]" (*id.* ¶ 22), that "Defendants were responsible for the illegal publication and distribution of the BanxQuote Ind[ices] online on their co-branded website . . . for a period of approximately 1,800 consecutive days around the clock" (*id.* ¶ 72), that Defendants' "infringement include[d] the unlawful reproduction, distribution and public display [of] the BanxQuote Ind[ices] on Defendants' co-branded products and marketing channels" (*id.* ¶ 112), and that Defendants engaged in "constant and continuous unauthorized *daily* reproduction and multimedia redistribution," (*id.* ¶ 120 (emphasis added)).  Nowhere do Plaintiffs explicitly allege that the "daily reproduction" of the BanxQuote Indices was of hot information.  However, one of the two examples Plaintiffs provide of Defendants' alleged misappropriation of the BanxQuote Indices is an instance of "approximately 146 million or more [] media impressions . . . [distributed] by mail and in print[] through the publication of the BanxQuote Indi[ces] in *The Costco Connection*."  (SAC ¶¶ 73-74 (emphasis in original).)  This publication dates the BanxQuote Indices data as "as of 5/22/07," and dates the publication itself as "5/07."  (*Id.* Fig. 1.)  Though the other example provided by Plaintiffs suggests a delay of approximately a month (*id.* Fig. 4), Plaintiffs need only show that they have a plausible claim for hot news misappropriation, not that every misappropriation gave rise to a hot news claim. Moreover, it is plausible to infer that the purpose of "daily reproduction" was to misappropriate daily – i.e. hot – information.  On a motion to dismiss the Court must "draw all reasonable inferences in [Plaintiffs'] favor."  *Gonzalez*, 572 F. Supp. 2d at 466.  Applying this standard, it is plausible to infer that the alleged misappropriation was of the allegedly continuously updating information, and Plaintiffs have provided an example that appears to be misappropriation of

information that was "hot."  Therefore, Plaintiffs have pled the second element of their hot news claim, though it is certainly conceivable that this issue will be revisited at summary judgment.

Defendants argue that Plaintiffs have not pled the third element of their claim because "Defendant Capital One paid Plaintiffs to use the [BanxQuote Indices] during the term of the License Agreement.  Additionally, the SAC is devoid of plausible allegations of free-riding by Costco."  (Reply Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Reply Mem.") 6.)  This argument is unpersuasive as Plaintiffs allege use of the BanxQuote Indices over and above, and in breach of, the License Agreement as part of providing a co-branded service with the knowledge of all Defendants.  (SAC ¶¶ 19, 27, 69-71, 86-96.)  Plaintiffs have, therefore, adequately pled the third element of their claim.

To establish the fourth element of their claim, Plaintiffs allege that "Defendants were in direct competition with services offered by Plaintiffs.  BanxQuote not only licensed its BanxQuote Ind[ices] to select third parties, but it also used its BanxQuote Ind[ices] . . . as a performance benchmark to facilitate the marketing of High Yield Savings Accounts and CDs offered by BanxQuote on behalf of other banks such as Defendant Capital One . . . ."  (*Id.* ¶ 121.) Defendants argue that this claim is "conclusory and implausible."  (Defs.' Mem. 16.)  The statement that the Parties are in direct competition is, indeed, a conclusion, but it is not conclusory because it is supported by the factual allegation that Plaintiffs market HYSAs and CDs that compete with Defendants' co-branded savings accounts.  Thus, Plaintiffs have alleged a non-preempted hot news claim, and, therefore, Defendants' Motion to Dismiss Count Two is denied.

### 2. Count Five: Breach of Contract

Plaintiffs allege breach of contract (against Capital One only) on the basis of Capital One's alleged distribution and use of the BanxQuote Indices beyond that allowed by the License Agreement, and in violation of promises not to distribute contained within the License Agreement.  (SAC ¶¶ 146, 150.)  Defendants argue that Plaintiffs' claim of breach of contract is preempted.  (Defs.' Mem. 17.)

