UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BANXCORP d/b/a BANXQUOTE,

                              Plaintiff,

             -v-                                          Case No. 09-CV-1783 (KMK)

COSTCO WHOLESALE CORPORATION, et al.,              OPINION AND ORDER
                                                  [REDACTED][1]
                              Defendants.

Appearances:

Kristen E. Renzulli, Esq. (argued)
Law Offices of Kristen Renzulli, P.C.
Chappaqua, NY

Mordechai I. Lipkis, Esq.
New York, NY
*Counsel for Plaintiff*

Nancy J. Mertzel, Esq. (argued)
Stacy Ceslowitz, Esq.
Schoeman Updike Kaufman Stern & Ascher LLP
New York, NY

Sarah Kickham, Esq.
Donovan & Lee, LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Consider the percentage "3.95%."  It seems to be a totally ordinary percentage.  It is the

---

[1] On September 30, 2013, this Court issued an Order and Opinion under seal and directed the Parties to submit proposed redactions within 14 days.  (*See* Dkt. No. 125).  By letter dated October 9, 2013, Defendants proposed one redaction.  By letter dated October 16, 2013, Plaintiff confirmed that it had no objections to Defendants' proposed redaction and that it proposed no additional redactions.  This Order and Opinion incorporates the redaction proposed by Defendants, and is otherwise identical to the September 30, 2013 Order and Opinion issued under seal.

amount by which Eastern Michigan University increased its tuition and fees for the 2012–13 school year relative to the previous one.[2]  It is how much the Mayor of Poughkeepsie proposes to increase the city tax levy for 2014.[3]  It is the amount by which sugar prices rose in India one day in November 2012.[4]  And, according to Plaintiff Banxcorp, it was the United States national average interest rate for five-year certificates of deposit as of December 21, 2005.[5]

For Plaintiff, then, 3.95% is not such an ordinary percentage.  Rather, Plaintiff initiated this lawsuit in part because it claims it has a valid federal copyright in that particular percentage — or, at least, that it has a copyright in its series of percentages of national average interest rates, of which 3.95% on December 21, 2005 is one part.  And it claims that it is entitled to substantial money damages because Defendants Costco and Capital One — a large retailer and a large bank, respectively — unlawfully copied those percentages in a series of individual advertisements touting how much higher their particular deposit rates were than the national average, as reported by Plaintiff.  Defendants' copying of individual averages is conceded; at issue for the copyright claim in this case is whether the percentages themselves are entitled to federal protection under the Copyright Act.

---

[2] Kellie Woodhouse, *Eastern Michigan University hikes tuition 3.95%, sets $290.6M operating budget*, AnnArbor.com (Jun. 19, 2012), http://www.annarbor.com/news/eastern-michigan-university-hikes-tuition-395-sets-2906m-operating-budget/.

[3] John Davis, *City Garbage Fee Would Jump $13.50 a Month to $39 in Budget Plan*, LoHud.com (Sept. 17, 2013), http://www.lohud.com/article/BK/20130917/NEWS01/309170019/Proposed-city-budget-increases-tax-levy-3-95-percent.

[4] *Sugar prices extend gain in futures trade, climbs 3.95%*, The Indian Express (Nov. 20, 2012), http://www.indianexpress.com/news/sugar-prices-extend-gain-in-futures-trade-climbs-3.95-/1033610/.

[5] (Decl. of Michael Kiernan, Ex. C, at COB0000194.)

The Court previously determined, on Defendants' motion to dismiss, that Plaintiff plausibly had alleged that its works of authorship had certain features that could, drawing all inferences in Plaintiff's favor, lead to the conclusion that its works of authorship were entitled to copyright protection.  *See BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 601–09 (S.D.N.Y. 2010).  But now the evidence is in, and, on cross-motions for summary judgment, the Court determines that, even drawing all reasonable inferences from the evidence in Plaintiff's favor, the averages are unprotectable because they are uncopyrightable facts, because they are too short to be copyrighted, and because the so-called merger doctrine — which applies where there is "only one . . . or so few ways of expressing an idea, that protection of the expression would effectively accord protection to the idea itself," *id.* at 608 (internal quotation marks and alterations omitted) — bars copyright protection.

But that is not the only claim in this case.  Plaintiff also contends that Defendant Capital One exceeded the scope of a License Agreement it signed that allowed it to use Plaintiff's data for certain marketing purposes.  The Court finds that the contract is ambiguous in relevant part and that a reasonable jury could decide in favor of either Party on this claim.  Accordingly, summary judgment is not appropriate for either party on the contract claim.

<u>I. Background</u>

A. Factual Background

    1. The Parties

Plaintiff Banxcorp is a Delaware corporation that does business under the name "Banxquote."[6]  (Pl's. Resp. to DSUF ¶ 131 (citing Lipkis Decl. Ex. 76).)[7]  Plaintiff touts online

---

    [6] Plaintiff stated in its Second Amended Complaint that it is a "New York corporation," (SAC ¶ 1), but it now disputes *its own statement* and states that it "is a corporation organized

3

that it "provides a family of widely followed indices and benchmarks that measure the rates and performance of banking, depository, mortgage, home equity and consumer loan markets." (Mertzel Decl. Ex. O, at BX 0048.)  In other words, Plaintiff regularly surveys the interest rates or other prices offered by particular financial institutions across the country, and then compiles this data into various indices that represent "national averages" of the rates.

Defendant Capital One Financial Corporation is a Delaware corporation that is the parent company of co-Defendants Capital One Bank (USA), N.A., and Capital One, N.A., which are nationally chartered banks with principal places of business in Virginia.  (DSUF ¶¶ 1–4.)  The Court refers to these entities collectively as "Capital One" except where expressly noted.  Capital One, a well-known national bank, provides so-called national direct banking products and services directly to consumers from its national headquarters.  (DSUF ¶¶ 5, 8.)

Defendant Costco Wholesale Corporation, a Washington corporation, is the second largest retailer in the United States.  (DSUF ¶ 11.)  Costco operates over 600 warehouse-style retail stores worldwide and has approximately 66.5 million cardholders.  (DSUF ¶ 12.)  In addition to the products sold at its warehouses, Costco markets a variety of services to its members.  (DSUF ¶ 16.)  Nearly all of these services are provided by third parties that have marketing agreements with Costco.  (DSUF ¶ 17.)

---

under the laws of the State of Delaware."  (Pl.'s Resp. to DSUF ¶ 131 (citing Lipkis Decl. Ex. 76).)  As explained further in Section II.B., Plaintiff's state of incorporation matters for jurisdictional purposes.

[7] "DSUF" refers to Defendants' Statement of Undisputed Material Facts, and "PSUF," refers to the analogous document filed by Plaintiff.  Both of these documents have been filed under seal because they allegedly contain details of confidential business practices and arrangements.

## 2. The Use of Plaintiff's Data in Capital One and Co-Branded Advertisements and Marketing Materials

Capital One markets its banking products nationally.  During the time period relevant to this case, its marketing materials frequently provided the Capital One rate being offered for a particular financial product alongside one or more comparison rates, such as a competing bank's rates or a national average rate.  (DSUF ¶¶ 65, 67.)  Capital One used comparison rates in many ads because it found that consumers often responded favorably to advertisements that provided a point of reference.  (DSUF ¶ 71.)

 Beginning in May 2003, Costco and Capital One entered into a series of marketing agreements.  (DSUF ¶¶ 22, 24.)  Costco and Capital One referred to this relationship as a "partnership," whereby Costco would facilitate the marketing of Capital One products and services to Costco members, and Capital One would provide Costco members with certain financial products and services at a "premium" rate.  (DSUF ¶ 36.)

Prior to January 2004, Capital One had been using national averages provided by a company called Bankrate in many of its advertisements.  (DSUF ¶ 76.)  But, for a variety of reasons — including the fact that Plaintiff published its rates for free online, which allowed potential consumers to verify the accuracy of the national averages, (DSUF ¶¶ 80, 81) — Capital One decided to switch to Plaintiff's averages.  (DSUF ¶ 84.)  On January 28, 2004, Capital One entered into a license agreement with Plaintiff to use Plaintiff's savings and jumbo CD averages, as well as its savings and jumbo money market averages, in many of its marketing materials, both online and in print.  (DSUF ¶¶ 94, 115.)  Capital One agreed to pay $6,000 per year for this privilege.  (DSUF ¶ 115.)  During the course of the agreement, Capital One obtained the national averages by copying the relevant data directly from Plaintiff's website.  (DSUF ¶ 99.)

Soon after the license agreement became effective, Capital One began using Plaintiff's data in its standard national marketing materials.  (DSUF ¶ 97.)  Later, Capital One began using Plaintiff's averages in marketing materials, both online and in print, that were created and distributed as part of the partnership agreement with Costco.  (DSUF ¶ 98.)

The record contains many examples of these partnership advertisements.  An entirely typical one from 2006 states at the top: "Earn more with exclusive rates for Costco members!" (Decl. of Michael Kiernan, Ex. C, at COB0000194.)  On the left side of the ad, there are several bullet points touting features of the account, and an offer stating that "Costco Executive Members receive $25 credited to their first new account opened."  (*Id.*)  On the right side are two bar graphs.  The first says "Money Market Account ($5,000 account balance)," and below that are two bars of different heights.  (*Id.*)  The left bar, in large numbering, states that Capital One's rate is 4.26%, and, in smaller print to the right of this, the ad notifies the reader that 4.26% is the "Annual Percentage Yield," or "APY," and there is a single asterisk next to that definition.  (*Id.*)  The right bar is much lower, and, above it in slightly smaller lettering and numbering, the ad states that the "National Average" is 1.20% APY, and there are two asterisks next to "APY." (*Id.*)  The second bar graph, which is reproduced just below, is similar to the first, except the second graph gives the Capital One and national average rate for a "Certificate of Deposit ($5,000 deposit, 5-year term)."  (*Id.*)  In this graph, the Capital One rate is 5.16% APY, and the National Average is 3.95% APY.  (*Id.*)  The comparative height of the bars is adjusted accordingly.



(Decl. of Michael Kiernan, Ex. C, at COB0000194.)

The single asterisk and the double asterisk are defined in small print on the left side of the page. (*Id.*)  The text following the single asterisk gives further details of the offer.  (*Id.*)  It is typical of the fine print that many people have encountered in the industry: the minimum daily balance requirement, minimal initial deposits, and the obligatory disclosures that the "terms and conditions of this offer" and the "rates" advertised are "subject to change without notice."  (*Id.*)  Meanwhile, more relevant for purposes of this case, the text following the double asterisk contains the source of the national average representation.  It reads, in full: "National average of APYs for CDs and money market accounts as published by Banxquote.com as of 12/21/05."  (*Id.*)

Below the two graphs on the right side of the ad is marketing copy.  "I love the exclusive perks Capital One offers Costco Executive Members, like the $25 I received when I opened my account," says "Jeffrey S." who is, presumably, a satisfied customer.  (*Id.*)  On the left side of the page, the ad implores the reader that he or she should "Open an account today!", and it instructs the reader either to visit costco.com or call a toll-free number to do so.  (*Id.*)  The logos of both Capital One and Costco are featured, and there are additional disclosures, fine print — i.e., "Member FDIC" — and even a copyright invocation by "Capital One Services, Inc."  (*Id.*)

Defendants used the national average data reported by Plaintiff frequently and essentially continuously during the 2004–08 period that is at issue in this suit.  (PSUF ¶¶ 96, 100.)  In

7

particular, the then-current Capital One interest rate was continually displayed next to a relevant

national average rate from Plaintiff on a co-branded website, and Defendants regularly

distributed brochures and marketing campaigns similar to the advertisement described above

during the relevant time period.  This co-branded website, which Defendants acknowledge was

initially subject to Costco's approval, was advertised to the public as being accessible solely by

visiting Costco's website at costco.com and clicking on "Services."  (Defs.' Resp. to PSUF,

¶¶ 89, 97.)

B. Procedural History

    1. Prior Determinations

    Originally, Plaintiff's CEO Norbert Mehl was also a Plaintiff in this case, and,

proceeding pro se, Plaintiffs filed their Complaint on February 25, 2009.  *Banxcorp*, 723 F.

Supp. 2d at 600.  After retaining counsel, Plaintiffs filed the SAC on September 2, 2009.  *Id.*

    The SAC alleges seven causes of action.  *Id.*  There are two federal causes of action:

Count One, which alleges copyright infringement based upon Defendants' improper use of the

BanxQuote Indices, (*id.* ¶¶ 106–16); and Count Three which alleges violation of the Digital

Millennium Copyright Act ("DMCA"), based on allegations that when Defendants copied the

BanxQuote Indices they altered or removed the copyright management information BanxCorp

had associated with the data, (*id.* ¶¶ 126–33).  The remaining five causes of action arise under

New York law: Count Two alleges hot news misappropriation of the time-sensitive data

contained in the BanxQuote Indices, (*id.* ¶¶ 117–25); Count Four alleges fraud based on

allegations that Defendants materially misrepresented their intentions with respect to their use of

the BanxQuote Indices pursuant to the license agreement, (*id.* ¶¶ 134–43); Count Five alleges

breach of contract against Capital One only, based on the alleged distribution to, and use of the

BanxQuote Indices by, Costco in violation of the License Agreement, (*id.* ¶¶ 144–51); Count Six alleges unfair competition based on allegations that Defendants' use of the BanxQuote Indices gave Defendants an unfair competitive advantage both in terms of decreased web traffic at Plaintiffs' websites and in terms of direct competition in providing savings accounts and CDs, (*id.* ¶¶ 121, 152–57); and Count Seven alleges unjust enrichment based on allegations that Defendants received value due to their wrongful use of the BanxQuote Indices, (*id.* ¶¶ 158–61).

Defendants moved to dismiss each claim for failure to state a claim, and the Court granted the motion in part and denied the motion in part. In particular, the Court dismissed as preempted by the Copyright Act Count Four, alleging fraud; Count Six, alleging unfair competition; and Count Seven, alleging unjust enrichment. *Banxcorp*, 723 F. Supp. 2d at 617–20. The Court also dismissed Mehl personally as a Plaintiff, because Mehl conceded he lacked standing. *Id.* at 621.

On July 8, 2011, the Parties stipulated that Count Two, alleging hot news misappropriation, and Count Three, alleging the DMCA violation, would be dismissed with prejudice. (Dkt. No. 68.) Thus, two claims now remain in the case: Count One, the federal claim for copyright infringement; and Count Five, the state claim for breach of contract against Capital One only.