The only "extra element" that Plaintiffs identify is the promise inherent in the License Agreement itself.  (Pls.' Mem. 16.)  Defendants acknowledge the existence of the promise, but argue that there is conflicting case law within the Second Circuit as to whether the promise inherent in a contract is sufficient to defeat preemption and, of course, argue that the Court should follow the cases which hold that the promise does not defeat preemption.  (Defs.' Mem. 18.)  There is, indeed, an intra-district split that the Second Circuit has not yet resolved. *Compare Am. Movie Classics Co.*, 922 F. Supp. at 931 (holding that "a breach of contract claim is preempted if it is merely based on allegations that the defendant did something that the copyright laws reserve exclusively to the plaintiff") *with Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 439 (S.D.N.Y. 1996) (declining "to follow the formulation applied in *American Movie*," and holding that "the extra element that saves a contract claim from preemption is the promise itself" (internal quotation marks omitted)).  Thus, precedent would seem to endorse two contradictory hard-line rules.  One, from *American Movie Classics*, holding that a breach of contract claim is always preempted if the promise that the plaintiff seeks to enforce is a right guaranteed by the Copyright Act, and one, from *Architectronics*, stating that breach of contract claims need not be preempted.

Courts in this district have continued to disagree as to how to analyze preemption of breach of contract claims. *See, e.g.*, *Broadvision, Inc. v. Gen. Elec. Co.*, No. 08-CV-1489, 2008 WL 4684114, at *4 (S.D.N.Y. Oct. 15, 2008) (holding that a breach of contract action was preempted when the plaintiff alleged that the defendant had used plaintiff's software in ways not permitted by the license agreement); *Gusler*, 580 F. Supp. 2d at 319 (holding that "alleged breach of [defendant's] duties under [a non-disclosure agreement] . . . [was] premised on the existence of [] allegations beyond mere reproduction" and, hence, not preempted); *Price v. Fox Entm't Group, Inc.*, 473 F. Supp. 2d 446, 451, 460-61 (S.D.N.Y. 2007) (holding that a breach of contract claim seeking to enforce an "alleged failure to treat [intervening plaintiff] as a co-author and to account to him for profits" was preempted); *eScholar, LLC v. Otis Educ. Sys., Inc.*, 387 F. Supp. 2d 329, 332-33 (S.D.N.Y. 2005) (agreeing with *Architectronics*, but holding that a breach of contract claim was preempted to the extent that it "seeks to enforce [p]laintiff's exclusive right to reproduce and distribute its work," and not preempted "to the extent it seeks to enforce contractually guaranteed rights to audit books and receive royalty fees"); *Sharp v. Patterson*, No. 03-CV-8772, 2004 WL 2480426, at *7-8 (S.D.N.Y. Nov. 3, 2004) (citing the *American Movie Classics* test, and holding that a breach of contract claim was not preempted when it sought to enforce contractual rights to a share in the proceeds of a work in which the plaintiff also claimed a partial copyright); *Logicom Inclusive, Inc. v. W.P. Stewart & Co.*, No. 04-CV-604, 2004 WL 1781009, at *18 (S.D.N.Y. Aug. 10, 2004) (citing both *American Movie Classics* and *Architectronics* in holding that a breach of contract claim was not preempted); *Torah Soft Ltd. v. Drosnin*, 224 F. Supp. 2d 704, 717 (S.D.N.Y. 2002) (applying the *Architectronics* rule to an explicit contractual promise to refrain from doing something that would otherwise be prohibited under the Copyright Act); *Grauer v. Deutsch*, No. 01-CV-8672, 2002 WL 31288937, at *2

(S.D.N.Y. Oct. 11, 2002) (holding that a breach of contract action based on an alleged promise to acknowledge plaintiff as co-author was not preempted, but that the rest of the contract claim, which sought a share of the proceeds based on the contract, was preempted); *Cooper v. Sony Records Int'l*, No. 00-CV-233, 2001 WL 1223492, at *5 & n.9 (S.D.N.Y. Oct. 15, 2001) (citing *American Movie Classics*, while acknowledging the disagreement of other courts in this district, and applying it to a case in which the plaintiff alleged that the defendant used the plaintiff's recordings in a way not permitted by the license agreement).