### 2. Copyright Registrations

Plaintiff's copyrights were unregistered during the time of Defendants' allegedly infringing activity. On March 5, 2009, after Plaintiff filed this lawsuit, Mehl submitted to the Register of Copyrights twenty applications for a federal copyright in the averages. (Mertzel Decl. Ex. T.) Each individual application covers a three-month span from January 1, 2004 to December 31, 2008. (*Id.*; *id.* at Ex. U, at 1.) Each "work" consists of five tables of rates for

various financial products, totaling approximately 400 different rates.  (*Id.* Ex. S, Ex. U, at 1.)

Mehl described the set of weekly tables that comprise each individual registration as a "[g]roup

registration for database titled BANXQUOTE INDEX."  (*Id.* at Ex. S, at BX002117.)  He

identified each quarterly group of tables as a derivative work, and in the space where a registrant

is required to identify any "preexisting work or works that this work is based on incorporates,"

he wrote "Previously published database."  (*Id.* at BX002118.)  Where he was asked to "give a

brief general statement of the material that has been added to this work and in which copyright is

claimed," he typed "Weekly updates."  (*Id.*)  Later, a representative of the Copyright Office

notified Mehl that "the application does not clearly describe the new material on which the claim

may be based."  (*Id.* at Ex. U.)  The representative suggested that an appropriate statement of the

new material in the work would be "'revised compilation,'" and Mehl agreed.  (*Id.*)  The twenty

works were then registered.  (*Id.* at Ex. V.)

### C. The Instant Motions

The Parties conducted discovery on the remaining claims.  The Parties have now cross-

moved for summary judgment on both claims.  Plaintiff also submitted objections under Federal

Rule of Civil Procedure 56(c)(2) to the admissibility into evidence of certain materials, and it

moved for sanctions against Defendants for violation of the discovery rules.  The Court held oral

argument on all outstanding motions on September 17, 2013.

## II. Discussion

### A. Standard of Review

Before the Court are cross-motions for summary judgment.  Summary judgment shall be

granted where the movant shows that there is "no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322–23 (1986).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006) (noting that a court must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted).

Importantly for this case, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also Wrobel v. Cnty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) ("To survive a motion under Rule 56(c), [plaintiff] need[s] to create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing that there is a genuine issue for trial." (internal quotation marks and emphasis omitted)). A fact is material when "it might affect the outcome of the suit under governing law."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).

11

At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *See Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted).  Thus, a court's goal should be to "isolate and dispose of factually unsupported claims."  *Celotex*, 477 U.S. at 323–24.

At the summary judgment stage, it is the "duty of district courts not to weigh the credibility of the parties."  *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005).  Thus, even when a plaintiff has relied exclusively on his own testimony, courts have denied summary judgment — but only as long as the plaintiff's "testimony was not contradictory or rife with inconsistencies such that it was facially implausible."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Bridgewater v. Taylor*, 832 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (denying summary judgment for plaintiff where defendant's evidence consisted "solely of his own testimony," but this testimony offered "a plausible alternate version of events"); *Bennett v. Vaccaro*, No. 08-CV-4028, 2011 WL 1900185, at *7–8 (S.D.N.Y. Apr. 11, 2011) (denying summary judgment where defendants did not establish that plaintiff's "testimony is, either on its face or in light of any other statements he has made, so self-contradictory or implausible as to rule out crediting it," and there was no evidence that plaintiff "ever contradicted his current version of [events]").

## B. Copyright Infringement Claim

### 1. Overview

"'To prevail on a claim of copyright infringement, the plaintiff must demonstrate both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant.'" *Cameron Indus., Inc. v. Caravan, Ltd.*, 676 F. Supp. 2d 280, 283–84 (S.D.N.Y. 2009) (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109–10 (2d Cir. 2001)); *see also Porto v.*

*Guirgis*, 659 F. Supp. 2d 597, 608 (S.D.N.Y. 2009) (requiring "'ownership of a valid copyright, and [] copying of constituent elements of the work that are original'" (quoting *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996))).  It is undisputed that Defendants actually copied Plaintiff's individual averages.  But Defendants vigorously dispute that they have copied anything protectable under federal copyright laws, because, among other arguments, the individual averages are unprotectable, discovered facts; they are uncopyrightable short phrases; and, even assuming the final values are in some sense "expressions," the merger doctrine precludes their protection.

In resolving these issues, the Court first determines what material facts are in genuine dispute.  Then, the Court surveys the law of copyright in factual material.  Next, taking the facts in the light most favorable to the non-moving party, the Court explains why the averages are uncopyrightable facts.  Finally, the Court explains additional why the averages are uncopyrightable under various other doctrines.

2. Plaintiff's Products

Because the legal lines are so carefully drawn in this area, it is vital to understand in detail the nature of how Plaintiff's averages are computed, how they are presented to the public, and how they are used.  Despite Plaintiff's efforts to muddy some of the waters, few material facts are in *genuine* dispute.

a. The Computation of Plaintiff's National Average Rates

According to Plaintiff's own website, Plaintiff "provides a family of widely followed indices and benchmarks that measure the rates and performance of banking, depository, mortgage, home equity and consumer loan markets."  (Mertzel Decl. Ex. O, at BX 0048.)  In other words, Plaintiff regularly surveys the interest rates or other prices offered by particular

13

financial institutions across the country, and then compiles this data into various indices that represent "averages" or other important financial benchmarks.

| Vol. 20 | BanxQuote Index - National US Avg. Bank Yields |
|---|---|
| | Copyright (C) 2004 by BanxQuote |
| No. 1 | **Savings Money Markets & CDs** |

Consumer savings rates for amounts of $10,000 or less.

| Date | MMkt | 3mo CD | 6mo CD | 1yr CD | 2yr CD | 5yr CD |
|---|---|---|---|---|---|---|
| 03/30/04 | 0.56 | 0.61 | 0.71 | 0.87 | 1.46 | 2.78 |
| 03/23/04 | 0.57 | 0.61 | 0.71 | 0.87 | 1.45 | 2.77 |
| 03/16/04 | 0.57 | 0.62 | 0.72 | 0.89 | 1.48 | 2.82 |
| 03/09/04 | 0.57 | 0.62 | 0.73 | 0.92 | 1.58 | 2.94 |
| 03/02/04 | 0.57 | 0.62 | 0.73 | 0.92 | 1.58 | 2.94 |
| | | | | | | |
| 02/24/04 | 0.58 | 0.62 | 0.72 | 0.92 | 1.58 | 2.93 |
| 02/17/04 | 0.58 | 0.63 | 0.72 | 0.92 | 1.59 | 2.93 |
| 02/10/04 | 0.58 | 0.63 | 0.72 | 0.92 | 1.59 | 2.97 |
| 02/03/04 | 0.57 | 0.63 | 0.71 | 0.93 | 1.61 | 3.00 |
| | | | | | | |
| 01/27/04 | 0.58 | 0.64 | 0.73 | 0.91 | 1.51 | 2.93 |
| 01/20/04 | 0.57 | 0.64 | 0.74 | 0.93 | 1.53 | 2.94 |
| 01/13/04 | 0.57 | 0.65 | 0.74 | 0.94 | 1.63 | 3.04 |
| 01/06/04 | 0.58 | 0.65 | 0.74 | 0.96 | 1.62 | 3.03 |

**Descriptive Statement** - Subject and origins of the data:
U.S. national average rates quoted by the largest banks in all 50 states and Washington DC, as provided to BanxQuote and published continuously online at www.banxquote.com.

**Approximate number of total data records:** 400

**Nature and frequency of changes:** weekly updates

(Mertzel Decl. Ex. S, at BX002125.)

Plaintiff compiles tables of averages organized by date, such as the one at the top of the following page. A variety of industry and general news publications described Plaintiff's product in a manner similar to that in which Plaintiff presented its own data. For instance, the record reveals that, in 2001, the *Wall Street Journal*'s "Banxquote Banking Center" reported that Plaintiff "provides benchmark rates and pricing information of financial institutions throughout

the United States." (Mertzel Decl. Ex. N, at BX0091.) *Newsweek*, in an article on savings rates around the country, noted that Plaintiff's CEO Norbert Mehl "surveys rates on savings deposits nationwide." (Mertzel Decl. Ex. P., at BX0105.) *American Banker* reported that Banxcorp is a firm that "monitors CD [i.e., certificate of deposit] rates," and featured in its front-page story a graph representing "[y]ields on 6-month CDs" from January to September of 1989, crediting "Banxquote" as the data's source. (Mertzel Decl. Ex. Q, at BX00107.) Indeed, the *Wall Street Journal* regularly included in its print edition a table of benchmark rates provided by Banxquote, such as one in the record titled "Banxquote Money Markets," which has a subheading stating "Average Yields of Major Banks." (Mertzel Decl. Ex. Q, at BX0065.)

The way the Banxquote indices are produced reflects their stated purpose: They are mathematical averages of the rates advertised by certain major financial institutions, updated at least weekly. Thus, a former software developer at Banxcorp named Abu Thomas testified that "if there are five banks," then, to calculate its average rate, Banxcorp would "take the average of five banks." (Lipkis Decl. Ex. 11, at 41.) The deposition continued:

> Q: So you take the rate that each of the five banks is paying on money markets, add it up, and divide?
> A: Yes.
> Q: Simple mathematical average?
> A: Yes.
> Q: Is there any weighting of the banks included in the national average?
> A: No.

(*Id.*) This method was independently confirmed by Defendants' expert Bruce Webster, a computer scientist who examined Plaintiff's source code.[8] (*See* Webster Decl. Ex. A, at 1.)

---

[8] Plaintiff challenges the admissibility of this expert report. For the reasons given below, the Court finds the expert report to be admissible.

Webster noted that the national average values copied by Defendants "are simple mathematical averages of reported rates, with no weighting or other calculations involved." (*Id.*)  In fact, only one actual computational function is used: a built-in database function called "AVG()," which adds up the total of the values and divides by the number of entries. (*Id.* at 20.)[9]  Plaintiff has proffered no evidence that would show that the computation process is any more complex.

So the computational process is uncomplicated, and the output is but a single number on any given date.  It turns out the inputs are equally straightforward:  Plaintiff maintains a database into which someone inputs the interest rate or other relevant, publicly available financial information from one big bank in each state, plus one in Washington, DC, and then the software calculates an average. (*Id.* at 27.)  From November 2002 to May 2007, for instance, the set of banks remained entirely consistent for the 5-year national average CD rate. (*Id.* at 28.)  That is, the input is simply the 5-year CD rate from "exactly the same set of banks, week after week, for 233 weeks." (*Id.*)  The story is nearly the same for the other average relevant to this case, the national money market rate.  For that average, Plaintiff made only three changes to the input banks from November 2002 to May 2007. (*Id.*; *see also* Mertzel Reply Decl. Ex. K, at 1 (Mehl, in an email to Capital One representatives, stating that "BanxQuote calculates the average rates based on the largest banks in each of the 50 states and DC"); Mertzel Decl. Ex. S, at BX002125

---

[9] A user of Plaintiff's database software must of course ensure that all rates are entered in a standard format.  That is, a user must be sure that each rate entered is for a comparable product, or has the same account minimum, or that all rates are given in the same unit of time — i.e., that the rates are converted to APY, or "Annual Percentage Yield," which is an industry standard metric.  This means that either the user or the software sometimes may have to undertake a fairly trivial conversion process before the average rate can be computed. (DSUF ¶ 152; Lipkis Decl. Ex. 6, at 153–55 (Mehl describing the APY conversion process, which involves taking a rate reported in one of "three different day bases" and converting them all to APY).)

(Plaintiff's submission to the Copyright Office stating that the data consisted of the "U.S. national average rates quoted by the largest banks in all 50 states and Washington DC").)

The evidence supporting many of the facts above comes primarily from Plaintiff's own website, the deposition of its own former employee, and the sole expert report submitted on this issue.  Plaintiff in its 56.1 statement and Mehl in his deposition dispute some aspects of this account, but — in addition to being extremely confusing and rife with legal propositions couched as factual differences — Planitiff's factual account, to the extent it differs from anything discussed above, is "contradictory [and] rife with inconsistencies such that it [is] facially implausible." *Fincher*, 604 F.3d at 726.  In other words, Plaintiff's deposition testimony fails to create any *genuine* dispute regarding the facts of how the averages are created, or of their perception as factual representations of the national average rates by the financial and general interest media. *See* Fed. R. Civ. P. 56(a).

Defendants offered the following as a statement of undisputed material fact: "Banxquote provides benchmark rates and pricing information on financial institutions throughout the United States."  (DSUF ¶ 132.)  As explained above, that statement is amply supported by the record. But Plaintiff attempts to create some factual dispute over that fact:

> BanxCorp does not dispute this statement, to the extent that the BanxQuote indices pertain to the creation of non-binding indices used to predict or estimate the performance of bank money market savings and CD rates in the United States, rather than the discovery of facts or actual national average bank rates in a literal sense.  The phrase "national average bank rates" or "benchmark rates" is a paradoxical colloquial or figurative expression or arguably an oxymoron since there are thousands of banks in the United States.  In addition, the disclosure of individual bank rates or recording of national average interest rates paid by banks are not compulsory or required by law, [and] there is a broad range of numerous possible variations not based on the same or substantially similar underlying market facts or singular form of expression.  BanxCorp further refers to its response to [16 other factual statements]. [Citing its

17

Response to Request for Admission and its Copyright Registrations.]

(Pl.'s Resp. to DSUF ¶ 132.)

The actual disputed facts are mostly obscured in that confusing response, and the explanation Mehl gives in his deposition is no more straightforward.  Consider the following important exchange.  The question that triggers the response that Mehl provides at the beginning of the quotation below pertains to what he thinks it means when Banxquote reports that, for instance, ".23 percent" is the national average interest rate for money market accounts on a given date.