Of particular note for this case, are the results in the license and non-disclosure cases. In *Broadvision*, *eScholar*, and *Cooper*, courts were confronted either with license agreements or similar distribution agreements and held that the breach of contract claims were preempted. *See Broadvision*, 2008 WL 4684114, at *1 (involving a "non-exclusive" license agreement); *eScholar*, 387 F. Supp. 2d at 331 (involving a distribution license agreement); *Cooper*, 2001 WL 1223492, at *1-2 (involving a distribution agreement). In *Gusler*, *Torah Soft*, and *Architectronics*, courts were confronted with explicit contractual promises of non-disclosure or exclusivity and held that the breach of contract claims were not preempted. *See Gusler*, 580 F. Supp. 2d at 312 (involving a non-disclosure agreement); *Torah Soft*, 224 F. Supp. 2d at 707 (involving a promise of exclusive use); *Architectronics*, 935 F. Supp. at 428-29 (involving confidentiality agreements and an exclusive license agreement). These cases cannot be reconciled, and the Court must choose which rule to follow.

The Court agrees with the cases that hold that "the extra element that saves a contract claim from preemption is the promise itself." *Architectronics*, 935 F. Supp. at 439 (internal quotation marks omitted). First, the emerging consensus among the Circuit courts is that the rule adopted in *Architectronics* is the correct one. *See Utopia Provider Sys., Inc. v. Pro-Med Clinical*

*Sys., L.L.C.*, 596 F.3d 1313, 1327 & n.26 (11th Cir. 2010) (holding that "a valid license

agreement . . . constitutes an 'extra element'" in part because "[p]arties may enter a license

agreement to avoid the cost of having to litigate the validity of a copyright"); *Bowers v. Baystate*

*Techs., Inc.*, 320 F.3d 1317, 1324 (Fed. Cir. 2003) (holding that the First Circuit was likely to

adopt the rule that contracts were not preempted, and agreeing with the Seventh Circuit (see

below)); *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1318 (11th Cir. 2001) (agreeing with the

Seventh Circuit (see below) that "claims involving two-party contracts are not preempted

because contracts do not create exclusive rights, but rather affect only their parties"); *ProCD,*

*Inc. v. Zeidenberg*, 86 F.3d 1447, 1455 (7th Cir. 1996) ("[A] simple two-party contract is not

'equivalent to any of the exclusive rights within the general scope of copyright' and therefore

may be enforced."); *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426,

431 (8th Cir. 1993) ("We conclude that the alleged contractual restriction on [defendant's] use of

the [copyrighted property] constitutes an extra element . . . ."); *Taquino v. Teledyne Monarch*

*Rubber*, 893 F.2d 1488, 1501 (5th Cir. 1990) ("This action for breach of contract involves an

element in addition to mere reproduction, distribution or display: the contract promise . . .,

therefore, it is not preempted."); *see also Acorn Structures, Inc. v Swantz*, 846 F.2d 923, 926 (4th

Cir. 1988) (holding that a breach of contract action fails the *subject matter* prong of the

preemption test and, hence, is not preempted).  *But see Wrench LLC v. Taco Bell Corp.*, 256 F.3d

446, 456-57 (6th Cir. 2001) (stating both that "[i]f the promise amounts only to a promise to

refrain from reproducing, performing, distributing or displaying the work, then the contract

claim is preempted," and that "[t]he extra element is the promise to pay," and "[t]he qualitative

difference includes the requirement of proof of an enforceable promise and a breach thereof

which requires, *inter alia*, proof of mutual assent and consideration, as well as proof of the value of the work and [defendant's] use thereof").

Second, though the Second Circuit has not directly addressed this issue, the Court notes that in *NBA*, the Second Circuit quoted at length from Judge Easterbrook's decision in *ProCD* on the issue of partial preemption under the Copyright Act, and adopted his reasoning. *NBA*, 105 F.3d at 849-50. While, of course, it is possible for the Second Circuit to endorse Judge Easterbrook's reasoning from a portion of the *ProCD* opinion and not from the rest of it, if *NBA* sends any signals at all about the Second Circuit's reasoning on the issue of breach of contract preemption, it signals agreement with *ProCD*.