> A: First of all, we just put numbers there.  People use it for different purposes.  So what they try to measure or how they try to measure, we cannot control.  So we use a certain system to show their performance over time.
> Q: What is .23 telling me?  What are you trying to tell me?
> A: I don't know what it tells you.  I know what it tells me.
> Q: What are you saying when you say .23?  What is .23?
> A: It shows an index based on certain banks that we track and certain indices that we track that are in our system.  And then it uses — and it shows it over time.
> Q: But today the .23 is not over time.  I'm asking what the .23 is telling me.  What are you telling me is .23?
> A: It could be what it would have been if you had left the money invested for a year.
> . . .
> Q: Is the average that banks are paying on money markets something that can be measured?
> . . .
> A: Theoretically, it could be. . . . First of all, it depends on what the meaning of the word "average" is, okay.  So when it comes to the average for money markets, the word "average" has been used as a colloquial term by various publishers and media, including us.  And each one attempts to show some index of certain banks that they track.  So that's why the word "average" in that context has a different meaning than what the word "average" would have in another context. . . .
> So that's one qualification.  The second is that in order to compute an average, you would have to track the interest rate of every bank in the United States.  So in theory, it may be possible, but in reality, it does not seem to be possible, because of the number of banks and the number of —

and the variety of money market products.  So there is no set convention
that would allow somebody to measure an actual average.  So you could
measure an estimate at best.

(Lipkis Decl. Ex. 6. at 88–91.)

Plaintiff thus appears to be putting forth a contrary factual account of how Plaintiff's

averages were described by Plaintiff, by Mehl, and by the media.  But Mehl's testimony on this

point has no actual support in the record, and indeed is directly contradicted by a variety of

documentary evidence.  For instance, Mehl's statement that Banxcorp "just put[s] numbers

there" is patently wrong: as explained above, Plaintiff published not only "numbers" —

Plaintiff's tables of average rates — but Plaintiff's own website contains a variety of detailed

explanations of what the data represents.  (Mertzel Decl. Ex. O, at BX0048.)  And its standard

License Agreement, which both Plaintiff and Capital One signed, states that "Banxquote agrees

to take all reasonable actions necessary to keep BanxQuote data current, accurate, true and

complete, and to notify [Capital One] of any errors or omissions."  (Lipkis Decl. Ex. 1-A, at 2.)

Thus, Mehl's testimony that he held out the BanxCorp averages as only estimates or predictions

is belied by his own promise on a document he personally signed to keep his "data current,

accurate, true and complete."  No reasonable jury could believe Plaintiff's testimony on this

point.

Also facially implausible is the statement in Plaintiff's Response to Defendants'

Statement of Undisputed Material Facts that the "phrase 'national average bank rates' or

'benchmark rates' is a paradoxical colloquial or figurative expression or arguably an oxymoron

since there are thousands of banks in the United States."  A mountain of incontrovertible

documentary evidence in the record shows that these phrases are not "paradoxical colloquials"

— whatever that means — but are instead the exact phrases used by Banxcorp itself, by Mehl,

19

and by the entire financial media to formally describe the averages.[10]   (Mertzel Decl. Ex. O, at

BX0048); *see Dzanoucakis v. Chase Manhattan Bank, USA*, No. 06-CV-5673, 2009 WL

910691, at *8 (E.D.N.Y. Mar. 31, 2009) (where the "uncontroverted record clearly supports a

[particular] finding," then "[p]laintiff's own self-serving declaration to the contrary is

insufficient, under the circumstances, to raise a triable issue of fact").

       In addition, Plaintiff and Mehl get quite philosophical about the nature of an "average."

But the point they are making about the "hypothetical" nature of an average is both factually

wrong and logically fallacious; this testimony, too, fails to create a genuine dispute of material

fact about Plaintiff's product.   For one thing, Plaintiff's statement is facially implausible as a

matter of describing the way the term "average" was actually used, as the record shows that both

Plaintiff as a company, Mehl himself, and the media used the term "average" in more than the

"colloquial" sense; rather, every relevant piece of documentary evidence in the record other than

Mehl's self-serving deposition testimony reveals that, to those well-versed in financial markets,

Plaintiff's data was treated as an "average" in the non-colloquial, mathematical sense.   (*E.g.*,

Mertzel Decl. Ex. N, at BX0091.)   And that media treatment was entirely justified, because

Mehl's statement is fallacious as a matter of mathematics.   After all, the numbers that Plaintiff

produced are unquestionably averages in the technical sense: any given data point reported by

Plaintiff is an exact, mathematical average of the rates that form the input into the database,

computed using the database function "AVG()."   (Webster Decl. Ex. A, at 1, 20.)   Indeed, there

is no testimony that contradicts Defendant's *factual* account of how the averages were

---

[10]   At oral argument, the Court asked counsel for Plaintiff what the phrase "paradoxical colloquial" means.   Counsel had no response.   Instead, she told the Court that her co-counsel had drafted that phrase — but co-counsel was not in the courtroom that day to explain what he meant.

calculated.  True, there is an entirely separate question of whether Plaintiff's *particular* average, taken from a set of large, geographically diverse banks, is a good approximation of what Mehl refers to as the "actual average" of "every bank in the United States."  But the answer to that question in no way affects the mathematical reality and the incontrovertible fact that Banxcorp's data points are simple averages.  Thus, no reasonable jury could conclude that each data point is anything other than a mathematical average.  The legal consequences of the fact that Plaintiff's input does not include data from every single bank in the United States are discussed in the next sub-section.

Plaintiff's assertion that somehow the data are predictions of future performance — that, in Mehl's words, an individual average of ".23%" in fact "shows performance over time" — is also without support.  As explained, all the evidence in the record is that ".23%" is the average of the roughly *current* rate that certain financial institutions are paying on their deposits.  (*E.g.*, Mertzel Decl. Ex. Q, at BX0065 (showing the "Banxquote Money Markets" table of average yields in the *Wall Street Journal*).)  Plaintiff attempts to portray each number as somehow containing an uncertain temporal component, apparently because an interest rate is something that is ultimately compounded and the resulting money is paid out at a future date.  But the fact that yesterday's average rate was .23% has ramifications for depositors today, tomorrow, and in five years does not mean that yesterday's rate of .23% is not a simple historical fact, fixed forever at that particular point in time.  No reasonable jury could find that an individual data point represents "performance over time" in any relevant sense, because no future financial upheaval could ever change the fact that the average rate being offered as of a particular date was a particular number.

As a final matter with regard to the factual characterization of the data, Plaintiff makes

much of the fact that competing providers of data — namely, those provided by the companies

Informa or Bankrate, Plaintiff's competitors — produced national average rates that differ

somewhat from Plaintiff's data.  Plaintiff includes an expert report on damages containing an

exhibit showing "Differences between Banxquote, Bankrate, and Informa Indices."  (Lipkis

Decl. Ex. 77, at Ex. C.)  In this section, there are a few exhibits that do indeed show some

variation in reported rates:  On one particular date in August 2008, the three indices diverged by

anywhere from approximately .20 to .59 percentage points, depending on the index.  (*Id.* at

COB0014998.)

   The Court, of course, takes this evidence at face value, and the Court construes the

divergence to be as large as Plaintiff's evidence permits.  But it should be clear that any

comparison with other averages does not change the nature of Plaintiff's calculation at all: that

is, how *others* might calculate a national average CD rate does not change the nature of the

evidence regarding how *Plaintiff* actually produces its data.

<u>b. Summary: Undisputed Material Facts Regarding Plaintiff's Averages</u>

   In sum, the record shows that the following material facts regarding Banxquote's national

averages for the money market and CD data are not in genuine dispute:

   1. Plaintiff's input to the averages was, for over four years, the most recently published

rates of major banks.  These rates were always publicly available and are objectively verifiable

facts about what interest rate a given bank is offering at a particular moment in time.  These rates

are inputted into Banxquote's database approximately weekly.  The particular banks used as

inputs changed infrequently, if ever, during the period at issue.  Some essentially trivial

conversion of published bank rates may have been necessary to ensure that the rates were

entered in a standard format.

2. Once the rates were inputted and standardized, the software calculated a simple mathematical average of the rates.  No weighing or any other sophisticated calculation or algorithm was used.  The built-in "AVG()" function was the only meaningful computer function used.  No financial data was used as part of the input to the calculation except the particular interest rate of a particular financial institution as of a particular date.

3. The output of the calculation was a single number that is the exact mathematical average of the inputted rates as of a particular date.  These outputs could then be compiled into a table, organized by date.

4. Plaintiff represented to consumers, customers, and the financial media that the averages were objective facts about average national interest rates as of a particular date.  Plaintiff promised licensees of its data that it would ensure the data was "current," "accurate," and "true."  The averages were called "benchmark rates," "national average rates," or other similar terms by Plaintiff, by Mehl, and by the financial and general interest press.

As described, the only evidence that might contradict these facts comes entirely from Mehl's own affidavits or deposition testimony.  "But a self-serving, contradictory affidavit fails to raise a triable issue of fact when it conflicts with documentary evidence." *Christiana Bank & Trust Co. v. Dalton*, No. 06-CV-3206, 2009 WL 4016507, at *4 (E.D.N.Y. Nov. 17, 2009); *see also Dzanoucakis*, 2009 WL 910691 at *8 (where the "uncontroverted record clearly supports a [particular] finding," then "[p]laintiff's own self-serving declaration to the contrary is insufficient, under the circumstances, to raise a triable issue of fact").  There is no triable issue of fact regarding how Plaintiff's data is computed or how it has been presented to and understood by the public.  Like many other cases implicating copyright in largely factual material, this case is ripe for decision at summary judgment. *See New York Mercantile Exchange, Inc. v.*

23

*IntercontinentalExchange, Inc.*, 497 F.3d 109, 119 (2d Cir. 2007) (deciding on summary judgment a case presenting the question whether settlement prices for futures contracts are entitled to copyright protection); *RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 676 F. Supp. 2d 9, 24 (D. Conn. 2009) (deciding on summary judgment a case presenting the question whether load ratings for ball bearings are entitled to copyright protection).

### 3. The Legal Landscape of Copyright in Factual Material

With the details of how Plaintiff's averages are computed and perceived in mind, it is time to turn to the legal question of whether Plaintiff's averages are protectable under the Copyright Act. The Court discussed the general legal landscape regarding copyright protection of factual material at some length in its earlier decision in this case. *Banxcorp.*, 723 F. Supp. 2d at 601–09. The discussion here tracks that discussion in many ways but also adds to it to include recent developments and additional analysis now that the issues in the case have been crystallized.

The key legal starting point is the deceptively simple proposition that "facts are not copyrightable." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 344 (1991). In *Feist*, the seminal Supreme Court precedent regarding the copyrightability of factual material, the Court theorized that no copyright can exist in facts "because facts do not owe their origin to an act of authorship[,] . . . [and are] not created[,] . . . [but] merely discovered . . . ." *Id.* at 347. But while originality "remains the *sine qua non* of copyright," "[f]actual compilations . . . may possess the requisite originality . . . [where] [t]he[] choices as to selection and arrangement . . . are made independently by the compiler and entail a minimum degree of creativity." *Id.* at 348. So the key line the Court drew in *Feist* is the one between uncopyrightable facts themselves and their arrangement, which may contain some elements of protectable originality. As applied by

the Court in *Feist*, the white pages in a telephone directory contained only unprotectable facts arranged in an entirely unoriginal way.  *See Feist*, 499 U.S. at 362.  The defendant was found not liable for copying at least 1,309 entries from the plaintiff's telephone directory and incorporating those entries into its own directory.  *See id.*

The cases applying *Feist* have made clear that some propositions are less obviously factual than the indisputably factual proposition that, say, the President of the United States resides at 1600 Pennsylvania Avenue in Washington, D.C.  For instance, in *New York Mercantile Exchange, Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109 (2d Cir. 2007), the Second Circuit was presented with the question of whether settlement prices for futures contracts were uncopyrightable facts.  *Id.* at 114.  While it might seem that the answer should be "yes, of course settlement prices are facts," it turns out that the determination of the settlement prices by the plaintiff exchange is fairly complicated.  According to the Second Circuit,

> A futures contract requires the delivery of a commodity at a specified price at a specified future time, though most contracts are liquidated before physical delivery occurs. . . . The settlement prices are used to value the open positions. . . . Unlike on a securities exchange, the settlement price may not be the final trade, for two reasons.  First, because of the nature of trading, it is not always clear which trade was the closing trade. . . . Second, . . . [f]or the "outer" months, those further from the trading date, there is often little or no trading on a particular day. . . . For high-volume months, settlement prices are based on a formula: "a weighted average of all trades done within the closing range." . . . For low-volume months, the extent of the . . . creative judgment is disputed.

*Id.* at 110–11 (footnotes omitted).  The Second Circuit ultimately decided the case on the alternative ground that the merger doctrine barred copyright protection, *id.* at 115, but the Second Circuit stated in well-considered dicta that "there [wa]s a strong argument" that the settlement prices were unprotectable facts, *id.* at 114, though that conclusion was less certain for the low-volume months, *id.* at 116.  For those low-volume months, the Court stated that, because

"there is no real market to speak of," the settlement prices "appear[] closer to creation, to making

predictions of expected values." *Id.* (internal quotation and ellipsis omitted).  By contrast,

> For high-volume months, settlement prices are determinations of how the
> market values a particular futures contract . . .[,] not how the market
> *should* value them or *will* value them.  Under this view, the market is an
> empirical reality, an economic fact about the world . . . .  So characterized,
> there is one proper settlement price; other seemingly-accurate prices are
> mistakes which actually overvalue or undervalue the futures contract.

*Id.* at 115 (emphasis in original).  Therefore, consistent with the dicta in *New York Mercantile*,

when confronted with raw data that have been converted into a final value through the use of a

formula, courts should put significant weight on the degree of consensus and objectivity that

attaches to the formula to determine whether the final value is fundamentally a "fact."  *See*

*Columbia Broad. Sys., Inc. v. Am. Soc. of Composers, Authors & Publishers*, 620 F.2d 930, 935

(2d Cir. 1980) ("[A]ppellate courts . . . have an entirely legitimate function of elucidating

principles of law, fairly raised by litigation, even if the resulting pronouncements are not

absolutely required for the precise decision reached.  Appellate guidance is not valueless because

it is dictum.").