Third, the Court is persuaded by the reasoning in *ProCD*. In that case, Judge Easterbrook observed that rights equivalent to copyright are rights "established *by law*," and "copyright is a right against the world" whereas "[c]ontracts, by contrast, generally affect only their parties." *ProCD*, 86 F.3d at 1454 (emphasis in original). Judge Easterbrook also noted that a contrary view would require that trade secrets and other information not protected by copyright could not be distributed to third parties based on contractual limitations on use – it would, for example, be impossible to enforce a contract that said, "I have done a lot of work to create an asset that is not copyrightable and I will let you use the asset for $X, but you have to promise not to show the asset to anyone else because I want to sell licenses to others too" – which is not only an odd result, but contrary to Supreme Court precedent that holds that contracts protecting trade secrets may be enforced. *Id.*[15] The contrary view would also prevent private parties from contracting

---

[15] *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974) (holding that Ohio's law protecting trade secrets was not preempted by federal patent law).

for specific remedies for breach of rights protected by the Copyright Act, thereby increasing the uncertainty and, hence, cost involved in protecting a copyright.

Finally, the Court agrees with Judge Easterbrook's view that permitting state law contract claims would not harm the federal copyright scheme.  *Id.* at 1454-55.  Preemption protects federal law by making sure that the rights granted by federal law are not removed or altered by state law, and by ensuring that the states do not create rights that federal law does not recognize. While a contract may create or remove rights it does so only against individuals who consent and receive consideration for their consent, and does not change the default rules that apply to the general public.  *Id.*

Therefore, the Court adopts the rule of *Architectronics* and *ProCD*, and holds that, as a general matter, a breach of contract action is not preempted by the Copyright Act.  In doing so, the Court follows Judge Easterbrook's lead in emphasizing substance over form and "refrain[s] from adopting a rule that anything with the label 'contract' is necessarily outside the preemption clause" of the Copyright Act, 86 F.3d at 1455, but holds that license agreements such as the one at issue in this case are not preempted.  Defendants' Motion to Dismiss Count Five is, therefore, denied.

### 3. Count Six: Unfair Competition

To state a claim for unfair competition, Plaintiffs must allege "that the [D]efendants misappropriated the [P]laintiffs' labors, skills, expenditures, or good will and displayed some element of bad faith in doing so."  *Abe's Rooms, Inc. v. Space Hunters, Inc.*, 833 N.Y.S.2d 138, 140 (App. Div. 2007).  To this end, Plaintiffs allege misappropriation of the BanxQuote Indices, which required labor, skill, and expense to create and maintain, and bad faith both in inducing Plaintiffs to enter the License Agreement with Capital One, and in conspiring to willfully violate

the License Agreement.  (SAC ¶¶ 25, 135, 153.)  Defendants argue that this cause of action is preempted.  (Defs.' Mem. 20.)

"[U]nfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by [17 U.S.C. § 301]."  *Computer Assocs.*, 982 F.2d at 717; *see also Medtech Prods.*, 596 F. Supp. 2d at 817 (Unjust enrichment claims "are preempted . . . when the rights to be protected by the state law claim would infringe one of the exclusive rights provided by federal copyright . . . law" (internal quotation marks omitted)).  However, "unfair competition claims based upon breaches of confidential relationships, breaches of fiduciary duties and trade secrets" are not preempted.  *Computer Assocs.*, 982 F.2d at 717.  The Second Circuit has made it clear that when the acts that allegedly satisfy the elements of unjust enrichment "would, in and of [themselves], infringe the" rights protected by the Copyright Act, the cause of action is preempted.  *Briarpatch*, 373 F.3d at 306 (finding a claim of unjust enrichment preempted for this reason); *see also Myrieckes*, 2009 WL 884561, at *5 (applying the *Briarpatch* rule to an unfair competition claim).

Defendants argue that Plaintiffs' unfair competition claim is preempted because it does not sufficiently allege breach of a fiduciary, or similar, duty.  (Defs.' Mem. 20-21.)  Plaintiffs rely primarily on Defendants' bad faith to establish an "extra element."  (Pls.' Mem. 17-18.)  However, as Defendants point out (Reply Mem. 7), bad faith is, like other scienter requirements, insufficient to establish an "extra element."  *See Gusler*, 580 F. Supp. 2d at 316 ("An action 'will not be saved from preemption by elements such as awareness or intent, which alter the action's scope but not its nature.'" (quoting *Computer Assocs.*, 982 F.2d at 717)).  Furthermore, the acts underlying Defendants' alleged wrongdoing are dissemination and use of allegedly copyrighted materials – i.e. they are rights protected by the Copyright Act.