   In *New York Mercantile*, the Second Circuit contrasted the settlement prices at issue with

a "compilation of estimated projections for used car prices" that the Second Circuit had

previously held merited copyright protection as a group in *CCC Information Services, Inc. v.*

*Maclean Hunter Market Reports*, 44 F.3d 61 (2d Cir. 1994).  *See N.Y. Merc.*, 497 F.3d at 115

n.5.  The crucial distinction between the two cases was that "[t]he values [in *Maclean Hunter*]

were based on assumptions about 'average' cars; as these cars did not exist, there could be no

actual market to discover."  *Id.*  By contrast, "settlement prices can be seen as 'pre-existing facts'

about the outside world which are discovered from actual market activity."  *Id.*

26

*New York Mercantile* and *Maclean Hunter* together provide helpful guideposts in determining the copyright status of price data.  If the data purports to represent actual objective prices of actual things in the world — the actual price of an actual settlement contract on a particular day — it is an unprotectable fact; if the data purports to represent an estimated price of a kind of idealized object — for instance, what a hypothetical, mint condition 2003 Ford Taurus with approximately 60,000 miles might be worth — then the hypothetical price may be eligible for some form of copyright protection in the right circumstances.  *See Maclean Hunter*, 44 F3.d at 71 (distinguishing between "building-block" ideas "that undertake to advance the understanding of phenomena or the solution of problems . . . and those . . . that do not undertake to explain phenomena or furnish solutions, but are infused with the author's taste or opinion").

To illustrate this distinction, this Court gave the following example in its previous opinion.  If a scientist knew an object's mass and the force acting upon the object, this raw data could be converted into the object's acceleration due to that force by using the "formula" known as Newton's Second Law of Motion.  This use of a formula would merely discover an "empirical reality," and therefore the result would be uncopyrightable.  This is true even if the resulting output is not completely accurate, so long as the formula used is generally accepted and quintessentially objective.  Thus, the output data generated by using Newton's Second Law of Motion — force equals mass times acceleration, or "F=ma" — would be a series of uncopyrightable facts, even though the output is in some sense an estimation because Newton's formula fails does not consider relativistic effects.  *See Albert Einstein & the Theory of Relativity*, http://csep10.phys.utk.edu/astr161/lect/history/einstein.html (last visited September 26, 2013) (lecture from "Astronomy 161" course at the University of Tennessee, Knoxville).

Since *New York Mercantile*, there has been one published opinion from a district court in

27

the Second Circuit that has attempted to navigate these tricky waters.  In *RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 676 F. Supp. 2d 9, 21 (D. Conn. 2009), the court considered the copyrightability of "load ratings" of ball bearings, which are measures of the "radial force a particular bearing having known geometric and physical attributes, such as size and quantity of balls, can withstand."  *Id.* at 16 (internal quotation marks omitted).  The exact values of the load ratings were "mainly a function of the geometry of the bearing and material, [but also accounted for] certain other 'life factors' enumerated in published industry guidelines . . . [such as] tolerances, material cleanliness, lubrication, hardness, and operating temperature."  *Id.*  The plaintiff's strongest argument that the load ratings were not mere uncopyrightable facts was that "creativity [wa]s used in developing the load ratings . . . [, because] certain bearing manufacturers use the various 'life factors' . . . to adjust their load rating calculations from a standard calculation based only upon the geometrical features of the bearings."  *Id.* at 22. However, the court found that argument unpersuasive in the light of *New York Mercantile*, because

> [w]hile there may be some level of judgment involved in selecting which particular "life factors" to utilize in adjusting the standard load rating calculation, based upon the record before the Court such judgment is very minimal given that the relevant life factors are published in industry guidelines.  The level of judgment necessary to calculate the load rating information is undoubtedly no more than that needed to determine the settlement prices at issue in *New York Mercantile* . . . .

*Id.*  Just as in *New York Mercantile*, though, the court did not rest its decision solely on this ground, and it stated that it would reach the same decision even if "the load bearing ratings are expressions rather than facts," because of the court's application of the merger doctrine.  *Id.* at 23.  The court's reasoning, therefore, like the reasoning in *New York Mercantile*, could be considered dicta in some sense.

All of the authorities discussed so far were available to the Court at the time of its earlier decision in this case.  Since then, the Second Circuit has not decided any additional on-point copyright cases, but its decision in *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876 (2d Cir. 2011), provides some additional illumination.  In that case, the Second Circuit held that the defendant was not liable under the state-law doctrine of hot news misappropriation for reproducing plaintiffs' "actionable" stock ratings — for example, an analyst's downgrade of or recommendation to buy a particular stock — without authorization.  *Id.* at 881.  While the majority did not discuss whether the ratings were uncopyrightable facts for purposes of the Copyright Act in particular, the majority opinion described the defendant as "collecting, collating and disseminating factual information — the facts that [plaintiff brokerage firms] and others in the securities business have made recommendations with respect to the value of and the wisdom of purchasing or selling securities — and attributing the information to its source.  The [plaintiffs] are making the news; [the defendant], despite the [plaintiffs'] understandable desire to protect their business model, is breaking it."  *Id.* at 902 (emphasis removed).[11]  As one leading copyright scholar noted, the case represents "[t]he most stunning example of judicial skepticism of ratings" to date.  James Grimmelman, *Three Theories of Copyright in Ratings*, 14 Vand. J. Ent. & Tech. L. 851, 865 (2012); *see also id.* (noting that the *Barclay's* opinion, despite dealing with state-law misappropriation, "casts grave doubt on copyright protection of influential ratings").

---

[11] Judge Raggi, in a concurring opinion, also hinted that the recommendations were not copyrightable.  She called the stock recommendations "uncopyrightable opinions," citing *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978 (2d Cir. 1980), which she described as "noting that copyright does not protect ideas or interpretations of facts."  *Barclay's*, 650 F.3d at 907 (Raggi, J., concurring).

In 2010, the Court summarized the doctrine as follows.  Where: (1) the raw data used to create the final value were unprotectable facts; (2) the method of converting raw data into the final value was an industry standard, or otherwise widely accepted as an objective methodology; and (3) the final value attempted to measure an empirical reality, then the final value produced from raw data ordinarily is not protected by copyright.  *Banxcorp*, 723 F. Supp. 2d at 604.  That summary not only appears to remain good law today, but it has been reinforced by the idea in *Barclay's* that the law should not allow a select group of people to gain a legal monopoly on information widely influential as a benchmark in financial markets.  *See Barclay's*, 650 F.3d at 896 n.29 (noting that allowing plaintiffs to block the reproduction of their recommendations "would ensure that the authorized recipients of the [r]ecommendations would in significant part be profiting because of their knowledge of the *fact* of a market-moving [r]ecommendation before other traders learn of that fact" (emphasis in original)).

### 4. Plaintiff's Averages Are Uncopyrightable Facts

Plaintiff's legal argument that any given individual average is protectable as a sufficiently original work withers away in light of the evidence of what Plaintiff's data is and the factual findings explained above.  Each average is a fact, plain and simple: It is the national average rate of interest offered by major U.S. banks on a given financial product at a given point in time based on publicly available data.  *See supra* Section II.B.2.  That is how Plaintiff held out its averages over the relevant time period, how the media interpreted and reported on them, and how any relevant consumer would have understood them.  Thus, on the spectrum from fact to estimate suffused with judgment and opinion outlined above, Plaintiff's data is legally equivalent to the unprotectable load ratings in *RBC Nice Bearings*, the likely unprotectable settlement prices in *New York Mercantile*, and the likely unprotectable analyst recommendations in

*Barclay's*.  By the same token, Plaintiff's list of averages are unlike the protectable list of estimated prices of hypothetical used cars at issue in *Maclean Hunter*.

Plaintiff has not created a genuine dispute of fact that the type of judgment that would infuse the data with "originality" goes into the calculation of each individual average.  Rather, Plaintiff inputs the relevant rates and the software runs an average, which Plaintiff then publishes verbatim.  And any "judgment" that went into the initial selection of banks was both extremely straightforward — one large bank in each state and the District of Columbia — and infrequent — Plaintiff's list of banks did not change at all for four years for one of the averages at issue. Applying the specific three-part test stated above, (1) the raw data used to create the final value consists entirely of unprotectable facts; (2) the method of converting raw data into the final value is an industry standard and widely accepted as an objective methodology, because the method involves merely tracking the interest rates offered  by large banks and computing a "simple mathematical average" of the inputted rates; and (3) the final value clearly attempts to measure an empirical reality.  *See Banxcorp*, 723 F. Supp. 2d at 604.  Each individual average is thus an uncopyrightable fact.

Instead of trying to parse the doctrine differently, Plaintiff instead claims that the averages are protectable based solely on its factually unsupported view of its averages.  "The Banxquote Indices are Purely Estimates or Predictions," states one subheading in Plaintiff's principal brief.  (Pl.'s Mem. 13.)  But, as explained, this statement is contradicted by the record. In fact, Plaintiff's averages are not predictions at all; they are reports of *historical* interest rates offered by financial institutions.  And, mathematically, they are not estimates at all; they are computed by computing the exact arithmetic mean of all the input values.

The only possible sense in which these averages could be considered "estimates" is by

taking into account the representation or purpose of the data as it is presented in various publications of the data series — including the presentation in Defendants' advertisements as the "national average rate."  That is, while any given value calculated by Plaintiff is exactly the average of the rates charged by the particular input banks, using this value to represent the "National Average Bank Rate" is in some sense an estimation, or perhaps a kind of shorthand, because Plaintiff's calculation does not use as input the average rate of every single financial institution in the United States.  But the fact that not every bank's interest rate enters the calculation is not nearly enough to move a reported average from the column of fact to that of judgment or opinion.  After all, very often, data fails to be perfectly representative or entirely complete relative to what it is supposed to measure, but the data nevertheless remains fundamentally factual.

For instance, no white pages directory lists every single person living in a particular area, or gets every address, phone number, and name exactly right — indeed, the white pages at issue in *Feist* even contained four fictitious listings, inserted to detect copying — but that does not make the white pages a work of opinion regarding who lives in a given area.  *See Feist*, 499 U.S. at 344.  Likewise, in a case about the census that did not address copyright issues, the Supreme Court acknowledged that no population census can possibly capture everything about the population it surveys with complete accuracy.  *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 322 (1999) (describing the Census Bureau's methods for compensating for the "undercount," which is the portion of the population not directly surveyed either in person or by mail).  And yet the Supreme Court stated in *Feist* that "[c]ensus data . . . do not trigger copyright" because "[c]ensus takers . . . do not 'create' the population figures that emerge from their efforts; in a sense, they copy these figures from the world around them."

32

*Feist*, 499 U.S. at 347.  So too here.  Each average at issue in this case is a fact about the world — an "empirical reality" — even though it is in some sense an imperfect representation of some platonic ideal of a "national average bank rate."

This explains why the fact that there are several competing companies that measure national average rates, all of which regularly computed slightly different final values, does not mean that Plaintiff's output is not fundamentally factual in nature.  The difference between two particular values, according to an email in the record, likely arises "due to the fact that the Informa national average is $10k [i.e., for accounts with a minimum balance of $10,000] and Bankrate's has no min [i.e., no minimum balance]."  (Lipkis Decl. Ex. 77, at  COB0014996.) Though not entirely clear from the record, the best inference is that each provider of national averages is actually collecting and computing a slightly different average, perhaps because each provider thinks that its own input is more relevant to its consumers.  For one company, the relevant metric is the interest rate large banks pay on CDs with a $10,000 minimum deposit, and, for another, it is the interest rate large banks pay on CDs with no minimum deposit.  These differences do not undermine the conclusion that Plaintiff's data is fundamentally an attempt to represent an empirical fact about the world.

Returning to the census analogy helps illuminate this point.  In creating census data, two different census takers might produce slightly different population figures, because there is some component of estimation and approximation that must be done given the limited resources and time of any organization that undertakes a population census.  *See Dep't of Commerce*, 525 U.S. at 322.  Likewise, here Plaintiff and its competitors use slightly different inputs to produce what each refers to as a "national average rate."  But the level of judgment that goes into this decision is both minimal and, more relevant, of a type that does not render the output copyrightable.  The

33

differences in output come from the company's slightly different views about how best to represent empirical, historical reality, given time and resource constraints and the need to simplify reporting and analysis for some audiences.

While the judgment here regarding "estimation" is minimal, even if it were more involved, it is still judgment of a fundamentally different character than the kind that can lead to potentially copyrightable price "estimates" like that ones at issue in *Maclean Hunter*.  As the Second Circuit stated in *New York Mercantile*, "[t]he values [in *Maclean Hunter*] were based on assumptions about 'average' cars; as these cars did not exist, there could be no actual market to discover."  *N.Y. Merc.*, 497 F.3d at 115 n.5.  But the settlement prices at issue in *New York Mercantile* "can be seen as 'pre-existing facts' about the outside world which are discovered from actual market activity."  *Id.*  The *New York Mercantile* court therefore drew a line between two kinds of price estimates: those prices that estimate the hypothetical value of a non-existent product, and those prices that estimate the current or historical value of an existent product.  The former price estimate is an estimate because it *must* be estimated; there is no true corresponding thing-in-the-world.  The latter price estimate, though, is only an estimate because of resource constraints or imperfect, incomplete information.  The decision in *New York Mercantile* implies that the former type of estimates are much more likely to merit copyright protection, not only because of the amount of judgment involved in the estimation but also because of the very nature of the judgment.  Plaintiff's averages fall on the side of the line where copyright protection is not available.

### 5. The Tables of Averages Are Not Copyrightable As Compilations

Defendants also do not own a valid copyright in their compilation of weekly averages.  In the Copyright Act, a "compilation" is defined as "a work formed by the collection and

34

assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."  17 U.S.C. § 101.  In light of this definition, a single number that is the outcome of a process that takes preexisting materials as inputs is *not* itself a compilation; once a calculation is done, that single output is no longer merely the result of "the collection and assembling of preexisting materials." That is, despite some confusion on this score, it is now clear on this record and from additional legal development that the only possible expression protectable as a compilation is Plaintiff's list of averages, organized by date.  But because that shows no more creativity in selection and arrangement than the white pages at issue in *Feist*, Plaintiff is not entitled to this form of copyright protection.