Finally, Plaintiffs assert that Capital One owed Plaintiffs fiduciary duties.  (Pls.' Mem. 18.)  Plaintiffs cite no law for the proposition that a bank owes a corporation it enters into a licensing agreement with a fiduciary duty.  Nor do Plaintiffs' citations to the SAC establish a fiduciary relationship, as all Plaintiffs have alleged is that BanxCorp entrusted its most valuable asset to Capital One, that BanxCorp expected "the highest standard of care and undivided loyalty," and that Capital One acted in bad faith.  (SAC ¶¶ 91-96.)  These allegations, which amount to no more than bad faith (discussed above), only establish the existence of a business relationship, and are insufficient to plead a fiduciary relationship.  *See Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) (noting that under New York law, a fiduciary relationship exists where "one person has reposed trust or confidence in the integrity and fidelity of another who thereby gains a resulting superiority or influence over the first," and requiring a showing of a duty to act "primarily for the benefit of another," or "control and responsibility over another" (internal quotation marks omitted)); *Rosenblatt v. Christie, Manson & Woods Ltd.*, No. 04-CV-4205, 2005 WL 2649027, at *9 (S.D.N.Y. Oct. 14, 2005) ("'Entering into a conventional business relationship generally does not create a fiduciary relationship.'" (quoting *Maalouf v. Salomon Smith Barney, Inc.*, No. 02-CV-4770, 2003 WL 1858153, at *5 (S.D.N.Y. Apr. 10, 2003))).  Therefore, Defendants' Motion to Dismiss Count Six is granted as preempted by the Copyright Act.

### 4. Count Seven: Unjust Enrichment

"To prevail on a claim of unjust enrichment, [] [P]laintiff[s] must show that 1) [D]efendant[s] w[ere] enriched; 2) at [P]laintiff[s'] expense; and 3) it is against equity and good conscience to permit [D]efendant[s] to retain what is sought to be recovered."  *Am. Med. & Life Ins. Co. v. Crossummit Enters., Inc.*, 27 Misc. 3d 1210(A), at *5 (N.Y. Sup. Ct. 2010); *see also*

*Estate of Goth v. Tremble*, 873 N.Y.S.2d 364, 367 (App. Div. 2009) (requiring the same three elements).  Plaintiffs rely on the same allegations to sustain this cause of action as to sustain their claim of unfair competition.  (SAC ¶¶ 158-61.)  Defendants argue that this cause of action is preempted.  (Defs.' Mem. 21.)

The preemption analysis governing unjust enrichment claims is substantially similar to that governing unfair competition.  *See Briarpatch*, 373 F.3d at 306 (holding that an unjust enrichment claim is preempted when premised on the rights protected by the Copyright Act); *Myrieckes*, 2009 WL 884561, at *5 (using the same analysis for unjust enrichment and unfair competition claims and holding that an unjust enrichment claim premised on unlawful reproduction of protected work is preempted); *Gusler*, 580 F. Supp. 2d at 316 (holding that where "the alleged acts giving rise to the unjust enrichment claim [] are identical to those underlying the federal copyright claim," the unjust enrichment claim was preempted).  Plaintiffs' attempts to find "extra elements" in Plaintiffs' creation of time-sensitive copyrighted material, and the work required to create the BanxQuote Indices (Pls.' Mem. 19), do not defeat the ultimate point: Plaintiffs seek to protect their copyrighted products from allegedly illegal distribution and publication, which is the purpose of the Copyright Act.[16]  Defendants' Motion to Dismiss Count Seven is, therefore, granted as preempted by the Copyright Act.

D. Count Four: Fraud

Plaintiffs allege fraud based on their claims concerning Defendants' alleged joint scheme to induce BanxCorp to enter the License Agreement.  (SAC ¶¶ 135-36.)  To sufficiently allege

---

[16] The Parties' dispute about whether the conduct underlying this claim is covered by the License Agreement does not affect this determination as it is irrelevant to the question of whether a well-pled claim of unjust enrichment is preempted by the Copyright Act.  (Pls.' Mem. 20.)