### a. Clarifying What Compilations Are

The statutory definition of a "compilation" given in 17 U.S.C. § 101 was elaborated in *Feist*.  The Court noted that "[m]any compilations consist of nothing but raw data."  *Feist*, 499 U.S. at 345.  Thus, the Court asked rhetorically, "[o]n what basis may one claim a copyright in such a work?  Common sense tells us that 100 uncopyrightable facts do not magically change their status when gathered together in one place."  *Id.*  In further explaining what may be protected by a copyright in a compilation, the Court stated that a "compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers."  *Id.* at 348.  As a matter of copyright law, "[t]hese choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws.  Thus, even a directory that contains absolutely no protectable written expression, only facts, meets the constitutional minimum for

copyright protection if it features an original selection or arrangement." *Id.* (citations omitted); *see also Key Publ'ns.*, *Inc. v. Chinatown Today Publ'g Enters., Inc.*, 945 F.2d 509, 512 (2d Cir. 1991) (defining a protectable compilation as "(1) the collection and assembly of preexisting data; (2) the selection, coordination, or arrangement of that data; and (3) a resulting work that is original, by virtue of the selection, coordination, or arrangement of the data contained in the work").

By contrast, a *single* output that takes as input more than one data point is not itself a compilation; instead, the *complete expression* of a selection and arrangement of factual matter is what may be protected as a "compilation." For example, in *Key Publications*, the entirety of a yellow pages directory featuring only businesses and categories particularly relevant to Chinese-Americans had a sufficiently original arrangement for the whole directory to be protectable as a compilation. *Id.* at 514. To be sure, the idea of an author's creativity in the "selection" of preexisting materials, which is so crucial for a compilation copyright, is also relevant to the question whether an individual price or some other individual piece of data is an uncopyrightable fact or a copyrightable expression. *See N.Y. Merc.*, 497 F.3d at 115–16 (analyzing the degree of judgment that goes into determining the settlement price of a futures contract for purposes of determining whether it is a fact or opinion, but not a compilation); *RBC Nice Bearings*, 676 F. Supp. 2d at 22 (noting that "[t]he level of judgment necessary to calculate the load rating information" of the ball bearings goes to whether the load ratings are purely factual). The more judgment that goes into the production of a price or a rating — as opposed to mere observation or calculation — the more likely the price or rating may be "original" and "creative," and hence possibly protectable on its own. *Id.*; *see also Banxcorp.*, 723 F. Supp. 2d at 605 (noting that the Court's test for protection of the averages "captures the Second Circuit's observation that 'the

exercise of judgment in choosing [ ] facts' is sufficient to warrant protection under the Copyright Act" (quoting *Key Publ'ns*, 945 F.2d at 513) (internal alteration in original)).  But the crucial point is that the single output of a complex calculation is not itself a compilation.[12]

### b. Application here

Properly understood, then, Defendants are not liable for copyright infringement of any potential compilation copyright.  Each individual average is not a compilation, because, as should be clear from the foregoing, each average value is not itself a "collection and assembly of preexisting data," but rather each is a single number that is the result of performing a mathematical operation on a collection of preexisting data.  *Key Publ'ns.*, 945 F.2d at 512.  Each average is *derived from* a set of preexisting facts, but not *composed of* those facts.  *See* Grimmelman, 14 Vand. J. Ent. & Tech. L. at 862 n.71.  Indeed, though Plaintiff draws on the compilation cases to attempt to shed light on the required threshold of creativity and originality that goes into its computation of a given national average, it never actually proffers a theory of

---

[12] Confusion on this point appears to have originated on the basis of a Ninth Circuit case, *CDN Inc. v. Kapes*, 197 F.3d 1256 (9th Cir. 1999), that has received some criticism.  That case concerned whether individual entries in a price guide for collectable coins were "sufficiently original as compilations to sustain a copyright."  *Id.* at 1259.  As Professor Grimmelmann forcibly argues, "[d]octrinally and taxonomically, the court is confused: the prices may be original, and they may be elements of a compilation, but they are not themselves compilations, which are defined as the 'collection and assembling of preexisting materials.'  A rating may be derived from other materials, but unlike a compilation, it is not composed of them."  14 Vand. J. Ent. & Tech. L. at 862 n.71 (quoting 17 U.S.C. § 101).  And this Court's previous opinion can be construed, in at least one place, to have implied that the individual averages at issue here can be thought of as "compilations" in some sense.  *Banxcorp*, 723 F. Supp. 2d at 602 (stating that "[b]oth the final value and the arrangement are, in different ways, compilations.")  To clarify, though, it is actually only the arrangement of multiple average values that could be protectable as a compilation in the precise sense defined in 17 U.S.C. § 101.  To the extent that Plaintiff's selection of individual banks has an impact on the originality of an individual average — which could make the averages "compilation-like" in a less precise sense, and which involves a similar inquiry — the Court explained in the previous section why the averages are nonetheless not entitled to copyright protection.

how each *individual* average might be protectable as a compilation.  Plus, as Defendants point

out, "Banxquote has not obtained a copyright registration for a list of banks and products, nor

has it established that Defendants had access to or copied such a list."  (Defs.' Reply 8.)  Thus,

whether Plaintiff's actual list of input banks is protectable as a compilation is not at issue.

Instead, in its Reply brief, Plaintiff notes that Defendants' taking of "final values . . .

from January 12, 2004 through December 31, 2008" infringes its copyright in the entire series of

weekly averages, which it claims is protectable as a compilation.  (Pl.'s Reply 2.)  Plaintiff goes

so far as to say that "because the Banxquote compilations were copyright-protected, it is not

necessary to also establish that the underlying individual estimated Banxquote indices or

averages were copyrightable."  (Pl.'s Reply 3.)

Plaintiff's confidence is misplaced.  Plaintiff's arrangement of its averages in tables

listing each week's average after the previous one does not "meet[] the constitutional minimum

for copyright protection" because it does not "feature[] an original selection or arrangement."

*Feist*, 499 U.S. at 345, 350.  Rather, Plaintiff's selection of raw data — its own weekly averages

— and Plaintiff's arrangement of the data in tables — chronologically by week — are the

numeric equivalent of the plaintiff's selection of address entries for its white pages in *Feist*:

there is no creativity at all.  In fact, as the Second Circuit noted in *Key Publications*, the

arrangement of weekly averages is exactly the kind of arrangement that is *not* original enough to

be copyrighted, as "[a]rrangement 'refers to the ordering or grouping of data into lists or

categories that go beyond the mere mechanical grouping of data as such, for example, the

alphabetical, chronological, or sequential listings of data.'"  945 F.2d at 513 (quoting Copyright

Office, *Guidelines for Registration of Fact-Based Compilations* 1 (Rev. Oct. 11, 1989)).  But

Plaintiff has done just exactly what the Second Circuit said did not merit copyright protection;

38

Plaintiff's tables do not go beyond mere "chronological" or "sequential" listings of factual material.

Moreover, unlike the defendants in *Key Publications*, *Feist*, and *Maclean Hunter*, Defendants here are not competitors of Plaintiff's that have lifted wholesale entire portions of Plaintiff's compilation. *See Key Publ'ns.*, 945 F.2d at 511; *Feist*, 499 U.S. at 343; *Maclean Hunter*, 44 F.3d at 64. Rather, Defendants have selected relevant entries of Plaintiff's data to feature one or two numbers in a given advertisement. Thus, even if Plaintiff's tables of data were protectable in their arrangement, Defendants would not be liable for infringement, because they have not copied that arrangement.

Plaintiff's copyright registrations do not change this conclusion. The only works that Plaintiff even attempted to register are twenty quarterly tables of averages, each as its own compilation. *See supra* Section I.B.2. Defendants question the validity of the registrations in the first place, (Defs.' Mem. 11), but, even assuming the registrations are valid, the result is unchanged. The "Copyright Office's examination of copyright applications is necessarily limited," and so a registration does nothing more than create a rebuttable evidentiary presumption of a copyright. *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 166 (2d Cir. 2003) (internal quotation marks omitted); *see also* 3 Nimmer on Copyright § 12.11(a)(3) ("Once the Register of Copyrights has issued a certificate, although certain prima facie presumptions are thereby created, the courts are free to examine the underlying facts and to rebut those presumptions, should the facts so warrant."). Here, Defendants have rebutted that presumption and have shown that they did not copy Plaintiff's arrangement of data in any event.

6. The Merger Doctrine Also Precludes Copyright Protection

In its previous opinion, the Court noted that courts in the Second Circuit have decided similar cases under the merger doctrine, which holds that "'expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself.'"  *Banxcorp*, 723 F. Supp. 2d at 608 (quoting *N.Y. Merc.*, 497 F.3d at 116–17).  But the Court determined that it was not appropriate to address that issue in the context of a motion to dismiss, because the nature of the inquiry "argues in favor of allowing parties to present evidence on this issue."  *Id.* (citing *N.Y. Merc.*, 497 F.3d at 116–17).  Now that the evidence is in, the Court holds that the merger doctrine does indeed bar protection of Plaintiff's averages, even if they were to be considered "expressions" that have some other hallmarks of copyrightability.

a. The Merger Doctrine as Applied to Numbers

The merger doctrine originates with the proposition that "ideas cannot be copyrighted. Instead, only the manner of an idea's expression is copyrightable."  *N.Y. Merc.*, 497 F.3d at 116 (internal quotation, citation, and brackets omitted).  The works at issue in *New York Mercantile*, like the works here, were economic indicators expressed in numerical form.  *See id.* at 110–11. Ultimately, after issuing the previously discussed dicta regarding the copyrightability of facts, the *New York Mercantile* court decided the case on the grounds that protection for the plaintiff exchange's settlement prices was prohibited by the merger doctrine.  *See* 497 F.3d at 117.

In so doing, the Second Circuit held that "[t]o survive summary judgment, . . . [the party seeking copyright protection] must demonstrate that the range of possible settlement prices [wa]s broad enough that any possible expression will not 'necessarily be substantially similar.'"  *Id.* (quoting *Hart v. Dan Chase Taxidermy Supply Co.*, 86 F.3d 320, 322 (2d Cir. 1996)) (internal

40

quotation marks omitted); *see also RBC Nice Bearings*, 676 F. Supp. 2d at 23 (requiring "a range of possible variations" in the final value).  The first task in the merger inquiry is to "identify[] the 'idea' that might be merging with its expression."  *N.Y. Merc.*, 497 F.3d at 117.  Next, courts "look at the range of possible expressions and consider whether all possible expressions are so 'substantially similar' that granting the copyright would bar others from expressing the underlying idea."  *Id.*  There is no precise limit on the number of possible expressions that would trigger the merger doctrine, but instead "[t]he appropriate inquiry focuses . . . on the effect of granting copyright protection; [courts] ask whether protection of expression would inevitably accord protection to an idea."  *Id.* at 117 n.9 (internal quotation marks omitted).

In applying this rule, the Second Circuit instructed that courts should "exercise considerable care in analyzing merger," and the *New York Mercantile* court held the merger doctrine was satisfied there because "any settlement price for a particular futures contract would be determined based on the same underlying market facts, [and] any dissension would be exceptionally narrow."  *Id.* at 116–17 (internal quotation marks omitted)).  Finally, the Second Circuit explicitly held that policy considerations weighed in favor of applying the merger doctrine to bar copyright protection, notably because the plaintiff exchange already had an incentive to produce the settlement prices so that it could carry out its primary business function: after all, to "establish a functioning commodities market, [the plaintiff exchange] must have a price at which to settle open positions."  *Id.* at 118.

The court in *RBC Nice Bearings* reached the same conclusion as applied to the facts there.  *See* 676 F. Supp. 2d at 23.  The court first noted that "it cannot be disputed that all possible expressions take the form of a number," and so it stated that the "question then becomes whether the range of possible load ratings for a particular bearing 'is broad enough that any

41

possible expression will not necessarily be substantially similar.'" *Id.* (quoting *N.Y. Merc.*, 497 F.3d at 117). The court held that the plaintiffs there had "not met their burden of demonstrating a range of possible variations in the load ratings for a particular bearing that would preclude application of the merger doctrine." *Id.* That is, plaintiff's mere assertion that the ratings were the product of some amount of "creativity" was not enough to survive a motion for summary judgment "absent illustrative or demonstrative facts" to that effect. *Id.*

   b. Application here

   Following *New York Mercantile* and *RBC Nice Bearings*, the Court holds that, even assuming the averages are expressions and not facts, the merger doctrine renders them unprotectable. This conclusion follows easily if the "idea" that Plaintiff is attempting to protect is described as the representation of the "average interest rate for CDs with a certain minimum value, as computed from the particular banks that comprise Plaintiff's input." For then there is one and only expression: 3.95% on December 21, 2005, say. (Decl. of Michael Kiernan, Ex. C, at COB0000194.) Surely the merger doctrine applies to bar copyright of the expression if the particular selection of banks is already baked into the idea itself, for the simplicity and objectivity of the computation makes one and only one number the sole possible expression. *See Yurman Design*, 262 F.3d at 111 ("[I]f there is just one way to express an idea, the idea and expression are said to merge.").

   But if Plaintiff's idea is described at a higher level of generality — if the idea is *any* representation of "the national average interest rate for CDs with a certain minimum value" — then it is a harder case. It is undisputed that there is some variation in the possible expression of this idea. For instance, the much-discussed average five-year CD rate on August 20, 2008 was reported as "3.51%" by Bankrate; "3.54%" by Informa; and "4.10%" percent by Banxquote.

(Lipkis Decl. Ex. 77, at  COB0014998.)

But it is hard to know what to make of this difference, which is among the largest in the record — .59 percentage points between Banxquote and Bankrate, or 14.4% percent of Banxquote's quoted rate — because the Parties provide very little context for it.  Plaintiff, for its part, does not tell the Court whether this spread was representative of a typical spread between the companies or whether it was anomalously low or high, though there is some evidence in the record that Banxquote's rates were usually lower than those of its competitors, and that the various published rates were more often within .14 to .30 percentage points than the .59 percentage seen in the specific example from August 20, 2008.  (*See* Bermudez-Cisneros Decl. Ex. C, at 7 (discussing spreads between Banxquote and Bankrate data of between .14 and .30 percentage points for a certain national average, and noting that [REDACTED]).)  Defendants' discussion of the legal relevance of the differences in reported data, by contrast, simply begs the question.  "[A]ny differences between competitors' national averages and the BanxQuote national averages do not render the BanxQuote averages copyrightable," they contend, "since the competitors may have different ideas regarding how to calculate a national average."  (Defs.' Mem. 25.)  That is correct but unhelpful, because the very question is whether competitors' modestly different ideas about the relevant inputs for a "national average bank rate" creates enough variation in possible expression such that the merger doctrine would not apply.