fraud, Plaintiffs must allege "(1) a misrepresentation or a material omission of fact which was false and known to be false by [Defendants], (2) [that] the misrepresentation was made for the purpose of inducing the [P]laintiff[s] to rely upon it, (3) justifiable reliance . . ., and (4) injury." *JAF Partners, Inc. v. Rondout Sav. Bank*, 898 N.Y.S.2d 496, 497 (App. Div. 2010) (internal quotation marks omitted).   Defendants argue that Count Four is duplicative of Plaintiffs' contract claims, that Plaintiffs fail to satisfy the heightened pleading standard contained in Fed. R. Civ. P. 9(b), and that Plaintiffs fail to plead the elements of fraud with regard to Costco. (Defs.' Mem. 22-24.)  As the Court holds that Plaintiffs' fraud claim is duplicative of their contract claim, the Court does not address the other issues.

Under New York law, the exact contours of what constitutes a duplicative fraud claim require careful parsing.  One New York court has suggested that fraud and breach of contract causes of action can co-exist when there is fraud in the inducement:

> A cause of action alleging fraud does not lie where the only fraud claim relates to a breach of contract.  A present intent to deceive must be alleged and a mere misrepresentation of an intention to perform under the contract is insufficient to allege fraud.  Conversely, a misrepresentation of material fact, which is collateral to the contract and serves as an inducement for the contract, is sufficient to sustain a cause of action alleging fraud.

*WIT Holding Corp. v. Klein*, 724 N.Y.S.2d 66, 67-68 (App. Div. 2001) (internal citations omitted).  The rule that emerges from the case law is that a fraud claim cannot be maintained based on misrepresentations as to acts or intentions that formed the content of the contract unless a separate legal duty existed.  *See Gutkowski v. Steinbrenner III*, 680 F. Supp. 2d 602, 614 (S.D.N.Y. 2010) (noting that "'where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract . . ., the fraud claim is redundant and

plaintiff's sole remedy is for breach of contract,'" and dismissing a fraud claim that was based on allegations that the "[d]efendant had no intention of fulfilling the agreement with [the p]laintiff, as his subsequent behavior demonstrate[d] and that [d]efendant knew that his promises and assurances were false when he made them" (quoting *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001)) (internal quotation marks and brackets omitted from second quotation)); *B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 480 (S.D.N.Y. 2010) (stating that "[t]o maintain a fraud claim alongside a breach-of-contract claim, a plaintiff must (1) 'demonstrate a legal duty separate from the duty to perform under the contract;' (2) 'demonstrate a fraudulent misrepresentation collateral or extraneous to the contract;' or (3) 'seek special damages that are caused by the misrepresentation and unrecoverable as contract damages'" and that "[e]ven a deliberately false statement that the defendant intends to perform on a contract, when he does not, will not suffice" (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.* 98 F.3d 13, 20 (2d Cir. 1996)); *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 409 (S.D.N.Y. 2009) (quoting the same test from *Bridgestone/Firestone*); *Marcantonio v. Picozzi III*, 893 N.Y.S.2d 623, 624 (App. Div. 2010) (holding that an allegedly false representation that formed the basis for a provision in the contract gave rise to a cause of action for breach of contract, and not for fraud).

Plaintiffs do not allege the basis for a legal duty other than one rooted in the License Agreement.  Plaintiffs allege misrepresentation as to Defendants' intentions when Capital One signed the License Agreement, but these allegations are simply allegations of an intention to breach the contract by using the BanxQuote Indices in ways forbidden by the License Agreement.  (SAC ¶¶ 135-36.)  Furthermore, Plaintiffs do not seek any form of special damages that will not be available if Plaintiffs succeed on their contract claim.  (*Id.* ¶ 143.)  It follows that

under New York law, Plaintiffs' fraud claim is duplicative of their breach of contract claim.

Defendants' Motion to Dismiss Count Four, therefore, is granted.

### E. Statutory and Punitive Damages

Defendants seek an order limiting the damages Plaintiffs could receive if successful on any of their claims.  First, Defendants argue that Plaintiffs' demand for statutory damages should be dismissed because Plaintiffs' copyright registration, which was applied for more than three months after first publication, post-dates the allegedly infringing conduct.  (Defs.' Mem. 24 (citing 17 U.S.C. § 412(2)).)  Plaintiffs concede that they are not entitled to statutory damages. (Pls.' Mem. 23 n.60.)  Therefore, the Court grants Defendants' Motion to Strike Plaintiffs' demand for statutory damages.  Second, Defendants argue that their alleged conduct was not egregious enough to warrant punitive damages.  (Defs.' Mem. 24.)  Plaintiffs seek punitive damages on "each Count."  (SAC ¶ D.)  Plaintiffs remaining claims are Counts One (copyright infringement), Two (hot news misappropriation), Three (DMCA violation), and Five (breach of contract).