Ultimately, the range of expression is not wide enough such that, if considered expressions, Plaintiff's averages would be distinct enough from their idea to prevent application of the merger doctrine as it is described in *New York Mercantile*.  The key to the application of merger in *New York Mercantile* was that "any settlement price for a particular futures contract would be determined based on the same underlying market facts, [and] any dissension would be

exceptionally narrow."  497 F.3d at 118 (internal quotation marks omitted)).  Though the record in *New York Mercantile* did not contain particular possible ranges, the court noted that the record there demonstrated that, at times, "[c]ommittee members [of plaintiff exchange] have disagreed on the exact settlement price."  *Id.*

Here, too, there is a range of possible values that a given national average rate can take, and, viewing the record here in the light most favorable to Plaintiff, the ranges can vary by as much as .59 percentage points, though they seem typically to vary less than that.  But the crucial point is that their *expressive* variation is very low, even negligible, because the purpose of computing and publishing a national average rate is to give the consumer or the customer insight into the fact of what is going on in a national market.  The goal is create a "benchmark," in Plaintiff's own parlance; the goal is not necessarily to report a comprehensive national rate that is scientifically accurate to many decimal places and representative of the rate charged by every single bank in the United States.  Thus, if the evidence showed that rates could vary wildly — that one provider could quote a very low rate and another one that is quite high — or if the evidence showed that different providers could show rates moving in entirely different directions — that one provider's quarterly table would reveal bank rates going up, and the other's table would reveal that bank rates were going down — then that might be a different story.  But there is no evidence of either of those phenomena in this record.  Instead, because any reasonably accurate, trustworthy national average bank rate statistic "would be determined based on the same underlying market facts," *New York Mercantile*, 497 F.3d at 118 — namely, the actual, easily measurable rates being charged by various financial institutional around the country — no such wide variation seems possible.  Accordingly, the merger doctrine would bar copyright protection here even if the averages were considered expressions and not facts.

44

### 7. The Averages Are Uncopyrightable Short Phrases

As a final alternative to denying copyright protection, the Court could hold that the national average rates are unprotectable as "analogous to short phrases or the titles of works." *Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 285 (3d Cir. 2004) (en banc).  This alternative ground was also offered by Judge Koeltl in the district court opinion in *New York Mercantile* as an additional reason to deny copyright protection to the settlement prices, and indeed the United States filed an *amicus* brief in the Second Circuit agreeing with that theory, but the Second Circuit did not reach that aspect of the district court's reasoning in its decision affirming Judge Koeltl.  *See N.Y. Merc.*, 497 F.3d at 113, 118.  Nonetheless, Judge Koeltl's reasoning is persuasive, and the arguments there about individual numbers being too short to be entitled to copyright protection is equally applicable here.

As Judge Koeltl noted, "[t]he Copyright Office's long-standing practice is to deny copyright protection to words and short phrases, and courts have found that the policies and interpretation of the Office are entitled to deference."  *N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.* ("*N.Y. Merc. D. Ct.*"), 389 F. Supp. 2d 527, 543 (S.D.N.Y. 2005). He cited two circuit cases that have expressly denied copyright protection to numbers.  *See id.* (citing *ATC Distrib. Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 709–10 (6th Cir. 2005) (holding that transmission part numbers that could vary from five to nine digits were too short to merit copyright protection); *Southco*, 390 F.3d at 286–87 (holding that nine-digit part numbers which could be mechanically generated by a specific numbering process were too short to merit copyright protection)).

The principle embodied in those cases applies with equal force here.  As Judge Koeltl perceptively observed, if a "price in dollars constituted copyrightable subject matter, public

conduct would be limited, regardless of the use of the price and regardless of the context." *N.Y. Merc. D. Ct.*, 389 F. Supp. 2d at 544.  That is because "[a]lthough the fair use doctrine might be used to protect users who had used the copyrighted price, it would be highly inefficient to litigate over the use of the price." *Id.*  Indeed, if courts begin to grant copyright protection to very short strings of numbers, like the percentages here, then that could well "threaten some of the most flourishing areas of recombinant culture — software programming, collage art, the cutting and pasting of snippets which is a wonder of digitization, criticism which requires significant quotation from the target of criticism — whether by a Ph.D. candidate or a blogger."  Justin Hughes, *Size Matters (or Should) in Copyright Law*, 74 Fordham L. Rev. 575, 636 (2005).  And the short works doctrine might even have the additional benefit of being particularly easy to apply in a case like this, because, according to the Government's *amicus brief* in the *New York Mercantile* appeal, "[c]opyright protection does not extend to short phrases, no matter how much creativity is expended in creating them, because they are understood not to include a 'substantial amount of original text.'"  Brief Amicus Curiae of the United States of America in *N. Y. Mercantile Exchange, Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109 (2d Cir. 2007), unpaginated, *available at* 2006 WL 5516201 (quoting U.S. Copyright Office Circular No. 46).

However, because the Second Circuit has never discussed the short phrases doctrine in this context, and because the Second Circuit has not officially adopted the Government's position that short works like those here are uncopyrightable regardless of the amount of creativity expended to create them, the Court is reluctant to rely expressly on this doctrine. Restraint is especially appropriate here, because the Court is able to dispose of this case on several alternative theories.

C. State-law Contract Claim

1. Jurisdiction

The remaining claim in this case is a state-law breach-of-contract claim against only the

three Capital One entities.  Before argument, the Court issued an Order bringing to the Parties'

attention that, were the copyright claim to be dismissed, there may not be original diversity

jurisdiction over the contract claim because the Parties are in fact not completely diverse from

one another.  (*See* Dkt. No. 116.)  In response, Plaintiff proposed dropping Defendant Capital

One Financial Corporation, a Delaware corporation, because it was not an "indispensable" party

under the Federal Rules of Civil Procedure.  (Dkt. No. 118 at 2 (quoting *CP Solutions PTE, Ltd.*

*v. Gen. Electric Co.*, 553 F.3d 156, 159 (2d Cir. 2009) (per curiam) ("Federal Rule of Civil

Procedure 21 allows a court to drop a nondiverse party at any time to preserve diversity

jurisdiction, provided the nondiverse party is not 'indispensable' under Rule 19(b)." (internal

citation omitted))).)  The remaining two Capital One Defendants, Capital Bank (USA), N.A., and

Capital One, N.A., are both national banks with main offices located in Virginia.  (*See* DSUF

¶¶ 2, 3.)  For purposes of diversity jurisdiction, these two entities are considered citizens only of

Virginia, *see Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006), and thus there would be

complete diversity for this claim if Capital One Financial Corporation were dismissed.

Defendants, in their letter, do not dispute that Capital One Financial is not an

indispensable party.  (Dkt. No. 120 at 1.)  But they do claim that there would not be diversity

jurisdiction anyway because the amount in controversy is not at least $75,000.  The Court has

determined, however, that Plaintiff has met this threshold.

"[I]n order for there to be diversity jurisdiction, the amount in controversy must exceed

$75,000, exclusive of interest and costs." *Fierro v. Gallucci*, No. 06-CV-5189, 2010 WL

1223122, at *5 (E.D.N.Y. Mar. 24, 2010) (citing 28 U.S.C. § 1332(a)).  In general, the burden is

on a plaintiff to establish jurisdiction, but "[t]his burden is hardly onerous" because there is "a

rebuttable presumption that the face of the complaint is a good faith representation of the actual

amount in controversy." *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397

(2d Cir. 2003) (internal quotation marks omitted).  For a defendant to overcome this

presumption, "'[i]t must appear to a legal certainty that the claim is really for less than the

jurisdictional amount to justify dismissal.'"  *Ocean Ships, Inc. v. Stiles*, 315 F.3d 111, 115 (2d

Cir. 2002) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938));

*see also Chase Manhattan Bank, N.A. v. Am. Nat'l Bank & Trust Co. of Chi.*, 93 F.3d 1064, 1070

(2d Cir. 1996) ("[T]he legal impossibility of recovery must be so certain as virtually to negate

the plaintiff's good faith in asserting the claim." (internal quotation marks and alteration

omitted)).

On the face of the Complaint, Plaintiff requested damages on the contract claim that

include "any profits of Defendant Capital One, together with pre-judgment and post judgment

interest, the costs and disbursements of this action, and all other and further relief the Court

deems just and proper."  (SAC ¶ 151.)   Later in the Complaint, in the prayer for relief, Plaintiff

requested "[c]ompensatory, incidental, consequential, statutory and punitive damages in a sum to

be determined at trial on each Count."  (SAC at 42.)

Though Plaintiff has not alleged any particular amount of damages, Defendants have not

shown to a *legal certainty* that Plaintiff would not entitled to contract damages in excess of

$75,000.  To be sure, Defendant may well be correct that some classes damages Plaintiff has

requested on this claim, such as Plaintiff's request for Defendants' profits, are unavailable to

Plaintiff as a matter of New York contract law.  *See Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F.

48

Supp. 2d 250, 269 (S.D.N.Y. 2005) ("Disgorgement of profits is not an appropriate remedy for a breach of contract.").[13]   But that does not mean that it is legally impossible for Plaintiff to recover $75,000 or more in standard-issue expectation damages.

Plaintiff has proffered that it would be entitled as damages to the value of what Costo would have paid for a yearly license fee, and that these damages *could* be more than $75,000 in total for the five years at issue.   Defendants have countered that Plaintiff's annual license fee was $5,000 to $6,000 — except for one higher fee paid by the company Discover Bank that Defendants call an "outlier" — and therefore the damages on this claim would at most be $30,000.   (Dkt. No. 120 at 2; *see also* Dkt. No. 122 at 4 (in second supplemental submission, Defendants claim that Plaintiff's damages could be at most "the value of the license fee paid by Capital One, which was $6,000 per year").)   But, assuming *arguendo* this is a proper measure of damages, the existence of the Discover Bank outlier proves that Defendants cannot meet their burden:   A reasonable jury *could* value the damages closer to the "outlier" fee than the average fee — or the jury could incorporate the Discover Bank fee into its damages calculation, despite Defendants' unsupported assertion that no jury should do so — and so it is not *legally certain* that Plaintiff cannot recover at least $75,000.   *See Scherer*, 347 F.3d at 397 ("Even where the allegations leave grave doubt about the likelihood of a recovery of the requisite amount,

---

[13] In the Court's earlier opinion, the Court granted Defendants' Motion To Strike Plaintiff's request for punitive damages on the contract claim.   *See Banxcorp*, 723 F. Supp. 2d at 620 ("Plaintiffs cannot receive punitive damages on their state law claims.").   The Court notes, though, that Defendants have not moved to strike from the Complaint any other class of damages.   Thus, the Parties should not construe anything in this Opinion to be a binding determination of what measure of contract damages are legally available to Plaintiff.   The Court need not parse the potential damages so finely to determine the amount in controversy, so it has not done so.

dismissal is not warranted." (internal quotation marks and alteration omitted)).[14]

Even if that component of the amount in controversy alone would render the question close, though, a potential award of attorney's fees pursuant to the contract puts Plaintiff over the amount in controversy threshold.  "The Second Circuit has held that attorney's fees may be used to satisfy the amount in controversy . . . where they are recoverable as of right pursuant to statute or contract."  *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 166 F. Supp. 2d 740, 755 (E.D.N.Y. 2001); *see also Maxons Restorations, Inc. v. Newman*, 292 F. Supp. 2d 477, 482 (S.D.N.Y. 2003) (same).  Here, the contract provides that "[s]hould any action be brought to enforce this Agreement, the losing party shall pay . . . reasonable attorneys fees [*sic*] incurred by the prevailing party to enforce this agreement."  (Lipkis Decl. Ex. 1-A ("License Agreement") ¶ 10.)  Though the Court cannot say with certainty what Plaintiff's attorney's fees related to the contract claim would be, this has been a substantial and lengthy litigation, and attorney's fees on this claim almost surely would total in the tens of thousands of dollars at least.  When added to the potential contract damages, Plaintiff has met its burden to show that more than $75,000 is in controversy on this claim.

Of course, it almost goes without saying that none of the forgoing means that Plaintiff

---

[14] *Tongkook America, Inc. v. Shipton Sportswear Co.*, 14 F.3d 781 (2d Cir. 1994), does not support a contrary conclusion.  In *Tongkook*, the Second Circuit vacated the district court's judgment and dismissed for lack of jurisdiction where an *undisputed factual* discovery revealed after the plaintiff filed the complaint made clear that plaintiff's contract claim was worth less than $75,000 to a legal certainty from the moment the case was filed.  *Id.* at 786.  That case stands for the proposition that where a factual discovery reveals that "the amount claimed was *never* in controversy," then the amount-in-controversy minimum has not been met. *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999) (emphasis added).  But here, the amount in controversy remains in dispute, and *Tongkook* itself states that "[w]here the damages sought are uncertain, the doubt should be resolved in favor of the plaintiff's pleadings."  14 F.3d at 785.

will definitely recover more than $75,000 in damages if it prevails on the contract claim — far

from it.  Rather, the Court's determination stands for the much more modest claim that it is not

*legally certain* that the claim is worth less than $75,000, especially when the potential attorney's

fees are considered.  And that is enough to put Plaintiff over the amount-in-controversy

threshold.[15]

Thus, by consent, Defendant Capital One Corporation is dismissed with prejudice.[16]  That

allows the Court to exercise diversity jurisdiction over the contract claim.

### 2. The Beach of Contract Claim Is Not Preempted

First, without directly acknowledging the Court's holding in its earlier Opinion that the

contract claim was *not* preempted by the Copyright Act, Defendants contend now that

"Banxquote's claim for breach of contract is preempted."  (Defs.' Mem. 27.)  Defendants'

attempt to relitigate to this issue is barred by the law-of-the-case doctrine.  Under that doctrine, a

court, "[a]s a general matter . . . will adhere to its own decision at an earlier stage of the

litigation."  *United States v. Plugh*, 648 F.3d 118, 123 (2d Cir. 2011) (internal quotation marks

omitted); *see also Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277, 288 (2d Cir.

---

[15] Because the Court has determined that diversity jurisdiction is proper over this claim standing alone, the Court need not address Defendants' contentions that the doctrine of "complete preemption" gives the Court federal question jurisdiction or that the Court should exercise discretionary supplemental jurisdiction.  (*See* Dkt. No. 120 at 2–5.)  Likewise, the Court need not address the somewhat tricky question whether Plaintiff may include previously dismissed state claims in the amount-in-controversy calculation, since this case presents the unusual situation where diversity jurisdiction did not actually exist when those claims were dismissed because there was no complete diversity between the Parties.