Punitive damages are not available on Plaintiffs' federal law claims.  Punitive damages cannot be recovered under the Copyright Act.  *See Football Ass'n Premier League Ltd. v. Youtube, Inc.*, 633 F. Supp. 2d 159, 167 (S.D.N.Y. 2009) ("There is no circumstance in which punitive damages are available under the Copyright Act of 1976."); *Granger v. Gill Abstract Corp.*, 566 F. Supp. 2d 323, 330 (S.D.N.Y. 2008) ("[I]rrespective of whether a plaintiff is seeking actual or statutory damages, 'punitive damages are not available under the Copyright Act of 1976.'" (quoting *Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir. 1983)); *Viacom Int'l, Inc. v. Youtube, Inc.*, 540 F. Supp. 2d 461, 464 (S.D.N.Y. 2008) ("Common-law punitive damages cannot be recovered under the Copyright Act.").  Punitive damages are also not available under

the DMCA.  *See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 704-05 (9th Cir. 2004)

(noting that district court ruling that dismissed plaintiff's state law claims "effectively precluded

[plaintiff] from seeking punitive damages" when plaintiff made a claim under, inter alia, the

DMCA); *see also* 17 U.S.C. § 1203 (providing for actual and statutory damages, but not punitive

damages).

Finally, Plaintiffs cannot receive punitive damages on their state law claims.  Under New

York law, to recover punitive damages on a breach of contract claim, Plaintiffs would need to

show that Defendants' "conduct is part of a pattern directed at the public generally," but

Plaintiffs have not offered any allegations that suggest that the conduct at issue in this case meets

that requirement.  *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82, 93 (2d Cir. 2005)

(internal quotation marks omitted); *see also Reads Co. v. Katz*, 900 N.Y.S.2d 131, 134 (App.

Div. 2010) ("Punitive damages are only recoverable . . . [for] breach of contract . . . where the

conduct was aimed at the public generally." (internal quotation marks, and citations omitted)).

For the same reason, Plaintiffs also cannot recover such damages for their hot news claim.  *See*

*Madison Equities, LLC v. Condren* (*In re Theatre Row Phase II Assocs.*), 385 B.R. 511, 522 n.19

(Bankr. S.D.N.Y. 2008) (noting that under New York law, "[t]o recover punitive damages there

must be a wrong against the public interest," and that "[i]f the harm is solely against a private

interest, punitive damages are not available"); *Fabiano v. Philip Morris Inc.*, 862 N.Y.S.2d 487,

490 (App. Div. 2008) ("A claim for punitive damages may, of course, be rooted in personal

injury, but for such a claim to succeed the injury must be shown to be emblematic of much more

than individually sustained wrong.  It must be shown to reflect pervasive and grave misconduct

affecting the public generally.").  Therefore, Defendants' Motion to Strike Plaintiffs' demand for

punitive and statutory damages is granted as against all remaining counts.

### F. Standing

Defendants argue that this lawsuit can only be prosecuted by BanxCorp, and that Mehl should be dismissed from this action. (Defs.' Mem. 1 n.1.) Plaintiffs conceded this point at oral argument. Therefore, Defendants' Motion to Dismiss Mehl for lack of standing is granted.

### III. Conclusion

For the reasons stated herein, Defendants' Motion to Dismiss is granted in part and denied in part. The Clerk of the Court is respectfully requested to terminate the relevant motion (Dkt. No. 20).

SO ORDERED.

DATED:     July **13**, 2010
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List (By ECF)

Nelson E. Canter, Esq.,
Canter Law Firm P.C.,
123 Main St,
14th Floor,
White Plains, NY 10601
ncanter@canterlawfirm.com

Nancy Jill Mertzel, Esq.,
Gibbons P.C. (NY),
One Pennsylvania Plaza,
37th Floor,
New York, NY 10119
nmertzel@gibbonslaw.com