[16] Defendants, in their first supplemental letter, requested that Capital One Financial Corporation be dismissed with prejudice, (*see* Dkt. No. 120), and Plaintiff did not object to a dismissal with prejudice, either at oral argument or in its second supplemental letter, (*see* Dkt. No. 123).  The Court construes this silence as Plaintiff's consent to Capital One Financial Corporation's dismissal with prejudice.

2011) (noting that "there is a strong presumption against amendment of prior orders").  The law-of-the-case doctrine is "subject to limited exceptions made for compelling reasons."  *Plugh*, 648 F.3d at 123 (internal quotation marks omitted).  In their opening memorandum of law, Defendants proffer no reason other than mere disagreement with the Court's ruling that the Court should reverse its earlier ruling.  (Defs.' Mem. 31–35.)  Their reply, however, cites an intervening Second Circuit case, (Defs.' Reply 26–27 (citing *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424 (2d Cir. 2012)), which raises the specter that the law of the case exception for an "intervening change in controlling law" might apply.  *Plugh*, 648 F.3d at 120.  In fact, though, *Forest Park* supports the Court's earlier determination that the contract claim is not preempted.

In *Forest Park*, the Second Circuit addressed "the extent to which the Copyright Act, 17 U.S.C. § 101 *et seq.*, preempts contract claims involving copyrightable property" — in other words, the question presented here.  *See* 638 F.3d at 427.  That case was brought by plaintiffs who contended that they had an implied-in-fact contract with a television studio according to which the studio would pay the plaintiffs if the studio produced a television series based on plaintiffs' idea, and the court held that the state law contract claim was not preempted.  In applying the so-called "equivalency requirement" of copyright preemption — the doctrine that a state law claim is preempted if, among other requirements, it vindicates a "'legal or equitable right[ ] that [is] equivalent to any of the exclusive rights within the general scope of copyright,'" *id.* at 430 (quoting 17 U.S.C. § 301(a)) (brackets in original) — the *Forest Park* court noted that there "are several qualitative differences between such a contract claim and a copyright violation claim," *id.* at 431.  The Court described at least three differences:

> First, the Copyright Act does not provide an express right for the

> copyright owner to receive payment for the use of a work.  It simply gives the
> copyright owner the right to prevent distribution, copying, or the creation of
> derivative works (though, of course, the copyright owner may cede all [or] part of
> these rights for payment).  *See* 17 U.S.C. § 106.  Second, a plaintiff suing for
> failure to pay under a contract must prove extra elements beyond use or copying,
> including mutual assent and valid consideration.  Third, a breach of contract
> claim asserts rights only against the contractual counterparty, not the public at
> large.  As the Seventh Circuit explained in *ProCD* [*v. Zeidenberg*, 86 F.3d 1447
> (7th Cir. 1996)], "A copyright is a right against the world.  Contracts, by contrast,
> generally affect only their parties; strangers may do as they please, so contracts
> do not create 'exclusive rights.'" 86 F.3d at 1454.

*Id.*

All three of those differences between a breach-of-contract claim and a copyright claim

apply here.  Thus, the intervening decision in *Forest Park* cuts in favor of adhering to the

Court's earlier determination, not against it.  Indeed, while this Court earlier noted that "[c]ourts

in this district have continued to disagree as to how to analyze preemption of breach of contract

claims," *Banxcorp*, 723 F. Supp. 2d at 614–15 (collecting cases), the early returns from *Forest*

*Park* show that it has provided necessary clarity to this area:  Both of the district court opinions

from within the Second Circuit to have cited *Forest Park* in addressing the question have held

that the contract claims under consideration were not preempted.  *See Paramount Pictures Corp.*

*v. Puzo*, No. 12-CV-1268, 2012 WL 4465574, at *7 (S.D.N.Y. Sept. 26, 2012); *Bill Diodato*

*Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *8 (S.D.N.Y.

Sept. 21, 2012); *cf. Muller v. Anderson*, 501 F. App'x 81, 84 (2d Cir. 2012) (summary order)

(noting that "[b]ecause [plaintiff] has properly alleged that defendants violated an

implied-in-fact contract by using his ideas without remuneration, his breach of implied contract

claim is arguably not preempted," but affirming the district court's judgment in favor of the

defendants on an alternative ground).  This Court too follows that course, and reaffirms its prior

53

conclusion that the breach-of-contract claim is not preempted.[17]

### 3. The Merits

On the merits of the breach-of-contract claim, the Court finds that granting summary judgment is inappropriate for either Party on this claim.  The relevant contractual language is ambiguous, and there is a genuine dispute of material fact regarding whether Defendants breached the contract.

#### a. Governing Law

The License Agreement at issue is governed by New York Law.  (License Agreement ¶ 10.)  Under New York contract law, "'the intention of the parties should control, and the best evidence of intent is the contract itself.'"  *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (quoting *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010)).  "In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous."  *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).  Deciding whether a contract is ambiguous is a question of law for a court to decide, and ambiguity "'is determined by looking within the four corners of the document, not to outside sources.'"  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting

---

[17] In a supplemental brief on jurisdictional issues filed one week before oral argument, Defendants for the first time ask the Court to assume jurisdiction over the state-law claim and then dismiss it based on the "complete preemption" doctrine, according to which the "preemptive force of federal law is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule."  *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 304 (2d Cir. 2004) (internal quotation marks omitted) (cited at Defs.' Letter of Sept. 10, 2013 at 2).  But even if Defendants are correct that the Court could assume original jurisdiction on this basis — in addition to diversity jurisdiction — the conclusion that the claim should then immediately be dismissed because "Banxquote's claim for breach is coextensive with its alleged copyright violation," (Dkt. No. 120 at 3), does not follow.  Rather, that is a rehash of its substantive argument on preemption, which the Court rejects for the reasons already explained.

*Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)).

A court is to give all words and phrases their plain meaning, and it should interpret words and phrases not in isolation but "in light of the parties' intent as manifested by the contract as a whole." *Gary Friedrich*, 716 F.3d at 313. Contractual language is "unambiguous only if it 'has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Id.* (quoting *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 461 (2d Cir. 1994)). By contrast, "if the terms 'suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement,' then the agreement is ambiguous and extrinsic evidence may be considered to determine the parties' intent." *Id.* at 313–14 (quoting *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)). The examination of extrinsic evidence to give meaning to an ambiguous term is of course subject to the framework of Rule 56, according to which the factual record is construed in the light most favorable to the non-moving party, and with all inferences drawn in the non-moving parties' favor. *See id.* at 308. In sum, because "'resolution of the ambiguity is a question for the trier of fact,'" under New York law, "contract claims are generally not subject to summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase." *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (quoting *State v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985) (per curiam)).

### b. The Contract Is Ambiguous

The first question is whether the contract either unambiguously provides for or unambiguously prohibits "Capital One's use [of the data] in co-branded marketing materials

distributed to Costco members." (Defs.' Mem. 31.) The answer is it does not; the contract is ambiguous on this score. The scope of Defendants' license to reproduce Plaintiff's averages is described by three different provisions in the operative License Agreement, and a fair reading of the plain meaning of the provisions could support either side's interpretation.

First, in a series of boxes at the top of the agreement, the Agreement contains various important details, such as the physical address of "Capital One" — identified as "Company" for purposes of the Agreement — what series of Plaintiff's data Defendants are entitled to use, the annual license fee, the commencement date, and the payment method. There is also a box captioned "Banxquote Licensing Service," and in the box, the Agreement states: "Licensed Data to be retrieved by the Company from the BanxQuote website at http://www.banxquote.com for use in direct mail, print advertisements, newspaper advertisements, Company website, and marketing presentations." (License Agreement 1.) The Court will refer to this latter list of ways in which Defendants may use Plaintiff's data as the "boxed provision."

Second, in the preamble, in a non-numbered paragraph directly under the bold heading "Terms of Conditions," the contract says: "Company is hereby contracting with BanxCorp ('Banxquote') for the display and dissemination of Banxquote's proprietary market data and indices, to be provided by Banxquote as indicated above. Subject to the Terms and conditions of this Agreement, BanxQuote hereby grants Company a non-exclusive, limited, and non-transferable license to electronically disseminate the BanxQuote Data on the Company's Web site." (*Id.*) The Court will refer to this as the "preamble."

Third, Paragraph One states: "Company agrees and understands that it is not permitted to sublicense, transfer, or assign its rights hereunder and that it shall not permit the redistribution of the BanxQuote Data by any other third party without the express prior authorization of

BanxQuote pursuant to a separate agreement or by mutually agreeable amendment executed and

attached hereto.  Except as otherwise specifically provided herein, this Agreement shall not

transfer to Company any right to, or interest in, the BanxQuote Data, or in any related trademark,

service mark or proprietary rights of BanxQuote."  The Court will refer to this as "Paragraph

One."  (*Id.* at ¶ 1.)

      The first thing to notice about these provisions is that, on their face, the boxed provision

and the preamble are contradictory.  The boxed provision allows for Capital One to use the data

in "direct mail, print advertisements, newspaper advertisements, Company website, and

marketing presentations."  But the preamble states the Agreement grants Capital One a

"non-exclusive, limited, and non-transferable license to electronically disseminate the

BanxQuote Data on the Company's Web site," with no mention of any other potential marketing

channels.  So which governs?

      On this question, the answer is clear:  The boxed provision trumps, because the Court

must construe the contract "in light of the parties' intent as manifested by the contract as a

whole."  *Gary Friedrich*, 716 F.3d at 313.  Here, the four corners of the document reveal the

clear intent for the Agreement to cover Capital One's use of Plaintiff's data in the marketing

materials in the boxed provisions, not just the website, as stated in the preamble.  First, the boxed

provision is clearly more "customizable" — it is in the boxes at the top where the signatures of

both Parties appear, for instance — and so any reader of the contract would assume that the

Parties paid much more attention to the language there than the language in what appears to be a

standard contract for the remainder.  Second, Paragraph Nine states that "Company agrees a) to

include the name 'Banxquote.com' on *all materials* which show Banxquote data . . . ."  (License

Agreement ¶ 9 (emphasis added).)  But to what "materials" does Paragraph Nine refer if the

contract is limited only to advertisements on Capital One's website?  The only reading that makes sense of the contract as a whole therefore demands that these "materials" should indeed include all of the materials listed in the boxed provision.

But though that apparent ambiguity is resolvable, the boxed provision itself is ambiguous regarding whether Defendants were authorized to use Plaintiff's data in co-branded marketing materials.  Consider the phrase "Company website" in the boxed provision.  It is perfectly possible that this could mean that Capital One could use the data on *any* website that, say, is funded and operated day-to-day by Capital One, regardless if there are any co-branded or alternative branding materials on it.  Or the authorization could be more restrictive, referring to the primary Capital One website only — the one users access via www.capitalone.com, or a similar address.  So too with "print advertisements" and the other phrases.  It is not clear whether the Agreement grants "Company" — i.e., Capital One — the right to use Plaintiff's data in "print advertisements" designed or financed in part by subsidiaries, partners, parent companies, affiliates, or any other entity that is not Capital One proper.

Paragraph One does nothing to clarify the ambiguity.  That provision prevents the "Company" from "permit[ting] the redistribution of the BanxQuote Data by any other third party."  Its plain language does not broaden or narrow the License Agreement either way, because "third party" is not defined.  Further, any *prohibition* on further distribution cannot *broaden* the express rights granted in the boxed provision discussed earlier.  In other words, whether Paragraph One bars the data's redistribution through what Defendants refer to as their Costco "marketing channel" does not alter whether the boxed provision authorizes Capital One to display the data on a co-branded website.  If the latter action was never authorized in the first place, then whether Paragraph One also bars that conduct is irrelevant.

Thus, the Court finds that the scope of the License Agreement is ambiguous on the question whether the License Agreement authorizes Capital One to use Plaintiff's data in co-branded marketing materials.

### c. There Is No Extrinsic Evidence That Determines This Question

"Given [this Court's] conclusion that the . . . license agreement is ambiguous, [the Court] look[s] next to the record to determine whether any relevant extrinsic evidence is so one-sided in [the moving party's] favor as to allow [the moving party's] interpretation to prevail on summary judgment." *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). Despite the fact that Costco and Capital One began negotiations regarding their marketing partnership prior to Capital One's contract with Plaintiff, (DSUF ¶ 22), they have pointed to no evidence that they mentioned or contemplated this issue at the time of contracting. The sole relevant piece of extrinsic evidence from the time of contracting submitted by Defendants to aid the Court's interpretation of the agreement is evidence that the boxed provision was added specifically at Capital One's request, and Plaintiff does not dispute this. (DSUF ¶ 114.) This evidence provides further support that the broader scope of the Agreement in the boxed provision should trump the narrower scope in the preamble, but it does nothing to resolve the ambiguity regarding whether the authorized uses in the boxed provision include co-branded marketing agreements.

By contrast, Mehl testified that his understanding was that "[i]t didn't matter to us on what medium Capital One would use [the data], except that they would just use it for their own product on their own website." (Lipkis Ex. 6 at 246.) While the Court accepts that this was his understanding, Mehl did not testify that the Parties discussed this issue and that Capital One expressly assured him that the contract would prohibit Capital One from using the data through co-branded marketing channels, including a co-branded website. This evidence is not so one-

sided that it demands the Court adopt Plaintiff's interpretation of the ambiguity.  *See Topps*, 526 F.3d 63 at 68.

### d. A Reasonable Jury Could Find In Either Party's Favor On The Question of Breach

In their briefs, the Parties have not separated the question of whether Capital One breached the contract from the interpretation of the contract itself.  The questions are related — the contract's interpretation will go a long way to determining whether there was a breach — but it is worth briefly noting the facts that would support a decision on breach either way.  This further shows that summary judgment is inappropriate.

In particular, a reasonable jury could find that Capital One breached the contract by using Plaintiff's data on a co-branded website, though such a conclusion is not compelled by the evidence.  Defendants note that "Capital One developed, hosted and maintained at its own cost a website dedicated to the deposit products that were marketed to Costco members."  (DSUF ¶ 39.)  Defendants also state that, while "Costco approved the initial co-branded website, Capital One could modify it without Costco's approval."  (Defs.' Resp. to PSUF ¶ 89.)  Moreover, "[t]he only published Internet link to the co-branded Costco/Capital One website appears when a user visits costco.com and clicks services."  (PSUF ¶ 97.)  From there, a user's click on the "High Yield Service Accounts" link "opens a new browsing window displaying the co-branded website, and a co-branded header appears in a frame on all pages within the co-branded website."  (*Id.*)  In fact, the entire marketing arrangement was expressly designated as "partnership" arrangement, as opposed to "Business As Usual."  (DSUF ¶ 9.)

There is thus evidence that points in either direction regarding whether Capital One's use of Plaintiff's data on this co-branded website went beyond the license granting Capital One the right to use the data on the "Company website."  Construing the evidence in Plaintiff's favor for

purposes of Defendants' summary judgment motion, the following facts could lead a reasonable jury to find that Capital One breached the Agreement: 1) Costco had to approve the website before it went online; 2) The website was not accessible through traditional company marketing channels; 3) The website had a co-branded header on every page; and 4) Capital One internally designated the arrangement as a partnership and *not* "Business As Usual."  Indeed, Defendants themselves describe "a website dedicated to the deposit products that were marketed to Costco members."  (DSUF ¶ 39.)  But that sounds like a description of an entirely separate website — one that is not part of the "Company website."

On the other hand, construing the evidence in Defendants' favor for purposes of Plaintiff's summary judgment motion, the following facts could lead a reasonable jury to find that Capital One did not breach the Agreement: 1) Capital One paid the entire cost of hosting and maintaining the website; 2) Capital One could modify the website without approval from Capital One; and 3) The agreement was described as a marketing partnership, not a joint venture or anything that conveys a legal identity that is definitively separate from Capital One.

Thus, a reasonable factfinder could take the facts produced by the Parties and find in favor of either party on the question whether the creation of the co-branded website breached the terms of the Agreement.  Summary judgment is therefore inappropriate for either party.

D. Plaintiff's Rule 56(c)(2) Objections and Application for Sanctions

Finally, Plaintiff has moved to exclude the expert report, deposition testimony, and declaration of Defendants' expert Bruce Webster, as well as the declarations and accompanying exhibits of Defendants' witnesses Bermudez-Cisneros, Haigh, Kiernan, and Wiederhorn.  (Pl.'s 56(c)(2) Mem. 2, 8.)  Plaintiff objects to the Court's consideration of these materials under Federal Rule of Civil Procedure 56(c)(2), which states that "[a] party may object that the

material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  Plaintiff also contends that Defendants' conduct surrounding the production of certain exhibits accompanying the Bermudez-Cisneros, Kiernan, and Widerhorn declarations is sanctionable under Rules 16 and 37 of the Federal Rules of Civil Procedure.  (Pl.'s 56(c)(2) Mem. 7.)  Plaintiffs' requests are denied.[18]

### 1. Expert Report and Other Materials of Bruce Webster

Plaintiff states that it "objects to the admissibility of Webster's Declaration, expert report, and testimony as they are utterly biased, flawed, and inadmissible."  (Pl.'s 56(c)(2) Mem. 7.)  Then, in a legal memorandum that exceeds the page limit provided by this Court's individual rules, Plaintiff lists ten "fallacies" in the expert report and the testimony.  But Plaintiff fundamentally misunderstands the relevant legal standard: Plaintiff's mere disagreement with the conclusions of an opposing expert is not sufficient grounds for exclusion of his testimony.

In considering a summary judgment motion, "the district court may rely on any material that would be admissible or usable at trial."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (internal quotation marks omitted).  Federal Rule of Evidence 702, which governs expert testimony like Webster's, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;

---

[18] At oral argument, Plaintiff did not address these issues even in a cursory fashion.  The Court, however, does not take Plaintiff's silence to constitute its formal withdrawal of these claims, and so the Court addresses them fully on the merits.

and

      (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In the Supreme Court's seminal decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court noted that "the inquiry envisioned by Rule 702 is . . . a flexible one." *Id.* at 594; *see also Floyd v. City of N.Y.*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) ("Generally, 'the rejection of expert testimony is the exception rather than the rule.'" (quoting Fed. R. Evid. 702 Adv. Comm. Notes (2000)).  Because the Rule's "overarching subject is the scientific validity — and thus the evidentiary relevance and reliability — of the principles that underlie a proposed submission," a district court's "focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95; *see also Major League Baseball*, 542 F.3d at 310–11 ("The *Daubert* principles apply not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." (internal quotation marks omitted)).

The first step in analyzing the admissibility of expert testimony is to investigate "whether the witness is qualified by knowledge, skill, experience, training, or education."  *United States v. Lesniewski*, No. 11-CR-1091, 2013 WL 3776235, at *8 (S.D.N.Y. July 12, 2013).  Webster's qualifications as a computer-science expert are unchallenged here, and the Court finds he is qualified as an expert.

Next, courts ask whether "a proffered opinion passes the required measure of scientific reliability."  *Id.*  Plaintiff objects at this prong on the ground that "Webster's expert reports and testimony are unreliable because they are not based on 'sufficient facts or data,'" (Pl.'s 56(c)(2) Mem. 10 (quoting Fed. R. Evid. 702)), but this contention is without support.  Indeed, most of the supposed "fallacies" in Webster's testimony do not even purport to reveal any flaw in

63

Webster's principles and methodology, nor on his reliance on sufficient facts or data.  For instance, fallacies two and three are respectively titled "'Misconstrued Functionality of 'bankupdate.asp,'" and "Misconstrued Functionality of 'Update' Button," referring to two pieces of Plaintiff's software that Webster examined.  (Pl.'s 56(c)(2) Mem. 11–14.)  But these are objections to Webster's "conclusions," not to his "methodology" — and thus Plaintiff has put forward exactly the type of argument the Supreme Court held irrelevant to admissibility in *Daubert*.  Instead, objections to an expert's conclusions go to the weight of the evidence, not its admissibility.  *See Cohalan v. Genie Indus., Inc.*, No. 10-CV-2415, 2013 WL 829150, at *5 (S.D.N.Y. Mar. 1, 2013) ("'Disputes as to the strength of [an expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony.'" (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

Other "fallacies" nominally couched in terms of methodology or reliability fare no better. For instance, Plaintiff contends that Webster's alleged "sole and disproportionate focus on BanxQuote's computer systems and programs appears to be misguided."  (Pl.'s 56(c)(2) Mem. 25.)  This is puzzling.  An expert in "computer systems and programs" is *supposed* to focus his expert testimony on, well . . . *computer systems and programs*.  Indeed, in the one prior case that Plaintiff brings to the Court's attention in which Webster's expert testimony was excluded, the testimony was excluded in part because the report "merely cite[d] deposition testimony" and did not "seek to explain complex technical issues."  *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002).  Perhaps Webster learned from that

experience, for he has limited his testimony and report to technical explanation here.[19]

Indeed, a comparison with that case is instructive.  In *LinkCo*, Judge Scheindlin excluded Webster's expert testimony because of the reason given above — that the report was not an attempt to explain complex technical issues — plus the additional reasons that testimony by fact witnesses would be more appropriate in many cases and that the report contained mostly legal "conclusions that are the exclusive province of the jury to decide."  *Id.*  But here, Webster has steered clear of those pitfalls.  His findings, as summarized in the introduction of his report, are based entirely on his analysis of Plaintiff's software code and its database of included banks.  (Webster Decl. Ex. A, at 1.)  And the body of the report confirms what is reported in the introduction: it is entirely based on an analysis of Plaintiff's underlying database and code, and at times the analysis veers into substantial technical detail.

Fundamentally, Plaintiff's objections go to the weight of Webster's report and other testimony.  But, as Defendants point out, Plaintiff has not offered its own software expert nor offered any evidence to contradict Webster's conclusions that the software computes little more than a mathematical average, and that the set of input banks was relatively stable over the relevant period of time.  (*See* Defs.' Mem. 13.)  The Court has found this evidence to have been reliably obtained, persuasive, and, as already explained, corroborated where possible.  Thus, Plaintiff's motion to exclude Webster's testimony, report, and declaration is denied.

---

[19] Plaintiff's attempt to rely on *LinkCo* also makes its argument internally contradictory. Plaintiff elsewhere states that "Webster's expert reports and testimony are unreliable because they are not based on 'sufficient facts or data,'" (Pl.'s 56(c)(2) Mem. 10 (quoting Fed. R. Evid. 702)).  But Plaintiff cannot have it both ways: either Webster should stick to just the facts and data, or he should go beyond them.  His method cannot be unreliable on both grounds.

2. The Bermudez-Cisneros, Haigh, Kiernan, and Wiederhorn Materials

Plaintiff also moves to preclude the Court from considering the declarations and accompanying exhibits of Defendants' witnesses Bermudez-Cisneros, Haigh, Kiernan, and Wiederhorn.  (Pl.'s 56(c)(2) Mem. 2, 8.)  Plaintiff contends that Defendants "failed to identify these witnesses and certain information in their Declarations as required by Rule 26(a) or (e)" of the Federal Rules of Civil Procedure.  But Plaintiff has not shown that Defendants violated these Rules, nor, even assuming a violation, that the remedy of sanctions or preclusion is appropriate.  In any event, much of the evidence is duplicative of other evidence, so, even assuming purely for the sake of argument that Defendants failed to comply with certain discovery obligations, any error would be harmless and not prejudicial to Plaintiff.

Rule 26 governs discovery generally, and it requires parties to make initial disclosures of "the name and, if known, the address and telephone number of each individual likely to have discoverable information — along with the subjects of that information — that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a).  Under Rule 26(e), a party must supplement or correct its initial Rule 26 disclosures "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  *See generally Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 67–68 (E.D.N.Y. 2012) (describing Rule 26).  But the obligation to supplement a Rule 26 initial disclosure is "only necessary when the omitted or after-acquired information has not otherwise been made known to the other parties during the discovery process."  8A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2049.1 (3d ed. 2010) (internal quotation marks omitted).  Thus, "there is no need as a matter of form to submit a supplemental disclosure to include

66

information already revealed by a witness in a deposition or otherwise through formal discovery." *Id.*; *see also Sealy v. Gruntal & Co.*, No. 94-CV-7948, 1998 WL 698257, at *2 (S.D.N.Y. Oct. 7, 1998) ("Since the identities of seven of these individuals were disclosed in deposition testimony, together with at least some information about their potential significance, plaintiff cannot demonstrate a clear-cut violation of [Rule 26] with respect to them."). The possible penalties for violating Rule 26 include sanctions, the authorization of additional depositions, and preclusion, though "[p]reclusion is a 'harsh remedy' that 'should only be imposed in rare situations.'" *Lujan*, 284 F.R.D. at 68 (quoting *Izzo v. ING Life Ins. & Annuity Co.*, 235 F.R.D. 177, 186 (E.D.N.Y. 2005)).

With regard to the witnesses themselves, Defendants provide compelling evidence that, even if these witnesses' names were not in the initial disclosures, Plaintiff had "had ample notice of the witnesses and categories of documents" but "elected not to pursue discovery." (Defs.' Sanctions Resp. 8; *see also id.* at 2–3 (citing particular documents where these witnesses were identified).). Plaintiff does not dispute this assertion, but instead states that it had "had no reason to engage in a fishing expedition and depose other employees of Defendants at random." (Pl.'s Reply 4.) This statement is non-responsive. Plaintiff had these witness's names and roles, and it could have easily deposed them if it chose to. And, if Plaintiff thinks something is missing from the record, it could ask to depose them now. That would be a more appropriate possible remedy than sanctions or preclusion, but Plaintiff has not made such a request. *See Sealy*, 1998 WL 698257, at *3 ("In any event, with respect to each of the eight witnesses, there are remedial measures far less drastic than preclusion that would protect plaintiff from any conceivable unfair prejudice. Specifically, plaintiff may be authorized to conduct depositions of each of these individuals, if she so chooses . . . .").

67

Plaintiff also contends that five exhibits attached to the respective declarations should be excluded because they were improperly withheld during the course of discovery.  (Pl.'s 56(c)(2) Mem. 4.).  Plaintiff faces a steep uphill battle on this point: "Because 'refusing to admit evidence that was not disclosed during discovery is a drastic remedy, courts will resort to preclusion only in those rare cases where a party's conduct represents *flagrant bad faith* and callous disregard of the Federal Rules of Civil Procedure.'"  *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 417 (S.D.N.Y. 2011) (quoting *Ward v. Nat'l Geographic Soc'y*, No. 99-CV-12385, 2002 WL 27777, at *1 (S.D.N.Y. Jan. 11, 2002) (emphasis in original)).  But Plaintiff has not alleged any bad faith — nor does Plaintiff even appear to be aware of this standard, as, remarkably, Plaintiff has not cited any caselaw in the particular sections of its two legal memoranda addressing this question.  (*See* Pl.'s 56(c)(2) Mem. 4–8; Pl.'s 56(c)(2) Reply 3–6.)  In any event, even assuming these documents were improperly excluded, they are mostly duplicative or similar to other evidence in the record.  Indeed, as Defendants make clear, Plaintiff relies extensively on supposedly inadmissible evidence in its own statement of undisputed material facts.  (Defs.' Sanctions Resp. 10.)  In such a circumstance, it is clear that any alleged error would be harmless.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, *unless the failure was substantially justified or is harmless*." (emphasis added)); *EMI Music Mktg. v. Avatar Records, Inc.*, 334 F. Supp. 2d 442, 445–46 (S.D.N.Y. 2004) (sanctions inappropriate where it was clear that one party who may not have "adhere[d] to the letter of the discovery rules" nonetheless did not subject the other party "to trial by ambush").

For those reasons, Plaintiff's request to exclude evidence and for sanctions is denied.

### III. Conclusion

For the reasons explained, Defendants' motion for summary judgment is granted on the copyright claim, and Plaintiff's cross-motion for summary judgment on that claim is denied. Both Parties' summary judgment motions are denied as to the contract claim, though, as mentioned, Defendant Capital One Financial Corporation has been dismissed from the case with prejudice to preserve diversity jurisdiction. Finally, Plaintiff's motion for sanctions and preclusion of evidence is also denied.

The Clerk is directed to terminate the pending motions, (Dkt. Nos. 87, 99).

SO ORDERED.

DATED:      White Plains, New York
            October ___, 2013

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE